**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| JORGE AVILA TORREZ, | : | |
| | : | |
| Movant, | : | Criminal No. 1:11-CR-00115-LO |
| | : | |
| v. | : | **CAPITAL § 2255 PROCEEDINGS** |
| | : | |
| JEFFREY KRUEGER, Warden, USP Terre Haute, UNITED STATES OF AMERICA | : | Hon. Liam O'Grady |
| | : | |
| Respondents. | : | |

**MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255**

KATHERINE THOMPSON
JOANNE HEISEY
SAMUEL J.B. ANGELL
Federal Community Defender Office
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone (215) 928-0520
katherine_thompson@fd.org
joanne_heisey@fd.org
samuel_angell@fd.org

JOAN C. ROBIN
VA Bar # 44502
421 King Street, Suite 505
Alexandria, VA 22314
Telephone (703) 349-1111
Facsimile (703) 349-1118
joni@jonirobinlaw.com

Counsel for Movant, Jorge Avila Torrez

Dated: XXXX, 2023

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**

Jorge Avila Torrez, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings, requests that this Court vacate the criminal judgment entered against him, grant him a new trial and/or vacate, set aside, or correct the sentence imposed.

## STATEMENT OF THE CASE
## AND PROCEDURAL HISTORY[1]

1.      On July 13, 2009, Amanda Snell was found dead in her room in a residential hall at Joint Base Myer-Henderson in Virginia. She was found in a closed wall locker with a pillowcase over her head. Tr. 4/01/11, 1319-20. Noting the absence of trauma, defense injuries, or sexual assault, the autopsy report listed the cause of death as "undetermined." Gov. Trl. Exh. 5B (autopsy report). During the investigation, military investigators recovered evidence from Snell's room, and conducted interviews and room searches of the individuals who lived in the same residential hall. Tr. 4/01/11, 1275; Tr. 4/02/14, 1589-90. Torrez, who lived down the hall, was included in that initial investigation. He consented to an interview, a search of his room, and to collection of a DNA sample. Gov. Trl. Exh. 10A (Interview Log, etc.).

2.      Seven months later, Torrez was arrested and charged with offenses stemming from incidents on February 10, 2010 and February 27, 2010, involving three women, M.N., J.T., and K.M., in Arlington, Virginia (the "Arlington offenses"). Gov. Exh. E7-A to E7-N. The charges included robbery, rape, and abduction with intent to defile, as well as other charges. Torrez was detained at the Arlington County Detention Center pending trial on the Arlington offenses. Because of his arrest on the Arlington offenses, the Government focused the investigation into Snell's death on Torrez. Among other things, they began testing DNA

---

[1] The specific factual allegations relevant to each of Torrez's claims for relief will be articulated within that claim below.

evidence found in Snell's room for comparison against Torrez's sample from the initial sweep. All samples tested at this point, including foreign DNA on the pillowcase over Snell's head, were inconclusive or excluded Torrez. Tr. 4/01/14, 1512–13. Although excluded from these samples, Torrez's DNA profile was placed into a national CODIS database, where it triggered a match for Y-profile DNA relating to a homicide investigation in Zion, Illinois, involving the May 2005 stabbing death of two young girls (the "Zion offenses"). *See* Dkt. No. 149, at 36–37. These offenses occurred when Torrez was a juvenile.

3.　　　　During this same month (July 2010), an Arlington City police officer assigned to Arlington County detention center was asked to assist in an internal investigation of Torrez. Tr. 4/02/14, 1790. This detective learned that Osama El-Atari, who was housed at the detention center awaiting trial on federal bank fraud charges, knew Torrez. The detective approached El-Atari, who agreed to cooperate against Torrez. *Id*. at 1790–92. After El-Atari agreed to record his conversations with Torrez, the Arlington detective arranged for El-Atari to be placed in a cell directly adjacent to Torrez. *Id*. at 1794.

4.　　　　Over the course of six days in August, 2010, El-Atari repeatedly engaged Torrez in conversation, encouraging Torrez to entertain him with "gruesome" stories. *Id.* at 1803. During these conversations, Torrez claimed responsibility for Snell's death, although he gave varying accounts of how he killed her. Torrez also claimed involvement in the Zion offenses. Torrez further claimed participation in numerous other homicides, telling El-Atari he killed twenty-three individuals in total, including ten or thirteen "confirmed kills" while in the Marines. Torrez described in detail an extended fight, ending in the murder of an individual named Christopher Hill. *See* A___ (Tr. 8/5/10 at 35); A___ (Tr. 8/10/10 at 24–53). Christopher Hill, however, is alive to this day. *See* A___ (Hill Dec.).

5.      After a trial, on October 14, 2010, an Arlington jury returned guilty verdicts for fourteen of the seventeen charges stemming from the Arlington offenses. On December 10, 2010, the Arlington County trial court entered judgment, imposing five life sentences with a consecutive sentence totaling 168 years. Sentencing Orders, *Commonwealth v. Torrez*, N. CR10-503 (Cir. Ct. Arlington County Dec. 10, 2010).

6.      On March 26, 2011, the Government indicted Torrez in this Court for the first degree murder of Snell. The indictment listed two statutory aggravators that would make Torrez eligible for the death penalty under the Federal Death Penalty Act ("FDPA") if convicted. Dkt. No. 1. On February 29, 2012, the Government filed a Notice of Intent to Seek a Sentence of Death. In support of the statutory aggravating factors, it listed the convictions for the Arlington offenses that had been entered more than a year after Snell's death. Dkt. No. 41. The notice also identified non-statutory aggravating factors stemming from the Zion offenses.

7.      The initial team appointed to represent Torrez in the capital case consisted of three lawyers from the Office of the Federal Defender for the Eastern District of Virginia—Geremy Kamens, Whitney Minter, and Nicholas Xenakis—and an attorney in private practice, Joseph John McCarthy. McCarthy was later replaced by Christopher Davis. However, Torrez ultimately elected to fire these lawyers and was appointed an entirely new set of attorneys in April 2013. *See infra* Claim III. The new lawyers were Robert Jenkins, William Brennan, and William Mitchell. To avoid confusion, this Motion will refer to the defense team that represented Torrez until April 2013 collectively as "initial counsel" or "the FPD," and the second defense team as "trial counsel."

8.      Following jury selection, trial began on March 31, 2014. Among other evidence, the Government presented testimony that a semen stain from Torrez was found on Snell's bed

(but not on Snell). Tr. 4/01/14, 1500. The Government also presented testimony from El-Atari, and played a number of excerpts of his recorded conversations with Torrez, including conversations where Torrez claimed responsibility for killing Snell. Tr. 4/3/14, 1832–78.

9.      The Government also presented testimony from Dr. Sean Swiatkowski, a medical examiner, and Dr. Allen Burke, a cardiovascular pathologist. Dr. Swiatkowski testified that the cause of death was undetermined. Tr. 4/01/14, 1341. Dr. Burke testified that he found an abnormality in an artery in the heart of the victim, stating it was a moderate narrowing of the artery. *Id*. at 1392. Finally, the Government presented Dr. Humphrey Germaniuk who stated that the victim's heart condition was incidental and asserting that the victim died from asphyxia. *Id*. at 1441–42, 1449. Trial counsel had available expert forensic testimony from forensic pathologist Dr. Jonathan Arden that there was no positive evidence of asphyxia in the case and that the victim's cardiac problems could not be ruled out as a cause of death, but did not present the evidence. *See infra* Claim I.

10.     On April 8, 2014, the jury found Torrez guilty of the first-degree murder of Snell. Immediately after the verdict was read, defense counsel requested an *ex parte* hearing, in which they advised that Torrez did not want counsel to present any mitigation or to argue against the death penalty. Tr. 4/8/14, 2087. Two weeks later, on the morning the eligibility phase was scheduled to begin, the district court told Torrez that he was entitled to foreclose a mitigation presentation and instruct his attorneys to remain silent during the eligibility and selection phases of trial. Tr. 4/21/14, 2112–14. The district court did not advise Torrez of the nature of the various rights he was giving up in either phase, or the consequences of such waiver. Nor did the court order an evaluation or hearing to determine whether Torrez was competent to make these decisions.

11.     During the one-day eligibility phase and three-day sentencing-selection phase, defense counsel made no opening statements or closing arguments, did not cross-examine any witnesses, object to any evidence, or present any evidence against death or in support of a life sentence. With Torrez's consent, the court told jurors that counsel was following Torrez's instructions by remaining silent. Tr. 4/21/22, 2149–50. At the eligibility phase, the Government presented evidence about the Arlington offenses that served as the statutory aggravating factors. *See*, *e.g.*, Gov. Exh. E2-A-E2-N. The jury found Torrez eligible for death based on the Arlington offenses. Dkt. No. 381. During the sentencing-selection phase, the Government focused the majority of its witnesses, exhibits, and argument for a death sentence on the Zion offenses. Tr. 4/22–23/14. Defense counsel did not contest any of the Government's selection phase evidence or argument, or present any evidence in mitigation. The jury returned a verdict of death on April 24, 2014. Dkt. No. 390.

12.     Torrez timely appealed. He was represented by attorneys from the Federal Defender's Office for the District of Maryland, as well as Robert E. Lee, Jr. On appeal, the Court of Appeals for the Fourth Circuit affirmed the judgment of this Court. *United States v. Torrez*, 869 F.3d 291 (4th Cir. 2017). The United States Supreme Court denied Torrez's Petition for Writ of Certiorari on June 17, 2019. *Torrez v. United States*, 139 S. Ct. 2712 (2019).

13.     Since that time, the United States Government has waived the statute of limitations that applies to this Motion. *See*, *e.g.*, Dkt No. 504. Most recently the Government waived the statute of limitations until ninety days following the date this Court rules about Torrez's outstanding request to proceed pro se. *See* Email from James Trump to Samuel Angell dated 9/9/22. *See* A__ XXX.

## CLAIMS FOR RELIEF

I.     **TRIAL COUNSELS' FAILURE TO DEVELOP AND PRESENT CAUSE-OF-**

**DEATH EVIDENCE TO SUPPORT THEIR OWN STRATEGY DEPRIVED TORREZ OF THE EFFECTIVE ASSISTANCE OF COUNSEL.**

14. The claims and factual allegations set forth in all other sections of this Motion are incorporated by reference and re-alleged as though fully set forth herein.

15. Torrez's trial counsel argued a cause-of-death defense to the jury without conducting a constitutionally adequate investigation or presentation of the readily available evidence to support it. Amanda Snell had several heart defects that remained undiagnosed, although not necessarily asymptomatic, until after her death. Dr. Sean Swiatkowski, who conducted the autopsy, found no other signs of trauma or disease. Although he consulted with a cardiovascular pathologist who identified the heart defects, Dr. Swiatkowski never reached a clear conclusion about cause of death. Instead, he ruled that the cause and manner of death were undetermined.

16. Torrez's initial team of lawyers consulted a pathologist, Dr. Jonathan Arden, and a cardiovascular pathologist, Dr. James Stone, and prepared to argue at trial that Snell's heart defects could have caused her death. [Kamens Dec. ¶ 3] When they withdrew from the case, they told the new trial team that both experts had given favorable opinions and turned over the slides Dr. Arden had developed. Trial counsel sought and obtained authorization from the district court to retain both experts. In spite of this early start, however, counsel did not begin preliminary consultations with either expert until the trial was already under way and did not call either as a witness. Nevertheless, counsel attempted to suggest at trial, without independent expert support, that Snell could have died because of her heart defects and that the Government had failed to prove Torrez guilty of premeditated murder. Trial counsel's inexplicable failure to develop and present readily available expert testimony that would have supported the very theory they argued in defense deprived Torrez of the effective assistance of counsel. U.S. Const. amend. VI.

8

A.      **Amanda Snell's Heart Exhibited Defects Known to Play a Role in Sudden Death.**

17.      Amanda Snell was 20 years old and apparently healthy at the time of her death on or about July 11, 2009. [AUTOPSY REPORT – Doc. 01, page1] An episode the previous year, however, was a red flag for the presence of the heart defects that may have killed her in 2009. On June 9, 2008, Snell became so short of breath and lightheaded during a routine morning run that she "fell out" of formation, reported to the clinic, and was sent by ambulance to the emergency room for testing. Medical staff found her "desaturated," with a blood oxygen level in the 80% range,[2] and her electrocardiogram was abnormal. She required supplemental oxygen at the emergency room. [Snell medical report, Doc. 02, pages 1, 3]. Released the same day, she had a "normal" examination at a follow-up appointment on June 12 and returned to full duty. [Snell medical report, Doc. 03, page 1]

18.      In another episode the following year, on April 14, 2009, Snell nearly passed out while waiting to see a doctor for an ear infection. She received intravenous saline solution and medications for her infection. [Snell medical report, Doc. 04, pages 1-2]

19.      Military personnel discovered Snell's body on July 13, 2009. Dr. Swiatkowski conducted the autopsy the following day. Because Swiatkowski had not yet received his board certification, Dr. Stephen Robinson observed the procedure and co-signed the report. Tr. 4/01/14, 1382; [autopsy report, Doc. 01, page 6]. Dr. Swiatkowski found "no evidence of significant recent trauma." [Doc. 01, p. 6]. This included the tissues and structures of the head and neck: he found no damage to the hyoid bone, the thyroid cartilage, or cervical spine; no external signs of a ligature or other compression mechanism; no hemorrhage or other damage to underlying neck

---

[2] Normal blood oxygen saturation level is 95-99%. Tr. 4/01/14, 1374.

tissues; no petechial hemorrhages; and no injuries to the tongue. [Doc. 01, pp. 2-3]. He observed external abrasions, but found them "consistent with post-mortem occurrence." [Doc. 01, p. 6]

20.     Dr. Swiatkowski consulted a specialist, cardiovascular pathologist Allen Burke, M.D., to dissect the heart. Dr. Burke identified several heart defects, described as "moderate dysplasia of the AV [atrioventricular] nodal artery," "mildly increased fibrosis at the crest of the ventricular septum," and "small vessel disease." [Doc. 01, pp. 9–10] Dr. Burke commented, "The significance of the narrowed AV nodal artery is unclear. Small vessel disease has been associated with sudden death in the absence of other findings." [Doc. 01, p. 10]

21.     Having received Dr. Burke's report, Dr. Swiatkowski gave his opinion:

> Examination of the heart revealed moderate dysplasia (narrowing) of the atrioventricular nodal artery which has been associated with cardiac arrhythmias and sudden death. . . . In light of the available investigative information and autopsy findings, the manner of death is best classified as undetermined.

[Doc. 01, p. 10]. He listed both the cause and the manner of death as "undetermined." [Doc. 01, p. 1].

**B.     Federal Public Defender Counsel Investigated and Developed Expert Testimony in Support of a Cause-of-Death Defense, But Trial Counsel, After Taking Over the Case, Abandoned that Effort.**

22.     In 2011, the FPD began to investigate and develop the evidence surrounding Snell's heart defects. They retained pathologist Jonathan Arden, M.D., and sent him a set of materials that included not only the autopsy report and photographs and Snell's medical records, but also jailhouse informant Osama El-Atari's grand jury testimony and an excerpted transcript of his surreptitious recording of Torrez in jail. [Contract, Doc. 05; Letter, Doc. 06 pp 1-4]. In the ensuing year, the FPD had several telephone conferences with Dr. Arden. He consistently told them that the heart defect was a possible cause of death. *See* [TC memo, Doc. 07, at page 5]. On October 5, 2012, the defense gave the prosecution notice that it intended to call Dr. Arden to

10

testify about "the nature of Snell's heart condition and whether that heart condition can be excluded as a cause or contributing cause of her death[.]" [Doc. 08, page 1]

23.     The prosecution, meanwhile, was also developing evidence respecting the cause of death. On February 28, 2011, Assistant U.S. Attorneys ("AUSAs") Rich and Fahey met with Drs. Swiatkowski and Robinson. They provided the doctors with a transcript of El-Atari's tapes and a summary of the DNA evidence. [Doc. 09, page 1] Dr. Swiatkowski reiterated that he could not say, to a reasonable degree of medical certainty, what caused Snell's death, and therefore would not offer an opinion on the manner of her death. As the AUSAs described it in an interview memo, Dr. Swiatkowski did not believe the nodal artery defect was "of a magnitude to cause her death." [Doc. 09, page 1-2] While he told the prosecutors that his inability to determine the cause of death was "not inconsistent with Snell having been asphyxiated," he cautioned them that he found no actual evidence of asphyxia:

> He reiterated that he could find no physical evidence on the neck skin or subdermal tissue of strangulation. The mark identified by Germaniuk on the right side of the neck he attributed to being caused by the impression of chain and cross shaped pendant that Snell was wearing when she was found. He noted that he was present in the barracks room before her body was removed.

[Doc. 09, page 1-2].

24.     The prosecutors also consulted Dr. Humphrey Germaniuk, a contract pathologist from Ohio. He did not prepare a report, but an agent who had interviewed him testified about his opinion in the grand jury. [Doc. 10] On September 21, 2012, the Government gave notice of proposed expert testimony, including that of Drs. Swiatkowski, Burke, and Germaniuk. The Government included Swiatkowski's autopsy report and Burke's addendum report but did not provide a report for Germaniuk. [Docs 11, 12, 13]. The Government indicated that it expected Dr. Burke to testify that the heart defect "did not cause" Snell's death. {Doc. 12, page 1]. Dr. Germaniuk would testify that the cause of death was asphyxia and the manner of death was

11

homicide. The Government did not expect Germaniuk to describe any one method of asphyxia; he would attribute it to "any or all of three methods": "burking" (lying on top of someone and preventing them from breathing), compression of carotid arteries, and/or smothering. [Doc. 13]

25.     After receiving these notices, FPD attorney Geremy Kamens emailed Dr. Arden, describing Dr. Burke's expected testimony and indicating that the defense planned to call Arden as a rebuttal witness. Kamens also asked whether Dr. Arden could recommend a cardiovascular pathologist who could advise the defense about Dr. Burke's opinion. Dr. Arden responded that he expected he could answer Kamens's questions after a planned trip to view the original autopsy slides in person. [Doc. 14 pages 1-2]

26.     Dr. Arden reviewed the slides twice at military facilities. After his first trip, he told counsel that, after reviewing them through a microscope, he believed the narrowing of the AV nodal artery was "severe," not "moderate" as Dr. Burke had indicated. He observed two other defects that Dr. Burke had also mentioned—fibrosis, or scarring, of the nearby heart tissue; and small vessel disease, or thickening of the small vessels of the heart. Small vessel disease, he told counsel, is also associated with sudden death. [Doc. 15, page 2] At his second slide review, Dr. Arden had the aid of a specialized microscope that enabled him to photograph the magnified images. He provided copies of these "photo micrographs" to the defense along with a key describing what each image showed. [CITE Doc. 16, Arden report] The FPD conferred with him after this visit, and made plans to call him as a witness at trial, which was now scheduled to begin within two months. [Doc. 17, Arden invoice, Doc. 24, scheduling order, and KAMENS DEC par. 5]

27.     The FPD also consulted cardiovascular pathologist James Stone to rebut Dr. Burke's anticipated testimony. Dr. Stone told counsel, after a preliminary review of Dr. Arden's

12

slides, that it was "impossible to say" that the heart defects did not play a role in Snell's death. Kamens dec., para. 10 Dr. Stone would not testify, however, without reviewing the slides himself. Kamens dec. para. 10.

28.     The FPD planned to challenge the cause of death as their main guilt phase theory and to call Dr. Arden as their principal guilt phase witness. They gave notice to the Government that they planned to call him. Doc. 8 (Arden expert notice), Kamens dec. para. 5. On February 22, however, the Court relieved the FPD as Torrez's counsel, and soon after that appointed new counsel, who would represent Torrez at trial a year later. Dkt. Nos. 266, 274. Kamens advised trial counsel that the FPD had retained both Dr. Arden and Dr. Stone, and that they expected both to give helpful opinions. In a transition memo to trial counsel dated May 9, 2013, Kamens described the favorable testimony Dr. Arden could provide:

> Dr. Arden has reviewed slides of Snell's heart, (slides at Tab 14), and has concluded that Snell had an extremely diseased heart with significant narrowing not only of the av nodal artery but in other small arteries as well. He has measured the lumen, or opening, of the AV nodal artery in Snell's heart, and compared it to the data in the Burke article, and concluded that Snell's level of narrowing meets the standard identified in the Burke article as associated with sudden death. Dr. Arden is prepared to testify that AV Nodal Artery dysplasia cannot be excluded as a possible cause of death to a reasonable degree of medical certainty.

[Doc, 30, transition memo 5/9/13, p. 7]

29.      Kamens also explained that his team had consulted Dr. Stone because his area of expertise matched that of the Government's expert, Dr. Burke. [Doc. 30 at 7] He wrote:

> Dr. Stone is familiar with Dr. Burke and thinks his expert notice contradicts his findings in his published article. He says that Snell plainly had an abnormal heart "with pathologic changes associated with sudden unexpected death." Based upon her demonstrated history of symptoms consistent with a cardiac event (blood oxygen desaturation following exercise, abnormal EKG), scarring in the septum and walls of the septum in heart slides, it is "impossible to say that the heart did not play a role in her death." His review is based on pictures of the heart slides taken by Dr. Arden, <u>but he needs to review the slides himself before he would be able to testify</u>.

13

[Kamens transition memo, Doc. 30 at 7] (emphasis in original). The first item in a section of the memo labeled "Immediate Action Required" read: "Retain Arden and Stone; arrange for Stone to view slides through [prosecutor] Jonathan Fahey." [Transition memo, Doc. 30. at 7.] Kamens's co-counsel, Christopher Davis, also told trial counsel that "the pathologist is ready to testify." [Doc. 32 – Davis email to Brennan 5/30/13]

30.     Trial counsel did retain the two experts. In July 2013, they spoke to Drs. Arden and Stone and learned that they were willing to work on the case. [Mitchell timesheet, Doc. 20, p. 3; email re contacting Arden and Stone, Doc. 34, 7/11/13, email Brennan to Stone, Doc. 36] They then moved to appoint both experts, indicating that predecessor counsel had already sent them materials and consulted them. [Docs 18 and 19]. Counsel informed the Court that cause of death "is very much at issue in this case" (Doc. 18 at 2), and that they expected Dr. Stone to testify that, "at the very least, the heart abnormality cannot be excluded as a contributing factor to her death." [Doc. 19 at 2.] The Court granted both motions on August 1. ECF Nos. 286, 290.

31.     Trial counsel did not, however, follow up with Dr. Arden until the trial was under way. [Arden supplemental dec, paras. 4 and 5]. Aside from a brief administrative call in December 2013, for which Arden did not submit a bill, he heard nothing from trial counsel until March 27, 2014, when he spent 15 minutes on file review and 15 minutes talking to counsel. [Arden supplemental dec. para. 4(c)] By that time, jury selection and motions had ended and the trial proper was set to begin a few days later, on March 31. Although Dr. Arden had not changed the helpful opinions he had communicated to FPD counsel [Arden report at 3, Arden supplemental dec para 6], trial counsel did not contact him again and he heard nothing more about Torrez's case until he read about the jury's guilty verdict in the Washington Post. [Arden supplemental dec para.4(d)].

14

32.     Trial counsel also delayed their consultation with Dr. Stone until the eve of trial. Although they knew by May 2013 that Dr. Stone would not testify unless he personally reviewed the slides of Snell's heart, and that former counsel regarded that review as a "high priority," they waited for nine months to attempt to set it up. On February 7, 2014, only thirty days before jury selection began, attorney Mitchell requested a duplicate set of slides for Dr. Stone to review. [email 2/7/14, Doc. 25, p. 2]. On February 20, the legal counsel for the Armed Forces Medical Examiner refused, offering instead to make the slides available to Dr. Stone at Dover Air Force Base, with Dr. Swiatkowski to coordinate the visit [email 2/20/14, Doc. 26, p. 2]. Counsel did not attempt to set up the visit. Dr. Stone reiterated his request for his own set of slides, and trial counsel passed the request along to Dr. Swiatkowski, but by March 23, Dr. Stone had not heard back. [email 3/23/14, p. 1, Doc. 27] On March 24, counsel for the army repeated the invitation for an in-person visit [email 3/24/14, p. 1, Doc. 28]. Finally, on March 25, trial counsel asked the Government to allow the visit on April 8, 2014. By the time counsel made this request, however, voir dire was already over and the trial about to begin. April 8 turned out to be the last day of the jury's deliberations at the guilt phase of trial. [Brennan emails, Doc. 29]

33.     On March 27, when the court convened to address motions before the beginning of testimony scheduled for March 31, Mitchell broached the subject of Dr. Stone's scheduling problem, but without requesting an adjournment to allow time for his in-person review. He told the court that Dr. Stone was going to testify for the defense but that April 8 was "the only time [Dr. Stone] could get in there" to review the heart tissue slides. Mr Mitchell attempted to "alleviate" what he anticipated as the Government's concern that after the April 8 review Dr. Stone might offer new opinions beyond what the Government already knew from defense disclosures. Tr. 3/27/14, 1024–25. AUSA Fahey objected (presciently) that the trial might be

15

over by April 8 and that Dr. Arden had already viewed the slides. He opposed any further delay in the trial. *Id*. at 1025–26. The Court ruled that "we are not going to hold up the trial," and that it was sufficient that Dr. Arden had seen the slides. *Id*. at 1026. Mitchell said that "I certainly understand the Court's admonition, and we are fine with that." *Id*. at 1027. He attempted to explain Dr. Stone's dispute with the Government lab officials over whether they could send him tissue samples, but the Court reiterated its determination not to delay the trial. Mitchell conceded that Dr. Stone would have to comply with the Court's schedule:

| | |
|---|---|
| Mitchell: | Ultimately, Your Honor, I think what we have here, that the situation has created, is not a substantive or procedural problem between defense and the Government and evidence. It's a scheduling problem. And we are fully advised that the train has left the station and we are all on board. |
| The Court: | Okay. |
| Mitchell: | And Dr. Stone is going to have to get on board as well. |
| The Court: | Well, hopefully Dr. Stone can get there in time. And if not, reach a comfort level with the samples that he has got. |
| Mitchell: | Yes, Your Honor. |

*Id*. at 1029. Counsel did not call either Dr. Arden or Dr. Stone at trial.

### C. Trial Counsel Could Not Rebut the Government's Theory on Cause of Death.

34. The defense opening at trial promised that the evidence would show that the cause of death was undetermined and the Government's own expert had identified a defect in Snell's heart. Counsel described the episode when her oxygen saturation level fell to 80%. Counsel stressed that the autopsy disclosed no signs of physical trauma or other injuries such as damage to the hyoid bone. Tr. 3/31/14, 1106–08.

35. The Government presented Dr. Swiatkowski and Dr. Burke, but neither of them supported its theory that Snell died of asphyxia. Dr. Swiatkowski testified that his autopsy

16

uncovered no injuries except for post-mortem abrasions. Tr. 4/01/14, 1329. He ruled the cause of death undetermined:

> The other thing was with the cardiovascular pathology consultation, there was a finding in which there was a dysplasia or narrowing of the AV nodal artery. The AV node is the atrioventricular node. It is the node that kind of puts electricity down through the ventricles of the heart. And there was a narrowing of that. And in the literature, it does say that there is examples of sudden death or fatal arrhythmias that can be caused because of that, because of an AV nodal dysplasia.
>
> Because of that and the fact that I had no significant injury or any injury to document, my findings were the cause and manner was undetermined. And the manner, therefore, was undetermined as well.

*Id*.; *see also* Tr. 4/01/14, 1341.

36.     The doctor gave contradictory testimony about the possibility of a natural cause of death:

> Q.     Was there anything in the scene examination, the autopsy at the lab, which included the results you sent out, that would indicate this was a natural cause of death?
>
> A.     *No.* The fact that she had moderate dysplasia of the AV nodal artery -- I mean, again, the literature states that it is possible to have sudden cardiac death from that. *So it could have been that.*
>
> Q.     What do the postmortem abrasions tell you in terms of that?
>
> A.     It still means that whoever found her then would have moved her.

Tr. 4/01/14, 1331–32 (emphasis added).

37.     He found no evidence of sexual assault. Tr. 4/01/14, 1334–35. While he suggested that "it could have been an accident," because "maybe something happened in the room and whoever was there got nervous and put her in a closet," he had not reviewed anything that indicated Snell's death was an accident. *Id.* at 1330–31. He found the facts "consistent" with homicide, and he found nothing inconsistent with death by asphyxia. *Id.* at 1334, 1336.

17

38.     Trial counsel had not spoken to Dr. Swiatkowski before trial, and on cross-examination he never asked directly for his opinion on whether the heart defects could have caused Snell's death. *Id.* at 1336. Counsel asked the doctor to describe the various types of injuries he checked for but did not find, and the AV nodal dysplasia that the cardiovascular consult did uncover. *Id.* at 1352–71. Counsel did not ask if Snell's heart defects could have caused death in *this* case, as opposed to cases described in the literature. Significantly, although he asked Dr. Swiatkowski to explain the term "rule out," he did not ask if the doctor could rule out the heart defects as causing death, or whether he thought them the most likely cause of death. *Id.* at 1376.

39.     Dr. Burke testified for the Government that he had found an abnormality in the artery to the AV node; his diagnosis was "moderate atrioventricular nodal artery dysplasia." This meant that "the artery in this region next to the atrioventricular node was somewhat narrowed and probably had been that way since birth." *Id.* at 1392. He viewed the condition as moderate, not severe, and "wouldn't expect that to be likely to cause any problems in this person." *Id.* at 1395. He acknowledged that he had conducted a study on this condition in 1993 and had found it associated with some cases of sudden death. *Id.* at 1397.

40.     Trial counsel was unable to elicit a favorable cause-of-death opinion on cross-examination. Indeed, Dr. Burke testified that he could not give any opinion on the cause of death. *Id.* at 1398. Snell's history of oxygen desaturation could have been attributed to the AV nodal dysplasia, but Dr. Burke could not say whether a drop of that level would be "critical for a human being." *Id.* at 1401. He told counsel that question was beyond his expertise. *Id.* at 1401–02. Counsel elicited Dr. Burke's agreement that his 1993 study concluded that AV nodal dysplasia was a "potentially underdiagnosed cause of sudden cardiac death, especially in young

adults." *Id.* at 1404–05. On redirect examination, however, Dr. Burke distinguished the "moderate" narrowing he found in this case from the "severe" narrowing he found in the test cases in his 1993 study. *Id.* at 1407.

41.   Humphrey Germaniuk, M.D., testified for the Government that the cause of death was asphyxia and the manner of death was homicide. He viewed Snell's heart condition as merely an "incidental finding." *Id.* at 1441–42, 1449. He based his conclusion on the circumstances in which the body was found, Torrez's taped statements and the DNA evidence, and the fact that death by asphyxia does not necessarily leave any marks. *Id.* at 1458.

42.   Trial counsel could not elicit any helpful testimony from Dr. Germaniuk on cross-examination. He testified that he did not base his conclusion on the autopsy findings alone, but on that evidence in combination with all the other evidence he had reviewed. *Id.* at 1465–66. With respect to the autopsy itself, he agreed that it had not uncovered any injuries, but stressed that a ligature around the neck or computer cord around the wrists would not necessarily cause any visible injury. *Id.* at 1466–70. He would not agree that the victim's post-mortem abrasions could have occurred in the closet. *Id.* at 1471.

43.   He described his determination of asphyxiation as "exclusionary." With no actual evidence of strangulation, he had relied upon information separate from the scientific findings in the autopsy report. While he was aware of Snell's heart condition and agreed that the condition can sometimes cause sudden death, he excluded it as a cause of death in this case because of the overall circumstances and the crime scene. *Id.* at 1473–78.

44.   Trial counsel, in summation, attempted to raise doubts about the cause of death, but could point to little evidence to create any doubts. He argued that the stories Torrez told to El-Atari must be lies because otherwise Dr. Swiatkowski would have found injuries to

19

corroborate them. Tr. 4/07/14, 2013–15. He argued that Dr. Germaniuk, as a paid witness, was less credible than Dr. Swiatkowski, and that Dr. Germaniuk based his conclusions on "speculation and guesswork," not "scientific evidence." *Id.* at 2016. Finally, he argued that the jurors should acquit because of missing evidence:

> Now, even if you are convinced that Torrez lied to El-Atari, had means to develop his entertaining story without actually being the perpetrator, you must still ask yourself, what happened in that room?
>
> Ladies and gentlemen, I will submit to you that no matter how hard the Government has tried to convince you, we just don't know. We don't know what happened between these two people. We don't know if she died as a result of her heart condition. I am not here to persuade you of that because I don't know. I heard the medical evidence just like you. None of the doctors could tell you conclusively one way or the other.

*Id.* at 2024. In fact, one of the doctors, Dr. Germaniuk, did say conclusively that, in his opinion, the victim had died in one way and not the other—of asphyxia and not of natural causes—but the defense had presented nothing to rebut his opinion.

45.     The jurors rejected counsel's unsupported argument, but constitutionally adequate investigation and preparation could readily have provided support for it.

**D.      Readily Available Evidence Would Have Supported Counsel's Own Theory on the Cause of Death.**

46.     During the year between their appointment and the beginning of trial, trial counsel could have developed ample support for their chosen defense by consulting readily available experts. As described, the court granted their motion to appoint Dr. Arden, who had consulted with predecessor counsel, reviewed the autopsy slides multiple times, and created a set of photomicrographs, or magnified photos, of the slides. He had discussed his opinions orally with predecessor counsel, who planned to call him as a witness. Trial counsel, however, consulted him only briefly and only after jury selection had already ended. He had never changed the favorable opinion he first gave to the FPD, but trial counsel did not call him.

20

47.     In 2020, Dr. Arden reviewed the autopsy report and photographs, his own photomicrographs, and other records, and prepared a report setting forth the opinions he could have given in consultation with trial counsel and in testimony at trial in 2014. [Doc. 16, at 1–2]. First, Dr. Arden could have explained that Dr. Germaniuk's opinion lacked an evidentiary foundation:

> Dr. Germaniuk testified at trial that in his opinion, Snell died as a result of homicidal asphyxia. That opinion was not supported by any positive evidence, and as such, cannot be held within a reasonable degree of medical certainty. Asphyxia simply means the interference with either taking in or using oxygen. Asphyxia can be caused by various different mechanisms, including interference with breathing at the nose and mouth (i.e., smothering), neck compression (i.e., strangulation), and compression of the torso to inhibit breathing (i.e., compressional asphyxia), among others. No positive evidence for any of those mechanisms of asphyxia were found in the autopsy of Snell. For asphyxia to be invoked as a competent cause of death, the mechanism of causation of asphyxia must be identified and specified. Dr. Germaniuk was not able to determine or opine by what mechanism Snell was asphyxiated, so his cause of death opinion was incomplete. More importantly, given the absence of any injuries to suggest any mechanism of asphyxia for Snell, his opinion was unsupported and speculative. The method by which Dr. Germaniuk arrived at that opinion was also flawed, in that upon not discovering any other identifiable cause of death, under the circumstances of the discovery of her body, he concluded that her death must have been homicidal, and therefore, simply by exclusion, concluded that she had been asphyxiated by some unknown means. His opinion had no basis.

[Doc. 16 at 4].

48.     Besides undercutting the prosecution theory on cause of death, Dr. Arden could have provided support for the defense theory. He noted that, although Dr. Burke had "minimized" the amount of narrowing to the AV nodal artery, his own examination had disclosed that the narrowing of arterial branches near the nodal artery was "significantly more severe than moderate in some locations." [Doc. 16 at 4]. These severely narrowed vessels would "confer a likelihood of critical deprivation of blood flow, with dysfunction of the tissue supplied by those vessels." As Dr. Burke had indicated in his report, "small vessel disease of the heart muscle may be a cause of sudden death, especially in the absence of supervening causes." [Doc.

21

16 at 5]. Furthermore, Snell's prior episodes of shortness of breath and lightheadedness were "highly suggestive of cardiac rhythm disturbances," and consistent with the arterial narrowing and small vessel disease. [Doc. 16 at 5]. Dr. Arden concluded:

> In summary, Snell had no injuries identified that caused her death. The conclusion that she was asphyxiated was not based on any positive evidence, and was therefore merely speculative. Her cardiac conditions cannot be reasonably excluded as a cause of a sudden cardiac death, especially under conditions of stress or exertion. I was available at the time of trial to testify to these opinions, which I held at the time and had discussed with original defense counsel at the Federal Public Defender. The photomicrographs that I took, and the measurements I made from them, were available to be used as bases for my opinions and as demonstrative aids at trial, had I been contacted by trial counsel.

[Doc. 16 at 5]

49.      Trial counsel also knew that former counsel had already consulted a cardiovascular pathologist, Dr. Stone. Such an expert could have given persuasive testimony that would have matched the expertise of the Government's expert, Dr. Burke. In 2020, Louis DiBernardo, M.D., the Head of Cardiovascular Pathology at Duke University Medical Center, reviewed the relevant records and prepared a report describing opinions he or a similarly credential expert could have provided at the time of trial. [Doc. 21, DiBernardo report, at 1, 4]

50.      Dr. DiBernardo found moderate dysplasia (narrowing) of the AV nodal artery with arteriosclerosis of its branches, hypertrophy (enlargement) and fibrosis (scarring), and dysplasia of small penetrating arteries from other parts of the heart. [Doc. 21 at 3]. He explained that these disease processes worked together:

> In my opinion the findings of hypertrophy and multifocal small artery disease in Snell's heart along with increased fibrosis rendered her susceptible to a sudden arrhythmic death. Focusing purely on the AV nodal artery, as described in the trial testimony and other records I have reviewed, underestimated the risk of sudden death in this heart.

[Doc. 21 at 3]. Dr. DiBernardo concluded:

In conclusion, Snell likely died as a result of her cardiac small vessel disease and myocardial hypertrophy. Her susceptibility to an arrhythmia would have been increased to the extent that a sudden death outcome would occur more quickly in the setting of physical or chemical hypoventilation. In fact as Dr. Burke stated in his report, the small vessel disease of the AV nodal artery and additional arteries throughout the heart has been associated with sudden death all by itself. Given this propensity and the absence of evidence of traumatic injury and asphyxia at autopsy, it cannot be concluded that her death resulted from asphyxia.

[Doc. 21 at 4].

51.     Trial counsel could also have consulted a cardiologist. In 2019–20, Athol Morgan, M.D., M.H.S., a board-certified cardiologist and member of the teaching faculties at the Johns Hopkins University School of Medicine and the University of Maryland School of Medicine, reviewed the relevant records and prepared a report. [Doc. 22, Morgan report at 1]. Dr. Morgan explained the effects of heart defects like Snell's on heart function:

At times of increased activity, the tissues of the heart require increased oxygen supply. If there is narrowing within the arteries that supply the blood carrying oxygen to these tissues, flow may become insufficient to meet the metabolic needs of the cells. This insufficiency then results in the condition known as ischaemia or a lack of oxygen stemming from a mismatch between oxygen supply and demand. This imbalance disrupts the normal electrical signaling function of the heart and can precipitate arrhythmias, which in turn can result in sudden cardiac death. In the setting of ischaemia the presence of fibrosis (scarring) within the tissues of the heart further increases the likelihood of precipitating such arrhythmias.

[Doc. 22 at 2]. He agreed with Dr. DiBernardo's account of the multiple disease processes present in Snell's heart, and agreed that they "rendered her susceptible to sudden arrhythmic death." [Doc. 22 at 2]. He concluded:

It is my considered opinion to a reasonable degree of medical certainty that:

1. Amanda Snell had significant dysplasia and narrowing of the artery to her AV node and other smaller branch arteries, as well as fibrosis, that were discovered at the time of her autopsy;

2. Under the right conditions, such narrowings would cause ischaemia which, especially in the presence of fibrosis, could then lead to arrhythmias and, in turn, sudden cardiac death; and

23

3. In the absence of any evidence to support an alternative cause of death, ischaemia caused by narrowing of the arteries supplying oxygen to the tissues of the heart resulting in cardiac arrhythmia cannot be excluded, to a reasonable degree of medical certainty, as the cause of death for Amanda Snell.

[Doc. 22 at 3].

52.     Trial counsel also could have consulted Dr. Swiatkowski's supervisor. Dr. Stephen Robinson co-signed Dr. Swiatkowski's 2009 autopsy report because the latter was not Board-certified at the time, and Robinson fully concurred with Swiatkowski's conclusions that the cause and manner of death were "undetermined." Declaration of Stephen Robinson, Aug. 7, 2020, at 1 [Doc. 23]. In 2020, Dr. Robinson reviewed the autopsy report, photographs, and other related reports and materials. He disagreed with Dr. Germaniuk's conclusion on the cause of death:

In my opinion, under the circumstances of this case, it is impossible to conclude to a reasonable degree of medical certainty that asphyxia was the cause of Snell's death. While it is possible for asphyxia to be "silent"—that is, to leave no physical trace—especially in infants, in an adult there will almost always be some positive evidence. Similarly, while an examiner will sometimes see circumstantial evidence of asphyxia, as when someone dies after a car slips off the jack and compresses their chest, we found nothing of the kind here. We found no positive evidence of asphyxia at all.

*Id*. at 2 (A_____). He also could not rule out Snell's heart defects as causing death:

In my opinion, it is also impossible to rule out, to a reasonable degree of medical certainty, the likelihood that the dysplasia of Snell's AV nodal artery, fibrosis, and small vessel disease were a cause of her death. The AV nodal dysplasia, alone, has been associated in the literature with cases of sudden unexplained death. Furthermore, a number of processes that could have put strain on Snell's heart, such as excitement, exertion, or decreased oxygen, could have resulted in her death in circumstances that would not have killed a person with a normal heart.

*Id*. at 2–3 (A_____). Dr. Robinson would have given the same opinions to trial counsel if they had contacted him, but he had no recollection of ever hearing from them. *Id*. at 1, 3 (A____).

**E.     Trial Counsel Unreasonably Failed to Prepare and Present Expert Testimony to Support Their Chosen Defense.**

24

53.     The Sixth Amendment imposes upon trial counsel the duty to undertake reasonable investigations, or to make reasonable decisions that make a particular investigation unnecessary. S*trickland v. Washington*, 466 U.S. 668, 690 (1984). Strategic choices made without a thorough investigation do not meet *Strickland*'s objective standard of reasonableness. *See, e.g.*, *Wiggins*, 539 U.S. at 527–28 ("Counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to [trial] strategy impossible."); *id.* at 536 ("[C]ounsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable.").

54.     Counsel's duty to investigate also extends to the professionally reasonable investigation and presentation of relevant expert testimony. *See Hinton v. Alabama*, 571 U.S. 263, 273 (2015) ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence. . . . This was such a case.") (quoting *Harrington v. Richter,* 562 U.S. 86, 106 (2011)); *Porter v. McCollum*, 558 U.S. 30, 32 (2009) (penalty phase representation found deficient where counsel "told the jury that [defendant] . . . was not mentally healthy" but failed to investigate or present readily available evidence which would have proven this very fact); *Elmore v. Ozmint*, 661 F.3d 783, 859–64 (4th Cir. 2011) (counsel deficient in capital murder trial for "blind acceptance" of State's forensic evidence of guilt and failure to investigate or adequately challenge that evidence).

55.     The Supreme Court has recently held that counsel's unfamiliarity with the available evidence, including expert evidence, can result in deficient performance and prejudice to the defense. In *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020), counsel was deficient because he ignored, or never learned about, "vast tranches" of potentially helpful evidence. He was "barely acquainted" with the witnesses he did call to testify and ignored red flags for expert

25

investigation. *Id*. at 1882–83. Counsel was also deficient for failing to investigate, and therefore failing to present readily available rebuttal of, the prosecution case. *Id*. at 1884–85.

56.     Courts applying these principles have found trial counsel ineffective for failing to conduct adequate investigation of the cause of death. For example, *Dunn v. Jess*, 981 F.3d 582 (7th Cir. 2020), trial counsel consulted a pathologist who told him that the victim died immediately after receiving the most serious one of multiple head injuries, which left him lying in a pool of blood behind the bar where he had been drinking. This was exculpatory for Dunn, who had slapped the victim hours earlier, knocking him to the ground. Several witnesses saw the victim upright and evidently unharmed immediately after Dunn slapped him. The defense theory at trial was that Dunn did not cause the fatal injury. 981 F.3d at 586–87. Erroneously believing that the medical examiner agreed with his pathologist, trial counsel decided not to call the pathologist and to instead rely on cross-examination. He held to this plan even after learning that the medical examiner and his pathologist did not in fact agree, and that additional experts consulted by his co-defendant's counsel might agree with his pathologist. He learned of these reports before trial but did not ask for a continuance to review them. *Id*. at 588–89.

57.     The Court of Appeals held that the state court had unreasonably rejected his ineffective assistance claim. Counsel's mere consultation with an expert did not justify his failure to investigate the "immediacy of death" after speaking to his pathologist, or to confirm that the medical examiner would actually agree with his pathologist's opinion. It was unreasonable to view the consultation as reasonable performance, given that counsel did not use the information gleaned from the consultation. *Id*. at 592. The state court also unreasonably accepted trial counsel's explanation for his approach as "strategic" and "practical." Counsel was not able to elicit the helpful evidence from the medical examiner, and it was unreasonable for counsel to

expect him to testify that the "state's causation theory was medically impossible." *Id*. at 592–93. Finally, counsel unreasonably "remained nearly passive in the face of damning testimony" when the medical examiner testified unfavorably, even though he knew that evidence helpful to the defense was available. *Id*. at 594–95. Because there was a reasonable probability that the result would have been different if trial counsel "had adequately investigated and presented evidence that Dunn did not cause [the victim's] death," the deficient performance was prejudicial. *Id.* at 595–96.[3]

58.     Torrez's case, like *Hinton*, is a case "'where the only reasonable and available defense strategy require[d] consultation with experts [and] introduction of expert evidence.'" 571 U.S. at 273. Trial counsel knew that Dr. Swiatkowski had found no evidence of pre-mortem injury on autopsy and that the Government expected him to testify that the cause of death was undetermined. They knew that the cardiovascular pathologist, Dr. Burke, had uncovered a type of heart dysplasia often associated with sudden unexplained death. Counsel also knew, however, that the Government expected Dr. Germaniuk to testify that the cause of death was asphyxia and Dr. Swiatkowski to testify that the evidence was consistent with asphyxia. Trial counsel

---

[3] *See also Couch v. Booker*, 632 F.3d 241, 246-47 (6th Cir. 2011) (counsel ineffective in murder case; hired expert but failed to provide him with records necessary to give informed opinion on whether victim died of combined effects of chronic heart problem, alcohol, and drugs, and not from asphyxia caused by beating in which defendant participated); *Johnson v. Premo*, 370 P.3d 553, 560–61 (Or. App. Ct. 2016) (counsel ineffective in aggravated murder trial for failing to investigate and present expert testimony that victim's death due to morphine overdose and not strangulation); *see also People v. Ackley*, 870 N.W.2d 858, 863 (Mich. 2015) (counsel ineffective in case involving murder of a child for failing to seek opinion of second expert after consulting first expert, who advised him he could not give helpful opinion on cause of death); *McKnight v. State*, 661 S.E.2d 354, 359 (S.C. 2008) (counsel ineffective in child murder case for calling one expert whose opinion was partly consistent with state's theory on cause of death, and not calling second expert whose opinion completely contradicted state's theory); *State v. Hales*, 152 P.3d 321, 338 (Utah 2007) (counsel ineffective in child murder case for failing to obtain qualified expert to give independent interpretation of CT scans and opinion on cause of death).

apparently never spoke to Germaniuk before trial, Tr. 4/01/14, 1462, and could not reasonably expect to shake Germaniuk's opinion, or elicit sufficiently helpful testimony from Swiatkowski or Burke, on cross-examination. Whatever counsel's hopes, cross-examination did not shake any of these experts from their opinions.

59.     Independent expert testimony undercutting Germaniuk's opinion and supporting a different cause of death would not only have rebutted an element of the crime but also bolstered another important aspect of counsel's trial strategy—to convince the jury that the "stories" Torrez told El-Atari in the jail were fictions. Counsel argued vigorously that El-Atari had a strong motive to lie, that the tapes failed to capture all his interactions with Torrez, and, most important, that the autopsy evidence contradicted each of the stories. Tr. 4/07/14, 2007–12. He told the jury that, as discussed above, Dr. Swiatkowski found no evidence of the injuries he would have expected with strangulation or asphyxia. *Id.* at 2013–14. Evidence that, instead, Snell's heart defects caused her death would have lent weight to counsel's attack on the El-Atari tapes. Counsel could have had no valid strategic reason to forgo such a powerful argument.

60.     In these circumstances, trial counsel's decision to go forward with a cause-of-death defense without securing readily available expert testimony to support it was blatantly unreasonable under prevailing professional norms. *See Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quoting *Strickland,* 466 U.S. at 688, 694). Counsel's fifteen-minute post-voir dire consultation with Dr. Arden and post-voir dire effort to secure a lab appointment for Dr. Stone fell far short of a reasonable consultation with two experts whom their predecessors had passed along to them primed and all but ready for trial. Counsel were not unreasonable for pursuing the opinion of a specialist, Dr. Stone. But they were highly unreasonable for *neither* pursuing Dr. Stone's opinion in a timely way *nor* seeking an adjournment to enable Stone to review the slides

28

*nor* presenting the testimony of the well qualified, experienced general pathologist, Dr. Arden. Arden had already reviewed all the evidence, formed a favorable opinion, and, as the FPD indicated, was "ready to testify." Trial counsel's attempt to skate by on their cross-examination of the Government's experts, when they could easily have secured supportive expert testimony for the defense, was blatantly deficient.

**F.      Trial Counsel's Deficiency Prejudiced the Defense at the Guilt-Innocence and Penalty Phases of Trial.**

**1.      Counsel's deficient performance prejudiced the jurors' verdict of guilt.**

61.      Trial counsel's constitutionally deficient investigation and preparation had a devastating impact on the defense. Other courts have held that comparably deficient performance caused prejudice and required relief.

62.      In *Hinton,* defense counsel had retained and called an expert he himself considered inadequate, out of ignorance of the law that made funding for a better expert available. The Supreme Court rejected the state's argument that Hinton could not show prejudice because the prosecution had presented two qualified experts who linked him to the murder weapon.

> Prosecution experts, of course, can sometimes make mistakes. . . . This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses; it is maximized when the defense instead fails to understand the resources available to it by law.

571 U.S. at 276.

63.      In *Elmore,* similarly, the court held, "With investigation, the jury undeniably would have seen a drastically different—and significantly weaker—prosecution case." 661 F.3d

at 870. Although a readily available defense pathologist[4] would have acknowledged that the time of death consistent with the prosecution theory was "not physically impossible," he would have testified that it was "incredibly unlikely," while a time for which the defendant had a corroborated alibi was much more probable. The court held that there was a reasonable probability that this evidence, with other evidence a reasonable investigation would have uncovered, would have led to an acquittal. *Id*. at 870, 871; *see also Dunn*, 981 F.3d at 594 (prejudice shown because medical examiner's incriminating testimony went unrebutted at trial and readily available expert testimony could have "cast significant doubt" on her conclusions); *Couch*, 632 F.3d at 247–49 (prejudice established because readily available report would have led to defense theory that thickening of victim's heart muscle and elevated blood alcohol and drug levels caused his death, and would have undercut prosecution theory that he "drowned in his own blood" following beating); *Johnson*, 370 P.3d at 561–62 (defense prejudiced by failure to consult toxicologist whose testimony could have reduced severity of crime of conviction).

64.     In this case, as discussed above, trial counsel failed to uncover and present abundant evidence to support their own cause-of-death defense, although they well knew it was available. There is a reasonable probability that, had they done so, the outcome would have been very different.

65.     As the court instructed the jurors, a conviction of first-degree murder required them to find that Snell had been killed with malice aforethought and premeditation. Tr. 4/07/14, 2062. If the jurors concluded that—or had reasonable doubts about whether—Snell's heart defects caused arrhythmia and thus her death, they could not find that premeditated actions

---

[4] The pathologist in *Elmore* was Dr. Arden, the same pathologist consulted by federal defender counsel and available to trial counsel in Torrez's case.

caused her death, no matter what kind of preceding encounter the Government might hypothesize. Effective counsel could have presented Dr. Arden's testimony that Dr. Germaniuk's theory of death by asphyxia was "not supported by any positive evidence" and "speculative." They could have presented the testimony of a cardiovascular pathologist such as Dr. DiBernardo, a cardiologist such as Dr. Morgan, or the co-signer of the autopsy report, Dr. Robinson, that Snell's heart defects were the "most likely" cause of death or, at a minimum, could not be ruled out as the cause of death.

66.     Because counsel's performance was deficient, "the question [regarding prejudice] is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton*, 571 U.S. at 275 (quoting *Strickland*, 466 U.S. at 695). Here, there is a reasonable probability that, if the jurors had heard this evidence, they would have had a reasonable doubt about whether Torrez was guilty of murder. This Court should therefore grant him habeas relief from his conviction on this ground, both individually and in combination with the other grounds set forth in this petition.

### 2.     Counsel's deficient performance prejudiced the jurors' sentencing decision.

67.     Even if the jurors had returned a conviction, there is a reasonable probability that they would have reached a different penalty phase decision if they had heard the evidence that trial counsel failed to develop and present. First, to demonstrate eligibility for the death penalty, the Government had to prove at least one of four mental state factors:

> ***One***, that the defendant intentionally killed Amanda Snell; ***two***, the defendant intentionally inflicted serious bodily injury that resulted in the death of Amanda Snell; ***three***, that the defendant intentionally participated in an act contemplating that the life of a person would be taken or intended that lethal force would be used in connection with a person other than one of the participants in the offense, and the victim, Amanda Snell, died as a direct result of the act; ***four***, that the defendant intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person, other than one of the participants in the

31

offense, such that the participation in the act constituted a reckless disregard for human life, and Amanda Snell died as a direct result of the act.

Tr. 4/21/14, 2180 (emphasis added).

68.     The Government could not establish any of these factors if it could not rule out Snell's heart defects as the cause of death, given the absence of any premortem injury whatsoever. Without some supporting evidence, the Government could not prove beyond a reasonable doubt that any encounter before her death had involved an "act of violence," or "lethal force," let alone intentional killing or intentional infliction of serious bodily injury. At the very least, there is a reasonable probability that at least one juror who had heard expert testimony rebutting Dr. Germaniuk and supporting the defense cause-of-death theory would have harbored reasonable doubt about, and rejected, all these eligibility factors. Trial counsel's deficient performance therefore prejudiced Torrez at the eligibility phase of trial.

69.     Finally, Torrez suffered prejudice at the selection phase. Empirical research shows that "'[r]esidual doubt' over the defendant's guilt is the most powerful 'mitigating' fact.'" Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998). In one study, over 60% of respondents said they would be much less likely to impose death if they had lingering doubts over the defendant's guilt. *Id*. In the jurors' deliberations on the aggravating and mitigating factors in Jorge Torrez's case, any remaining questions about the impact of Snell's heart defects on her death could have played a decisive role. There is a reasonable probability that at least one juror acquainted with the readily available expert testimony that effective counsel could have prepared and presented would have decided that the aggravating and mitigating factors weighed in favor of a life sentence. *See* 18 U.S.C. § 3593(e).

32

70.     Accordingly, even if this Court does not grant Torrez habeas relief from his conviction, it should grant him sentencing relief on this ground, both individually and in combination with the other grounds set forth in this petition.

## II.     TRIAL COUNSEL'S FAILURE TO DEVELOP AND PRESENT DNA EVIDENCE TO SUPPORT THEIR OWN STRATEGY OF SUGGESTING AN ALTERNATE SUSPECT COMMITTED THE CRIME DEPRIVED TORREZ OF THE EFFECTIVE ASSISTANCE OF COUNSEL.

71.     The claims and factual allegations set forth in all other sections of this Motion are incorporated by reference and re-alleged as though fully set forth herein.

72.     Trial counsel adopted a multi-faceted reasonable doubt strategy focused on undermining Torrez's apparent admissions on the El-Atari tapes. In summation, attorney Jenkins pointed out that the tapes included three mutually inconsistent versions of the killing, each of which also contradicted the autopsy evidence. Tr. 4/07/14, 2010–11. As discussed in Claim I *supra*, he argued (although ineffectively) that Snell could have died as a result of her heart defects. *Id*. at 2024. Beyond that, telling the jurors that "we embrace the science," *id*. at 2011, Jenkins itemized the numerous other ways the purported admissions contradicted the evidence NCIS had collected:

- The statements indicated Torrez took out the trash, but crime scene photos depicted an overflowing trash basket (*id.* at 2011);

- The statements indicated that Torrez wiped down doorknobs and other surfaces to eliminate fingerprints, but the doorknob had a fingerprint of unknown origin (*id*. at 2012);

- The statements described Torrez placing everything he had touched into a pillowcase, but the placement of the items found on the desk demonstrated that could not be true (*id*. at 2012).

73.     Jenkins pointed out that, while Torrez claimed NCIS had recruited him as a "double agent," the NCIS officers who testified denied this. *Id*. at 2017. Finally, counsel acknowledged that the Government had presented evidence, namely the semen stain on the

33

bedsheet, that Torrez had entered the room at some point. But he argued that "we don't know" when Torrez was in the room. Tr. 4/07/11, 2017, 2024.

74.     Surprisingly, however, Jenkins abandoned one of the most powerful arguments that could have supported the trial team's strategy of debunking the El-Atari tapes from every angle: the evidence that someone else, possibly a male, had left DNA on the pillowcase found over Snell's head. Attorney Mitchell had told the jury in opening that the partial DNA profile lifted from the pillowcase could not have come from Torrez. Counsel briefly elicited the Government DNA expert's acknowledgement of this fact, but never prepared or presented any expert testimony, through the Government's expert or an independent witness, to explain why Torrez could not have contributed to that stain and why it could have come from another man. Furthermore, counsel presented no summation argument to support his own earlier suggestions that someone else was responsible for the crime. Counsel's half-hearted, elliptical attempt to pin the blame for the victim's death on someone else, without preparing and presenting readily available evidence and argument to support the attempt, deprived Torrez of the effective assistance of counsel both independently and in combination with the other deficient performance described in this petition. U.S. Const. amend. VI, XIV.

**A.      Trial Counsel Possessed DNA Evidence Pointing to an Alternate Suspect.**

75.     The documents the Government provided in discovery disclosed that crime scene technicians submitted the pillowcase found over Amanda Snell's head for DNA analysis in July 2009. [Lab request 09-07-16]. The Government analyst, Jeffrey Fletcher, reported on September 3, 2009, that he found a mixture of profiles from at least two contributors; the major contributor's profile matched Snell, and the partial minor profile "originated from an unknown individual." [Report 09-09-03, PDF p. 4; 09-08-21 autorads]] Fletcher annotated a chart displaying the pillowcase results with the remark, "Unknown checked against staff database – no

matches." [Allele chart 09-09-03]. In other words, he checked for matches between the unknown profile and the profiles of personnel working on the case and found none.

76.     After Torrez's arrest in the Arlington case in 2010, the lab reanalyzed a collection of samples, including the pillowcase. [doc. 8/13/10]. Fletcher compared Torrez's profile to the partial minor profile on the pillowcase and concluded that he was "excluded as a possible contributor." [Report 8/23/10].

**B.      The Defense Had Access to a DNA Team That Could Have Helped Prepare and Could Have Presented an Alternate Suspect Theory.**

77.     The FPD retained a DNA team headed by Dan Krane, Ph.D., and gave notice that they would call Dr. Krane at trial. [Rule 16 Notice 2/5/13]. In July 2013, shortly after federal defender counsel's removal and trial counsel's appointment, trial counsel contacted a member of Dr. Krane's staff and learned that he was still willing to testify. [email 7/11/13] Attorney Brennan exchanged emails with staff member Nathan Adams and told him to send just the reports Krane's team had generated, and not all the data. [email July 19, 2011]. In November, Mitchell informed counsel for the Government that the defense was "probably" going to withdraw its notice of intent to call a DNA expert. [email 11/20/13].

78.     Trial counsel did not call Dr. Krane or another DNA expert at trial. Nevertheless, they attempted to rely in part on the DNA evidence in their defense.

**C.      Counsel Suggested that Another Person Was Responsible for the Victim's Death Without Developing Readily Available Supporting Evidence or Presenting Closing Argument.**

79.     Mitchell briefly suggested in his opening argument that someone else had placed the pillowcase over the victim's head:

> There is an unknown DNA profile on the pillow case. The Government collected this off the pillow case and they sent it down to have it tested. It was a partial minor profile, but testable and identifiable. They don't knows [sic] whose it is. Torrez is excluded as a contributor to that profile.

35

Tr. 3/31/14, 1105. He made another brief reference to the pillowcase DNA in cross-examining the Government's DNA expert, Jeffrey Fletcher:

Q.      And here, is this a separate—this is a mixture of DNA profiles from at least two individuals was obtained from the pillow case/crime scene. Is this a separate and distinct extraction, or is this the same one that you were referring to back in '09?

A.      This is the same paragraph that was referenced in the previous report. The only difference was we were able to do a comparison to the known standard from Jorge Torrez. And so, basically we just added him as, you know, subparagraph (b) into that particular finding.

Q.      Right. So the unknown profile that you identified in 2009 when you didn't have a Buccal swab from Jorge Torrez, at this stage in 2010 you do have a Buccal swab from Jorge Torrez and he is excluded as a contributor to that profile?

A.      His DNA profile did not match the partial minor profile that was obtained on the pillow case.

Q.      So fair to say then, to date we still don't know whose DNA that is?

A.      No indication of male DNA was present on that particular sample, but still remains a partial unknown profile.

Q.      Was it a female?

A.      I did not get any indication of any male DNA present on that partial minor. Therefore, at this point it is still just an unknown profile.

Q.      So it could be anybody?

A.      It's an unknown profile at this point.

Tr. 4/01/14, 1512–13. Mitchell neither asked Fletcher to explain how the evidence excluded Torrez as a contributor nor presented independent evidence explaining it. He did not challenge Fletcher's volunteered contention that there was "no indication of male DNA" in the sample.

In summation, Jenkins argued that the semen stain on the fitted sheet could have been deposited at another time. Tr. 4/07/14, 2024. ("We know that Torrez was in the room at some point in time, but from the DNA evidence we don't know when he was in the room. Because

36

as the DNA expert told you, I can't tell you when it got there. I don't know if it was there a week, a month."). But he said nothing to support that argument by pointing to Torrez's exclusion as a contributor to the profile on the pillowcase. Although that evidence pointed to someone else as the perpetrator, Jenkins did not mention it at all.

80.     The trial team could have presented independent expert testimony explaining why Torrez could not have contributed to the profile on the pillowcase or could have elicited an explanation from Fletcher. Furthermore, counsel could have demonstrated that the evidence did suggest a male donor. In 2022, DNA expert Huma Nasir reviewed the evidence the Government provided to trial counsel in discovery, and independently concluded that Torrez could not be the minor contributor of the sample on the pillowcase.

81.     Nasir has reviewed Fletcher's DNA testing, confirmed the presence of the foreign, minor DNA donor on the pillowcase, and confirmed Torrez's exclusion. [Nasir report par. 5]. She has explained her conclusion in the following table:

Table 1: DNA profile at Four Loci where Mixture is Observed in the Pillowcase Sample (Area 1)

| Loci | Mixture Alleles Observed | Amanda Snell | Alleles Foreign to Amanda Snell | Jorge Torrez |
|------|--------------------------|--------------|----------------------------------|--------------|
| D8S1179 | 10, 12, 13 | 13 | 10, 12* | 13, 15 |
| D3S1358 | 14, 15, 17 | 14, 15 | 17 | 15, 17 |
| D19S433 | 12, 13, 16.2 | 13 | 12, 16.2 | 13, 15 |
| D5S818 | 11, 12, 13 | 11, 13 | 12 | 10, 11 |

*= may be stutter artifact or foreign contributor*

In the table above, the mixture alleles depicted in blue are consistent with Amanda Snell. Those in red are present in the mixture but do not match Amanda Snell meaning these alleles originated from a foreign contributor. When the alleles in red are compared to alleles possessed by Jorge Torrez, it is clear that those alleles do not match Torrez; hence Jorge Torrez is excluded as a contributor to this pillowcase sample.

[Nasir report, para. 5]

37

82.     Nasir also explains that the donor could be male. She observes an extra peak in the portion of the electropherogram (printout of the test results) "where the male peak would be present." Although this peak falls below the below the laboratory's reporting threshold, it "may indicate presence of male DNA in the sample." *Id.* at 3, para. 6. Therefore, Fletcher's trial testimony that "I did not get any indication of any male DNA present on that partial minor" was misleading. The analysis did contain such an indication, although not one strong enough to report as a result.

### D.     Counsel's Performance Was Deficient.

83.     As discussed in Claim I, *supra*, defense counsel's unreasonable failure to consult and present necessary expert testimony is deficient performance and, where prejudicial, ineffective assistance. Courts applying the principles set forth in controlling Supreme Court precedents have found counsel deficient for inadequate preparation and presentation of DNA evidence and evidence pointing to alternative suspects. *See Hardy v. Chappell*, 849 F.3d 803, 818–24 (9th Cir. 2016) (counsel deficient for failing to investigate and present evidence that state's star witness was real killer); *Rivas v. Fisher*, 780 F.3d 529, 547–50 (2d Cir. 2015) (counsel ineffective in murder case for failing to consult expert about time of death and relying only on cross-examination of state's expert about changed opinion on time); *Elmore,* 661 F.3d at 851 (counsel ineffective, in part, for not discovering that mitochondrial DNA testing of Caucasian hair found on victim's body had unknown profile that could not belong to victim); *People v. Watson*, 965 N.E.2d 474, 481–82 (Ill. App. Ct. 2012) (counsel ineffective for failing to challenge partial-profile DNA comparisons which overstated evidence that defendant was a "match").

84.     As sketched in the opening statement, part of the trial team's strategy was to question whether Torrez was in the room on the night of Snell's death. Mitchell previewed and

38

elicited Fletcher's testimony that Torrez was excluded from the profiles found on the pillowcase. In summation, Jenkins vigorously attacked the testimony of El-Atari placing Torrez in the room and indicated that the semen on the bedsheet could have come there at an earlier time. Nevertheless, counsel never developed testimony, through Fletcher or an independent expert, explaining why Torrez was excluded, and said nothing at all in summation about the DNA on the pilllowcase. Furthermore, when Fletcher volunteered that there was "no indication that male DNA was present," Mitchell had no way to demonstrate otherwise. As in *Andrus*, the trial team's inadequate investigation and deficient presentation left them unable to rebut the prosecution's case against their client. *See Harrison v. Tegels*, 216 F. Supp. 3d 956, 967 (W.D. Wis. 2016) (counsel ineffective for promising in opening to reveal many inconsistencies in complainant's and mother's statements and then failing to do so); *Madrigal v. Yates*, 662 F. Supp. 2d 1162, 1188 (C.D. Cal. 2009) (counsel ineffective for promising in opening to present alibi and third-party guilt evidence, in part through client's testimony, and then presenting only shaky alibi).

85.    Given that the trial team went partway down this road in opening and cross-examination, no conceivable strategy could justify their failure to develop the defense. Casting doubt on Torrez's responsibility for the attack could only have reinforced counsel's complementary (although ineffectively implemented) strategy of questioning the cause of death. Both strategies struck at the foundations of the prosecution's theory of the case by undermining the various El-Atari versions that the Government's counsel hammered home. Counsel's failure to develop evidence and present argument supporting their own strategy was deficient performance.

       **E.**       **The Deficient Performance Prejudiced the Defense at the Guilt-Innocence and Penalty Phases.**

86.     There is a reasonable probability that, if trial counsel had confronted the jurors with developed evidence that the DNA of another person who may have been a male appeared on the pillowcase found on the victim's head, in addition to expert opinion that the heart defects likely caused her death, the jury would have had a reasonable doubt about Torrez's guilt. Both the DNA evidence and the cause-of-death evidence would have supported the broader strategy of highlighting the myriad ways in which the El-Atari tapes contradicted the scientific and non-scientific evidence, from the presence of yet another unknown fingerprint on the doorknob to the overflowing trash basket, which gave the lie to the taped claim that it was emptied. As it was, the contradictory evidence kept the jurors deliberating all afternoon on April 7 and until nearly noon on April 8. An effective presentation and summation argument—instead of summation silence—could have given the jurors compelling grounds for reasonable doubt. There is certainly more than a reasonable probability that a constitutionally adequate presentation would have done so. Counsel's deficient performance respecting the DNA evidence accordingly prejudiced Torrez at the guilt-innocence phase of trial, both independently and in combination with the deficient performance respecting the cause-of-death evidence.

87.     Moreover, there is a reasonable probability that at least one juror who had heard constitutionally adequate evidence and argument on DNA would have harbored a reasonable, residual doubt whether Torrez was there at all on the night of the victim's death. Any such juror would have rejected all the necessary factors at the eligibility phase or voted for life at the selection phase, independently and cumulatively with the evidence on the cause of death. Counsel's deficiencies accordingly, at a minimum, prejudiced Torrez at the penalty phase of trial.

40

88.     For all these reasons, this Court should grant Torrez habeas relief from his conviction or, alternatively, his death sentence, both on this ground and in combination with the other grounds set forth in this motion.

### III.   TRIAL COUNSEL WERE INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO ADEQUATELY INVESTIGATE AND IMPEACH STAR GOVERNMENT WITNESS OSAMA EL-ATARI

89.     The claims and factual allegations set forth in all other sections of this Motion are incorporated by reference and re-alleged as though fully set forth herein.

90.     As noted above, Osama El-Atari was an important prosecution witness in Petitioner's case.  Agents of the prosecution used El-Atari to record conversations with Mr. Torrez pre-trial.  El-Atari was provided with a recording device to record Mr. Torrez in jail and El-Atari testified at the trial during the guilt and penalty phases.  *See Torrez*, 869 F.3d at 297-98. El-Atari did not record all the conversations he had with Petitioner.  Trial Tr. 4/3/14, 1891-92.

91.      Before – and while – recording Petitioner, El-Atari was himself a defendant in more than one federal criminal case, *United States v. El-Atari*, Docket Nos. 10-cr-64-A & 10-cr-139-A (E.D. Va.).  He was charged with bank fraud, specifically, defrauding banks in excess of $54,000,000.  El-Atari pled guilty.

92.      El-Atari was interviewed by a United States Probation Officer during the course of the preparation of a pre-sentence report for El-Atari's criminal cases.  The trial prosecutor in Petitioner's case alerted trial counsel that the probation office questioned the credibility of statements El-Atari made for a pre-sentence report.  Even so, counsel failed to adequately investigate, pursue and use this information to show that El-Atari continued to engage in deceitful conduct after signing a plea agreement and cooperating with the government.

93.     El-Atari signed the plea agreement with the government on April 29, 2010. *El-Atari*, No. 10-cr-64, Dkt. No. 35. In it, he agreed to plead guilty to the crimes with which he was charged. The agreement contained a number of other terms and conditions to which he agreed. Among them, he agreed to "cooperate fully and truthfully with the United States." Plea Agreement, at 8. In addition, the agreement put El-Atari "on notice" that he "may not violate any federal, state, or local criminal law while cooperating with the government, and that the government will, in its discretion, consider any such violation in evaluating whether to file a motion for a downward departure or reduction of sentence." *Id*. at 9. Similarly, El-Atari agreed that "nothing in this agreement prevent[ed] the government in any way from prosecuting the defendant should the defendant knowingly provide false, untruthful, or perjurious information or testimony." *Id*. at 9-10. The agreement continued: "This plea agreement is conditioned upon the defendant providing full, complete and truthful cooperation." *Id*. at 10. El-Atari could be prosecuted and punished for breaching the agreement by "commit[ting] any additional federal, state or local crimes, or intentionally giv[ing] materially false, incomplete, or misleading testimony or information, or otherwise violat[ing] any provision of this agreement." *Id*. at 12-13.

94.     When being interviewed for the Presentence Investigation Report ("PSR"), El-Atari told the United States Probation Officer that he was kidnapped and raped as a child in Jordan. Recorded phone calls between El-Atari and his family and attorneys – El-Atari cavalierly called his attorneys on a line he knew was being recorded – indicate that El-Atari supported this story with false information and these recordings support a strong inference that the story itself was fabricated.

95.     United States Probation Officer Nina Blanchard prepared the PSR that the Court relied on when sentencing El-Atari. The PSR was completed, as amended, on August 18, 2010.

In a section on Personal and Family Data, the PSR recited a story told by El-Atari that he was

kidnapped and raped as a child in Jordan:

> 45.  . . . [W]hen [El-Atari] was about eight years old, he suffered a traumatic incident when the family was visiting relatives in Jordan.  According to the defendant, and as confirmed by his father, the defendant was out playing soccer one day when he was kidnaped by a group of men and physically and sexually assaulted.  He was hospitalized for over a month as a result of the attack.  Once the family returned to the United States, the defendant was not sent to a counselor to talk about the experience.  Rather, as his father told this officer, "our culture does not talk about those kinds of things."  The family went on with his life as though the incident never occurred.
>
> 46.  The defendant reportedly suffered nerve damage as a result of the attack, and was left impotent.  He advised this officer that when he started dating as a teenager, he began consuming alcohol in excess in order to have an excuse as to why he could not perform sexually.  He eventually developed an addiction to alcohol.
> . . .
>
> Physical Condition
>
> 47.  The defendant advised that when he was 23 years old, he went to London, England to have surgery, and then went to Jordan to recover.  The surgery in London focused on the re-routing of nerves, and reportedly resulted in rejuvenation of sensation in the defendant's genital area.
>
> 48.  The defendant was unable to recall the name of his surgeon or the name of the hospital in which he had the surgery in London.  During a telephone interview, the defendant's father advised this officer that he was unaware the defendant had this surgery, since the family never talked about the incident or anything related to its aftermath.  Reportedly, the defendant's father does recall the name of the physician who first treated the defendant in Jordan; however, the name was not provided to his officer.  In any event, because of the location of the doctor and any accompanying records, verification of the defendant's injuries and treatment would be unattainable by the time of sentencing, unless directly obtained and provided by the defendant's parents, who are in Jordan currently.

PSR, *U.S. v. El-Atari*, Docket Nos. 10-cr-64-A & 10-cr-139-A (E.D. Va.).

96.     El-Atari's attorneys filed a sentencing memorandum in his case on August 20,

2010.  It repeated the same story set out in the PSR:

> At the age of eight, while in Jordan, Mr. El-Atari was abducted and repeatedly and viciously assaulted by a group of men, sexually and with a knife, simply because he was an American.  ¶45.  The assault left him with severe, life-altering injuries, the physical

and mental effects of which will haunt him for the rest of his life.  ¶¶45-46.  Before undergoing experimental surgery in the United Kingdom in his early twenties, Mr. El-Atari was unable to perform sexually; he still remains unable to father children.  ¶46.

Sentencing Memorandum at 4, *U.S. v. El-Atari*, Docket Nos. 10-cr-64-A & 10-cr-139-A (E.D. Va.).  This portion of the sentencing memorandum had been redacted and filed under seal.  The file was unsealed on April 27, 2016.  *El-Atari*, Docket No. 69.

97.     Before his sentencing, El-Atari made numerous phone calls to his family and attorneys while he was in the Arlington County Detention Center.  These calls were recorded.  He sought to bolster his claim that he had been raped in Jordan and had corrective surgery as a young man.  He told his family that his story, if believed, would lead to a sentence of probation.

98.     In a July 1, 2010 phone call, Katherine Yingling, an associate attorney on El-Atari's legal team, told him that Nina Blanchard, the probation officer, needed the name of a hospital or doctor to corroborate story that El-Atari was raped.  TC 7/1/10, 165308.[5]  On the same day, El-Atari spoke with his brother, Belal, and told him to call their dad to find a doctor their dad trusted who preferably spoke English.  TC 7/1/10, 170034.  In another conversation with Yingling, El-Atari stated that he did not know the name of the doctor who treated him.  TC 7/6/10, 121947.  Yingling informed El-Atari that she told P.O. Blanchard she would provide the name of the contact.  *Id*.  According to Yingling, Blanchard said she found El-Atari very personable and wanted the issue of what happened in Jordan resolved.  Subsequently, El-Atari told his sister that he was very stressed.  He said that supporting the rape story would make the difference between a sentence of probation and five years.  El-Atari related that the probation officer was in tears when she heard it.  TC 7/6/10, 125928.

---

[5] The citation to the phone calls is to the date of the call and the time called.  For example, TC 7/1/10, 165308 refers to a call made on July 1, 2010 at 4:53 p.m. (and 8 seconds).  Each of the calls has a recorded message at the beginning stating that the call may be recorded.

99.     The next day, El-Atari had a conversation with his brother about finding a doctor in Jordan to support his story.  He said the following in a combination of English and Arabic; the Arabic portion (translated) is italicized:  "Now, the office address [for the doctor] is very easy.  You know what I mean?  It's not hard.  Ok?  *Make one up.*  Ok?"  TC 7/7/10, 134305; see also TC 7/8/10, 101800 (El-Atari asking his brother in Arabic whether their father is "looking for someone there") (translation of Arabic is italicized – translated by Ratib Habbal in his declaration dated 5/10/21).

100.     Still intent on making up an identity for this doctor, El-Atari told his brother in Arabic to smuggle in a pen and paper on a visit to the jail so he could write out instructions for his brother.  *"When you come, bring a pen and paper and put it in your underwear.*  All right?" TC 7/9/10, 095939 ; *see also* TC 07/09/10, 224041 (To brother Belal:  "You can only bring your license in.  Ok.  You can't bring in your phone, or anything.  *But put a paper and pen in your ass.*) (translation of Arabic is italicized – translated by Ratib Habbal in his Declaration dated 5/10/21).

101.     After some back and forth, El-Atari told his brother to go on the internet and find a hospital that was around at the time of incident and give it to him, not to his lead attorney, Bernard Grimm.  TC 7/13/10, 103448.  El-Atari's brother said he found a list of hospitals which he provided to their father to select a hospital.  El-Atari said he wanted to use the one that was farthest away.  TC 7/13/10, 214429.

102.     El-Atari gave his brother very specific instructions to give Grimm's paralegal, Megan, that the information on the hospital in Jordan was not to be sent to the probation officer until 3 p.m. on the next day and not before.  TC 7/14/10, 193532.  If the probation officer received it at that time, she would have a hard time following up before she finished the pre-

45

sentence report which was due in two days on Friday, July 16, 2010.[6]  El-Atari told his brother, "I want the time difference on my side."  TC 7/14/10, 201323.

103.    El-Atari spoke with Grimm about the hospital information and instructed Grimm to tell the probation officer that this was the hospital at which El-Atari was originally treated.  El-Atari told Grimm that his strategy was that the defense team would drop the ball in the probation officer's lap, i.e., give her a name, address and phone number and leave it to her to follow up.  TC 7/15/10, 171450.

104.    El-Atari confirmed with Grimm's paralegal that, pursuant to Grimm's and El-Atari's instruction, the hospital name, address and phone number were emailed to P.O. Blanchard.  TC 7/16/10, 115454.

105.    During one of their conversations, Grimm reprimanded El-Atari for saying on a recorded line that he expected to get out in the fall.  Grimm told El-Atari that it could lead the government to not seek a reduction in El-Atari's sentence. Grimm had seen that happen before.  TC 7/15/10, 171450.  El-Atari thought that, if the probation officer did not believe this story, he could get charged with falsification to authorities, which would adversely affect his sentence.  Grimm agreed, telling El-Atari, "We're f****d if we don't get the records."  TC 7/11/10, 133856.

106.    El-Atari was sentenced after he recorded conversations with Petitioner, but before he testified at Petitioner's trial.  On September 9, 2010, he received a sentence of 144 months (12 years) incarceration and, following his release from incarceration, restitution at the rate of $400/month.  *El-Atari*, No. 10-cr-64, Dkt. No. 47.

_____

[6] As stated, the PSR was completed, as amended, about a month later.

107.     On March 24, 2014, seven days before witness testimony commenced at trial, AUSA Jonathan Fahey sent an email to trial counsel with a number of disclosures.  Included was the following: "[i]n the PSR, El-Atari discusses being abused as a kid.  Because the probation officer was unable to find medical records or documents to corroborate the account, she did not believe that he was truthful about this incident.  This is described in the PSR."  3/24/14 email from AUSA Jonathan Fahey to Robert Jenkins, *et al*.

108.     In April 2014, El-Atari testified at Petitioner's capital trial during both the guilt and sentencing phases.  The government used El-Atari to introduce portions of the tape-recorded conversations with Petitioner.  El-Atari admitted that not all of his conversations with Petitioner were recorded.

109.     On direct examination, El-Atari was asked about his cooperation with the government as follows:

Q.     What's your understanding of the consequences to you if you lie in this court or in the course of your cooperation?

A.     I don't get anything.

Tr. 4/3/14, 1822.  This gave the impression that El-Atari had not lied to government officials during his cooperation.  Otherwise, he would not be testifying.  He would have no incentive to testify because he "[would]n't get anything."  The impression created was misleading.

110.     Following his testimony in this case and having served a little over four years of his original sentence, El-Atari was resentenced on May 9, 2014.  He received time-served, substantially less time than the original sentence.

111.     El-Atari is now deceased.  *See* Third man arrested in Leesburg bank scammer's death, *Loudon Times-Mirror* (May 29, 2016).

47

112.     It is a federal crime for a defendant to give materially false information to a United States probation officer.  18 U.S.C. § 1001(a)(2) and (a)(3); *see United States v. Vreeland*, 684 F.3d 653 (6th Cir. 2012) (defendant convicted of giving false information to probation officer while on supervised release).

113.     Defense counsel knew that El-Atari was an important government witness. Counsel sought to impeach him at trial.  They had AUSA Fahey's email stating that El-Atari's probation officer thought he was not being truthful about his background.  This was during the time of his cooperation with the government.

114.     Counsel could have used the information in the recordings that el-Atari gave false information to the probation officer not only to attack El-Atari's credibility, but to attack the thoroughness and good faith of the case put on by the government.  *Cf. Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (a common defense tactic is "to attack . . . the thoroughness and even the good faith of the investigation").

115.     Defense counsel received recordings of these phone calls and knew, or had reason to know, that El-Atari was speaking with his brother about obtaining information on – *not* the doctor who treated him – but a doctor his father "trusted" who could speak English and one for whom his brother made up the address.

116.     El-Atari directed his attorneys to send the information to the probation officer about the supposed hospital where he was treated at a specific time when he believed the probation officer would not be able to follow up.  He did this after signing a plea agreement in which he agreed to provide full, complete and truthful cooperation and not commit any additional crimes.

117.     El-Atari admitted that he did not record all of his conversations with Petitioner. The government cannot verify what incentives El-Atari gave to Petitioner to talk during the recorded conversations.  If the jurors had been made aware of El-Atari's deceit, partially – and apparently intentionally – obscured by his use Arabic, it is reasonably probable that the information would have negatively impacted their perception of the government's case which relied heavily on information El-Atari obtained.  It would also have shown that El-Atari continued not to be truthful even when he was cooperating with the government.  It would have rebutted the presumption created by his testimony that he was being truthful, since he was on the stand and expecting a reward from the government for his cooperation.  By itself, and in combination with other errors of a constitutional magnitude at Petitioner's trial, it is reasonably likely that there would have been a different outcome if the jury had been presented with convincing evidence of El-Atari's ongoing deceit after he signed a plea agreement stating he was going to be truthful in his cooperation with the government.

118.     To the extent that impeachment information was in the government's possession and it did not provide that information to the defense and/or did not provide the information in a timely fashion to defense counsel, the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

## IV.     PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING WHERE COUNSEL FAILED TO INVESTIGATE AND DEVELOP AVAILABLE PENALTY-PHASE EVIDENCE AND FAILED TO PRECLUDE TORREZ'S WAIVER OF ANY PENALTY-PHASE DEFENSE.

119.     The claims and factual allegations set forth in all other sections of this Motion are incorporated by reference and re-alleged as though fully set forth herein.

120.     The Supreme Court has clearly established that counsel in a capital case must

49

conduct a thorough investigation of the defendant's background and identify all reasonably available mitigating evidence. *See Andrus v. Texas*, 140 S. Ct. 1875 (2020); *Sears v. Upton*, 561 U.S. 945 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). "To that end, trial counsel must inquire into a defendant's social background, . . . family abuse, mental impairment, physical health history, and substance abuse history; . . . consult with appropriate medical experts; and pursue relevant leads." *Hamilton v. Ayers*, 583 F.3d 1100, 1113 (9th Cir. 2009) (internal quotations and citations omitted); *see also Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008) (recognizing that "'the assistance of one or more experts (e.g., social worker, psychologist, psychiatrist, investigator, etc.)' in the investigation, development, and presentation of relevant mitigating evidence 'may be determinative as to [the] outcome" at sentencing.'") (quoting American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1.C (2003) ("ABA Guidelines")). Counsel also has a duty "to seek information that . . . rebuts the prosecution's case in aggravation." ABA Guidelines 10.11. These duties exist regardless of a defendant's willingness to cooperate with counsel's investigation. *See, e.g.*, *Porter*, 558 U.S. at 40; *Rompilla*, 545 U.S. at 381–82; *Branker*, 529 F.3d at 232

121.    Additionally, when representing a client who has indicated a desire to waive the presentation of penalty-phase evidence, capital counsel has a duty to "fully educate [the client] about the ramifications of his decision" and may not simply acquiesce in the client's wishes. *Silva v. Woodford*, 279 F.3d 825, 847 (9th Cir. 2002), *as amended* (Feb. 22, 2002). "There are multiple aspects to ensuring a decision [to waive the penalty-phase presentation] is informed and knowing, but the objective is to ensure that the defendant comprehensively understands what he

or she is giving up by declining to present a penalty defense." *Sanders v. Davis*, 23 F.4th 966, 987 (9th Cir. 2022). Thus, although a competent capital defendant may, under appropriate circumstances, ultimately choose to waive penalty-phase evidence, *see Schriro v. Landrigan*, 550 U.S. 465 (2007), that waiver does not automatically foreclose habeas relief on a claim that trial counsel provided ineffective penalty-phase assistance, *see, e.g.*, *Blystone v. Horn*, 664 F.3d 397, 425–27 (3d Cir. 2011); *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1360 (11th Cir. 2009). Rather, "[w]hen counsel commits errors in addition to conducting a deficient" investigation, this Court "look[s] to see whether those additional errors, combined with the deficient investigation, establish a reasonable probability that the result of the proceeding would have been different." *Sanders*, 23 F.4th at 983 (citing *Landrigan* and *Strickland*).

122.    Here, trial counsel failed to competently investigate and prepare a penalty-phase presentation as required by the Sixth and Eighth Amendments. Torrez's initial trial team had retained mental health experts and conducted a preliminary social history investigation. Together, these efforts revealed significant red flags suggesting that Torrez, inter alia, was raised in a neglectful and abusive environment, suffers a serious mental illness, and has organic brain damage. But the attorneys appointed to replace the first trial team failed to fulfill their constitutional duty to complete this investigation. The second trial team also ignored evidence in its possession that could have been used to challenge the Government's case in aggravation. Additionally, counsel failed to adequately consult with Torrez about his decision to waive the presentation of penalty-phase evidence. Lastly, the trial team failed to challenge Torrez's competence to knowingly, intelligently, and voluntarily waive both the right to present mitigation and the right to counsel at the penalty phase of trial. Torrez was prejudiced by counsel's deficient performance, as there is a reasonable probability that effective counsel could

51

have precluded the complete abnegation of a penalty-phase defense and there is a reasonable probability that, had the available mitigating evidence been presented, at least one juror would have voted in favor of life.

### A.      Factual Background

#### 1.      The FPD penalty-phase investigation

123.      Shortly after being appointed, the FPD team retained Ingrid Christiansen, a private mitigation specialist with extensive capital experience. IC Dec ¶¶ 1–2. Additionally, in April 2012, the FPD hired Spanish-speaking mitigation specialist Dhyana Fernández, whose experience focused on the cases of foreign nationals from Latin countries, including Mexico. DF Dec ¶¶ 1–2. Although Torrez was born in the United States, his parents were both born and raised in Mexico and both had extended family members still living in Mexico. Moreover, neither of Torrez's parents ever learned to speak English, and several other extended family members living in Illinois spoke only Spanish. The team also consulted with members of the Federal Death Penalty Resource Counsel Project, including Scharlette Holdman, who was then a nationally-recognized expert in capital mitigation. Finally, consistent with best practices, the FPD retained qualified mental health experts to evaluate Torrez and an experienced social worker to prepare a life history. *See infra*.

124.      Although amply staffed, the FPD's mitigation efforts met significant resistance from Torrez's immediate family members, who insisted that the charges against Torrez were born from a conspiracy and that therefore any effort focused on sentencing was a waste of time. IC ¶ 28; DF ¶ 25. Torrez himself proved to have little insight into his own upbringing or mental health issues and consistently insisted that he was "normal." IC ¶¶ 6–8, 13–15. Meanwhile, because the family had lived an unusually isolated existence in the United States, it was difficult for the investigators to obtain information about Torrez or his background from extended family

members, neighbors, or others in the community. *Id.* ¶¶ 12, 23, 38–40, 52, 64. These challenges notwithstanding, the FPD team was able to gather substantial mitigating evidence, including evidence of abuse, neglect, and possible trauma within Torrez's nuclear family, as well as evidence of significant mental health issues and organic brain damage.

### a.  Family neglect/abuse/possible trauma

125.    As described in the declarations of FPD mitigation specialists Ingrid Christiansen and Dhyana Fernández, witnesses who knew Torrez growing up unfailingly described him as a sweet child who craved affection and connection. Extended family members recalled that as an adolescent, Torrez loved when the larger family was all together and that he was generous and kind with his many cousins. IC ¶¶ 52–54, 58; DF ¶¶ 42–46. Yet, as these extended family members also disclosed, Torrez's parents were unable or unwilling to meet their son's emotional needs themselves and forced him to lead an insular life. *See, e.g.*, IC ¶ 60 ("Cesareo and Alicia were 'not loving.' They did not say 'I love you' or hug their children. . . . Alicia and Cesareo wanted good kids, but they forgot the importance of loving them."); *id.* ¶ 63 ("The four members of Jorge's nuclear family were always together. [But] neither Sara nor Jorge was close to either of their parents and . . . Cesareo or Alicia were not affectionate with Jorge."); *id.* ¶ 64 ("Jorge's family [w]as a very secretive family, . . . different from others, they don't communicate with anybody, and they keep their business to themselves."); *id.* ("Jorge was a very high energy kid, but . . . his parents would not let Jorge just be a kid."); DF ¶ 55 (Jorge's dad "was not a friendly guy in general, and was harsh on Jorge, not loving.").

126.    Others reported that Torrez's father, Cesareo, not only neglected his son, but was physically and emotionally abusive. IC ¶ 58 (Cesareo hit Jorge, for no apparent reason); DF ¶ 47 (Cesareo disciplined Jorge by hitting him with a belt); DF ¶ 55 ("Cesareo treated Jorge like a slave and if Jorge did not get something right, his father would actually punch him in the way he

53

would punch another man."). According to the only friend that Torrez was allowed to invite to the house when young, Walter, "Jorge was unhappy at home. . . . Cesareo treated him 'real bad,' telling Jorge he was worthless, yelling at him, and hitting him." IC ¶ 69. Walter also explained that Jorge "believed that [his mother] did not care about him because she did not defend Jorge to his dad." *Id.*

127.    Over time, the family's secretiveness, neglect, and abuse took its toll on Torrez. As Christiansen later wrote:

> By the conclusion of my work on Jorge's case, I had come to understand that Jorge grew up in a family that was extremely isolated and fearful. But I learned that as a child, he wanted to be different. His parents were very controlling and distrusted outsiders; no visitors were welcome and they kept to themselves. Jorge, by contrast, was not a secretive sort of person when he was young, and he tried to learn to be a freer, more normal person. He wanted to be someone who had friends and eventually a wife and a well-paying job. It seems the damage from his family was done, however, and he could not figure out how to make any of these things happen for him.

IC Dec. ¶ 12.

128.    The FPD team also believed that the immediate family's near complete unwillingness to assist in the investigation to save Torrez's life suggested that there is trauma in his background that the family desperately wanted to keep secret, even at the cost of losing their son and brother to execution. It was certainly understandable that the family would initially insist on Torrez's innocence; he had been accused of truly horrific actions. But over time, the FPD provided the family with more than enough evidence to demonstrate that, regardless of Torrez's actual innocence, there was a substantial likelihood that he would be convicted and that he was therefore at risk of receiving a death sentence without the family's cooperation. The FPD also worked tirelessly to convince the family that their cooperation was critical to building a persuasive penalty-phase presentation. Nevertheless, Torrez's parents refused to cooperate and actively interfered with others' ability to do so. Sister Sara was likewise unwilling to open up in

54

any meaningful way. According to Jan Vogelsang, a social worker who had been working on capital cases since 1989 and who was retained by the FPD to prepare a social history report for Torrez, it was incredibly rare for the family of a capital defendant to offer such little assistance to the defense team. *See* Kamens Dec. ¶ 17; *see also* DF ¶ 17 ("I believe that Jorge's parents (and sister) were guarding some secret that was so painful that they were willing to sacrifice Jorge to avoid disclosing it. This would not have been the first time I had seen this happen, especially with victims of sexual abuse.").

### b. Mental illness

129. The FPD also obtained evidence suggesting that Torrez suffers from a serious mental illness. As an initial matter, his academic records made clear that he has a learning disability, and the evidence discovered by both the FPD and undersigned counsel demonstrates that Torrez in fact has organic brain damage. *See infra*. But the records and interviews with former educators also indicated that Torrez harbored emotional problems that precluded him from even performing up to the capacity that could be expected based on his testing, especially given that he was mostly enrolled in special education classes for which he received additional resources. For instance, Julie Wendorf, the former head of special education for the Zion School District, observed that Torrez's "innate abilities" were "average," but his performance was "off," even though most of his courses were in the resource room. IC ¶ 80. She was also struck by the fact that Torrez's scores on multiple administrations of the Otis-Lennon School Ability Test were "all over the place." *Id.* "There should have been consistency, as the scores display innate ability, not what one has learned. Yet there was, for example, a 43 point discrepancy between his fourth grade verbal score (56) and his seventh grade verbal score (99)." *Id.* According to Wendorf, "something must have been interfering with Jorge's performance." *Id.*; *see also id.* ¶ 81 (another former educator stating that "Jorge's failing grades did not reflect his ability" given

55

that most of his classes were special education classes but he still performed poorly).

130. The FPD also discovered evidence of social and practical deficits that interfered with Torrez's ability to form close relationships with same-age peers, including romantic relationships. Again, this was not for lack of trying, as Torrez desperately wanted to fit in and dreamed of one day marrying and having children. *See* IC ¶ 12; DF ¶ 9. Yet he had difficulty registering social cues and did not seem to understand the distinction between a mere acquaintance and a close friend. IC ¶ 23; DF ¶¶ 74. Furthermore, although consistently described as polite and kind, he did not express emotions in a manner that would allow him to form close friendships. DF ¶ 74. His social challenges were exacerbated by the fact that—whether on account of parental neglect, poverty, or mental health challenges—Torrez maintained poor hygiene in high school and was bullied mercilessly by classmates who called him "Stinky Jorge." *Id.*; IC ¶ 71. As a result, by the time of his arrest, the only people that described him as a close friend at the time he was awaiting trial were two fellow Marines who had known Torrez for less than ten months and five months, respectively. A552.[7] And, despite his claims to the contrary, there is no evidence that Torrez ever had a romantic partner or engaged in a consensual sexual relationship. IC Dec. ¶¶ 19–20.

131. Torrez's social deficits were also evidenced by his gullibility and immaturity. Interviews with peers from his adolescence revealed that Torrez often spent time with neighborhood kids who were at least two years younger or were themselves cognitively impaired. IC ¶ 74. That Torrez had not fully matured by the time of his alleged crimes was highlighted by his repeated discussions with multiple jailhouse informants in which he claimed

---

[7] One of these friends, Kenneth Overman, had been stationed with Torrez in 2007, but did not befriend him until April 2009. A552. The other friend was Overman's girlfriend, and later wife, Autumn, who first met Torrez in September 2009. *Id.*

responsibility for multiple murders and made other highly damaging statements.

132.    Also suggestive of mental health problems was evidence demonstrating that Torrez had altered sexuality extending beyond his failure to find romantic love. For instance, each of his alleged crimes involved a sexual element. However, the Pre-Sentence Report prepared following Torrez's conviction for the Arlington crimes noted that he had never ejaculated during the multiple instances of sexual assault perpetrated against one of the victims. [ARL PSR at 8]. Additionally, the search history discovered on Torrez's personal computer at the time of his arrest revealed an addiction to pornography, including pornography featuring family incest in various combinations. *Id.* at 16, 20. Torrez also became notably hostile whenever asked about having entertained homosexual feelings or engaged in sexual activity with another male. *See, e.g.*, ECF No. 253 at 5.

### c.    Organic brain damage

133.    The first mental health expert retained by the FPD team was neuropsychologist Dale Watson, Ph.D., who administered a full battery of neuropsychological testing over the course of three days in May 2012. The intelligence testing, which was consistent with IQ testing administered while Torrez was in school, demonstrated that although he had certain strengths, there was a significant spread between his verbal and performance scores. Overall, the results from Dr. Watson's testing suggested, inter alia, damage in the left temporal lobe. Kamens Dec. ¶ 14.[8] Dr. Watson noted that left temporal lobe damage is associated with altered sexuality. *Id.* He also recommended that Torrez undergo brain imaging and a Qualitative Electroencephalogram ("QEEG"), and that the FPD consult with an expert such as Dr. Ruben Gur, who uses volumetric

---

[8] Dr. Watson was only retained to administer neuropsychological testing. He did not conduct an evaluation and never analyzed the testing data he obtained in the context of any biopsychosocial history. Nor did he ever prepare a report. *See* Kamens Dec. ¶ 14.

measurements to understand brain structural compromise. *Id.*

134.    The FPD also retained neuropsychiatrist, Dr. Thomas M. Hyde, as a consultant and potential expert witness. ECF No. 221. Dr. Hyde met with Torrez on three separate occasions and concluded that there was evidence of brain damage and other mental health issues requiring further investigation. [10-15-12 Mental Health Notice.] Echoing the recommendations of Dr. Watson, Dr. Hyde also advised the FPD to obtain an MRI and a QEEG, and he provided the necessary prescriptions. [10-15-12 Mental Health Notice]; [12/20/12 Scripts]. Torrez was eager to obtain the imaging, *see, e.g.*, [Nov. 2012 Pro Se Letter], and the FPD team obtained an ex parte order from the Court authorizing Torrez's transport to Georgetown University Hospital for brain imaging, ECF No. 222. However, as discussed immediately below, the FPD was removed from the case before the imaging could be obtained.

### 2.    Torrez's efforts to self-represent or obtain new counsel.

135.    Throughout the course of the FPD's representation, Torrez had resisted the team's efforts to speak to his extended family members in Mexico. Nevertheless, mitigation specialist Fernandez travelled to Mexico in November 2012 for that purpose and, when Torrez asked attorney Christopher Davis about Fernandez's trip, Davis untruthfully claimed she was there on another case. Upon learning that Davis had lied to him, Torrez cut off communication with his attorneys and ceased working with them in any way, including refusing to undergo the brain imaging to which he had previously agreed.

136.    On November 7, Torrez orally requested that the Court allow him to represent himself. The Court denied the motion, stating that Torrez was incapable of making the complex legal decisions required in a capital case. As the Court explained: "The laws surrounding death penalty eligible cases are like no other laws. . . . Whether to allow mitigation evidence, whether to admit evidence in the sentencing phase, again, a completely different body of law than exists

58

anywhere else in our legal system, and you are incapable of understanding and being able to represent yourself in those matters." ECF No. 418 at 9. The Court directed counsel to confer with Torrez and report back.

137.    The Court conducted another ex parte hearing in early December. Once again, the Court denied Torrez's request to self-represent, explaining that Torrez was "not capable" of handling the legal questions at issue in the case. ECF No. 420 at 8. The Court advised Torrez to consult with Zion attorney Jed Stone on the matter. ECF No. 204. Ultimately, Stone was unable to persuade Torrez to maintain the FPD as his counsel, but he did convince Torrez that it was not in his best interest to represent himself. In a subsequent letter to the Court, Torrez acknowledged as much and stated that he would be willing to accept substitute counsel. ECF No. 226.

138.    The Court determined that it could not rule on the request for substitute counsel without a competency evaluation, and appointed local psychiatrist Richard Ratner to perform an evaluation. *See* ECF No. 253. Dr. Ratner met with Torrez for three hours on February 14, 2013. He was not provided with the "developmental, family, social, educational, or occupational, legal history" of Torrez. Accordingly, did not have the records he would need for a comprehensive psychiatric evaluation. Ratner Dec. He received no records from the FPD or any other source; and denied seeing the results of any neuropsychological testing or other mental health evaluations conducted at counsel's request. *See* ECF No. 253.

139.    Based on their single, brief meeting, Dr. Ratner found Torrez competent both to stand trial and to self-represent. However, he noted that he wondered about Torrez's judgment because, while Torrez blamed his counsel for some mistakes, they were not the type of mistakes that would prevent counsel from competently representing Torrez. *Id*.

140.    Additionally, Dr. Ratner noted that Torrez had complained of his attorneys'

59

efforts to conduct a mitigation investigation, but Dr. Ratner explained that he thought a competent individual would want to have that type of investigation because it could be important as to whether Torrez received a life sentence or a death sentence.  Dr. Ratner thought Torrez exhibited a large amount of denial.  *Id*.  However, Dr. Ratner thought the denial would not affect the guilt-innocence part of trial.  Ratner Dec.  Dr. Ratner "expressly reserved any conclusions about [Torrez's] competency related to penalty-phase proceedings." *Id.*

141.    At a subsequent hearing, the Court once again informed Torrez that it was not in his "best interests" to either replace his current counsel or to represent himself, but Torrez insisted on at least obtaining substitute counsel. ECF No. 424 at 8. The Court then asked whether Torrez would seek to replace any new attorneys once they took steps to investigate mitigating evidence. Torrez explained that he understood capital counsel has a legal duty to conduct a mitigation investigation regardless of his "feelings" and that he would have "no problem" with new counsel performing that task. *Id.* at 9–10. At the conclusion of the hearing, the Court granted Torrez's request to substitute counsel.

### 3.    The transition between defense teams

142.    Jenkins, Brennan, and Mitchell were appointed on May 3, 2013. ECF No. 426. That same day, the Court scheduled voir dire to begin on January 21, 2014, and trial to begin on February 4, 2014. *Id*.

143.    Immediately following the new trial team's appointment, Geremy Kamens of the FPD team offered to meet with the new lawyers to brief them on the FPD's work to date. *See* Kamens Dec. ¶ 21. The two teams met in May 2013 and the FPD provided the trial team, inter alia: an overall summary of the case and pleadings filed to date; all discovery; memoranda detailing the mitigation investigations to date and recommendations as to the work that remained outstanding; copies of all interview memoranda written by the FPD mitigation specialists; copies

60

of the life history records they had gathered; and the results of neuropsychological testing performed by Dr. Watson that showed Torrez had significant impairments in several areas. *Id.* ¶¶ 6, 20. The FPD also provided the new attorneys with a list of each of the experts consulted by the FPD, their role in the case, and their contact information. [List of Experts]. This list included the contact information for both Dr. Watson and Dr, Hyde, as well as social worker Jan Vogelsang, who had "begun investigating Torrez's social history and [was willing to] continue with investigating, summarizing, and testifying about the social history of Torrez and his family." *Id.* Among the actions that the FPD recommended the new trial team take "immediately" were to "[r]eview expert list for other experts to retain," and to "[a]rrange brain scans" for Torrez. [Transfer Memo at 7].

144.     The new trial team also met with members of the Federal Death Penalty Resource Counsel Project familiar with the case.[9] Among the participants were David Bruck, who was appointed as resource counsel following the FPD's removal from the case; renowned capital defense attorney Judy Clarke; and David Freedman, the Project's Mental Health Consultant. [05/31/13 DF-re-team-meet]; *see also* Kamens Dec. ¶ 13 (describing Clarke as "one of the most renowned and experienced death penalty attorneys"). During the meeting, Dr. Freedman outlined the evidence of brain damage found in Torrez's school records and neuropsychological testing. [05/31/13 DF Notes] He also informed the team about the investigative steps that still needed to be taken to reach a mental health diagnosis, which included examining the client's prenatal history and birth records, his early childhood and medical care, his parents' mental state and functioning, and whether he was impacted by isolation and poverty. *Id. See also* [05/31/13

---

[9] As noted above, the FPD team had consulted members of the Project throughout its representation of Torrez, in particular with regard to mitigation-related issues such as mental health and potential toxin exposure. *See supra* ¶ 120; *see also* Kamens Dec. ¶ 13.

61

Jenkins Notes] (noting that client had various impairments but had not yet been "fully diagnosed").

### 4.    Trial counsel's penalty-phase investigation

145.    Despite the information provided by the FPD and resource counsel, and notwithstanding the ethical obligations on capital counsel to conduct an independent and thorough penalty-phase investigation, trial counsel performed virtually no further work to prepare for the likely sentencing phase of Torrez's trial.

146.    On August 1, 2013, the team moved for the appointment of a guilt-phase investigator and four experts, all of which were approved by the Court that same day. The only one of these experts relevant to the penalty phase was prison adjustment expert Mark Cunningham. The team never retained a mental health expert.

147.    Finally, in mid-October 2013—four months before trial was scheduled to begin— the trial team retained Caroline Burry, Ph.D., LCSW-C, as a mitigation specialist. Over the following several weeks, Dr. Burry reviewed records, met with counsel once, and met with Torrez three times. [2/03/14 Burry Voucher]

148.    On December 9, 2013, Dr. Burry sent an email to Jenkins informing him that Torrez "seemed perfectly comfortable speaking with" her and giving her his views on various records. [12/09/13 CB-RJ]. Nevertheless, Dr. Burry raised concerns about timing and the team's plans for completing prior counsel's mitigation investigation:

> As the scope of the information has become more clear to me, I am very concerned about a trial starting in February. I do understand that there has been an extended period of trial preparation and that many materials have been collected. However, . . . per the memo on the deficiencies of the previous investigation, there are dozens of interviews, etc. yet to be done by an investigator (who will do those?). In addition, I need to interview Torrez's family in Illinois and other witnesses on whom I will rely.

*Id.* Jenkins's only response to these concerns was that he doubted they would be granted a

62

continuance. He provided no answer to her question regarding who would be responsible for the "dozens of interviews, etc. yet to be done by an investigator." [12/10/13 RJ-CB] Dr. Burry replied: "I think it's critical to try and get more time. Not only do I still hold out some hope for a plea (which will take more time w/ Torrez) but also the sheer volume of materials + not-yet-done interviews *is overwhelming*." [12/10/13 RJ-CB]

149.    On December 16, 2013, the defense moved to continue the start of trial by just four weeks—from February 4, 2013, to March 4, 2014, explaining:

> Dr. Burry has been working diligently to digest and analyze the voluminous information already gathered for the purpose of a possible penalty phase, but requests additional time to provide effective assistance to defense counsel in the event this case should reach that phase. As most "legwork" has already been completed, and *the balance involves analysis and the formation of opinion*, defense counsel are confident that nothing greater than a very short postponement of proceedings is necessary.

ECF No. 312 at 2. The Court never ruled on the motion, but the trial was nevertheless continued until March 31, 2014 due to an inability to secure a large enough jury venire pool by the intended start date. [1/07/14 Trump-JBM]

150.    Despite the additional time, the team did little more to prepare for the penalty phase. In fact, according to a voucher she submitted for the period between October 17, 2013—the date she was retained—and February 2, 2014, Dr. Burry billed a total of 52.5 hours on the Torrez case. [2/03/14 Burry Voucher] This figure includes travel time, which was significant, as Dr. Burry had to drive fifty-two miles for her single in-person meeting with the trial team, and 100 miles for each of her five visits to Torrez. *Id.* Aside from the one in-person lawyer meeting and visits to the client, Dr. Burry's time was dedicated to reviewing the materials collected by the FPD team. *Id.* She interviewed no new witnesses and the only individuals aside from Torrez with whom Dr. Burry met were the members of his immediate family, whom she spoke to as a group on a single occasion in late February 2014. [2/21/14 CB-JBM]

63

151.    On March 9, 2014, Brennan shared with the team a one-page document entitled "Mitigation/Themes." [3/09/14 Brennan Mit Themes] The list included five separate issues: (i) residual doubt; (ii) the fact that one life sentence for the murder of Snell was "adequate and sufficient punishment" because Torrez had already received five life sentences for the Arlington crimes; (iii) that "society could be protected" via the strict security measures in prison; (iv) that prison was punishment; and (v) "Torrez family." *Id.* Under this final theme, Brennan provided the following details: "does not want him to die;" Torrez "was 'normal' for a while – 'happy go lucky, etc.;'" and "family is nuts." *Id.* There is no indication as to how counsel intended to establish any of the factors pertaining to "Torrez family."

152.    Ten days before trial, on March 21, 2014, Dr. Burry responded to Brennan's list of mitigation themes, suggesting presenting the client's "good behavior in jail," although that was followed by the question: "is this true?" [3/21/14 CB-JBM] Clearly, Dr. Burry had not reviewed Torrez's prison records, which reflected numerous infractions. Nor had she reviewed the Government's Notice of Intent to Seek the Death Penalty, which included the aggravating factors supporting future dangerousness discussed above.

153.    Meanwhile, counsel took no concrete steps towards completing the mental health investigation. As indicated above, they never moved for the appointment of a mental health expert. And, although the Court promptly renewed its prior order authorizing Torrez to be transported to Georgetown University Hospital for an MRI at counsel's request in November 2013, *see* ECF No. 308, counsel made no immediate effort to schedule the MRI, even though trial was then scheduled to begin on February 4, 2014. Notably, in December 2013, Mitchell sent his two co-counsel an article entitled "Did Brain Scans Just Save a Convicted Murderer From the Death Penalty?" [12/13/13 WM-JBM] The article discussed a recent capital trial in which the

64

jury sentenced the defendant to life in prison after hearing testimony from Dr. Ruben Gur—the expert expressly recommended by Dr. Watson in this case. *See supra* ¶ __. The article went on to explain that an MRI of the defendant's brain showed that certain parts were "unusually small in relation to his overall brain volume." Greg Miller, *Did Brain Scans Just Save a Convicted Murderer From the Death Penalty?*, WIRED, Dec. 12, 2013. It also mentioned a 2010 capital case that ended with a life sentence, explaining that some of the jurors later said they had been persuaded by defense evidence of a QEEG demonstrating the defendant's abnormal brain activity. *Id.* Still, counsel did not act on the prescription Dr. Hyde had written for an MRI until late February 2014, [*see* MRI Report], after voir dire had already begun, and they never acted on the prescription authorizing a QEEG. Nor did counsel seek to have the MRI reviewed by a mental health expert trained in forensic neuroscience who had the relevant neurobehavioral information necessary for a thorough interpretation of the images in the relevant context. Instead, they apparently accepted the findings contained in a one-page report from hospital radiologist Dr. Christabel Lee stating that the impression was "normal." *Id.*

154.     Finally, counsel apparently failed to even realize that they had evidence in their possession to rebut the Government's case in aggravation. As a central part of its case for death, the Government alleged that Torrez had killed two girls—eight and nine years old—in his hometown of Zion, Illinois, in 2005, when he was sixteen years old. While the Government relied on testimony from DNA lab analysts to support its narrative, counsel had in their possession DNA evidence pointing to a second unknown perpetrator of the offense. Yet nothing in the records suggests that counsel was aware of this evidence or made any strategic decision against developing and using it at the penalty phase.

### 5.     Torrez's penalty-phase waiver

155.     Torrez was convicted of first-degree murder on April 8, 2014. Almost

immediately after the verdict was read, counsel requested an ex parte hearing and advised the Court that Torrez did not want to present any mitigation or to argue against the death penalty. Tr. 2087. Torrez clarified that he was not asking that counsel affirmatively ask the jury to impose death, only that they refrain from submitting any case in favor of life. When the Court questioned Torrez as to his motivations, he explained that "there is nothing there worthwhile to argue for mitigation." Tr. 4/8/14, 2088.

156.    The Court urged Torrez to consult with counsel further on the matter and also to speak with his family about his decision, noting that the penalty phase was not scheduled to commence until April 21, 2014. That same afternoon, Mitchell shared with co-counsel an article about death penalty "volunteers" which noted that although "most" capital defendants express a preference for execution over life in prison, "[most] of them . . . change their minds." [4/08/14 WM-JBM]; John H. Blume, *Killing the Willing: "Volunteers," Suicide and Competency*, 103 Mich. L. Rev. 939, 940 & n.7 (2005). Nevertheless, when a team member asked that evening whether she should tell the potential penalty-phase witnesses to be prepared to testify the week of April 21, Mitchell simply replied: "Haha." [4/08/14 HAHA]

157.    On April 9—just one day after being asked to consult with Torrez on his momentous decision—counsel submitted an ex parte letter to the Court in which they asked to withdraw from the case. In the letter, counsel claimed that they had diligently prepared for the penalty phase, but also noted that Torrez had "place[d] certain limits on the extent of [their] investigation and preparation of the mitigation case," which they had followed. [14/04/09 JBM-J. O'Grady at 1] Counsel did not outline these limits, which are not reflected in any of counsel's communications with Dr. Burry, or any authority for their decision to allow the client to dictate their investigative efforts. Counsel also explained their belief that they were "duty bound to

66

abide by the client's decisions concerning the objectives of the representation," but did not feel it was their "role" to "assist [him] in volunteering for a death sentence." *Id.* at 2.

158.    The Court denied the motion the following day, in part because "questions or issues will likely arise during the eligibility and sentencing phase that will require legal analysis." [14-04-11-J. O'Grady Letter]. The Court also stated that it would "question" Torrez about his position ex parte on April 21, "after asking [counsel] to summarize the testimony and evidence [they] would present in his mitigation defense, if allowed." *Id.*

159.    Over the course of the next several days, Brennan discussed the upcoming ex parte hearing with Barry Fisher, the Federal Resource Counsel in charge of capital appeals. Fisher told Brennan that it was "imperative" that the trial team create a record showing that: (i) counsel "asked the judge to let [them] go ahead and act as counsel for Torrez, including arguing, putting on mitigation witnesses, crossing the Government's witnesses, etc., notwithstanding whatever opposition he expressed to the court;" (ii) counsel "argued that this request was supported by specific authorities Fifth Amendment right to due process, the Sixth Amendment right to counsel, the Eighth Amendment right to a reliable sentencing hearing, and the [Federal Death Penalty Act];" and (iii) the judge nevertheless "denied that request [because] of what the client told him at the ex parte" hearing. [4/24/14 BF-DB]. Instead, Brennan began the hearing by telling the Court that counsel believed Torrez was competent to waive his defense and that counsel was ethically bound by that decision. Tr. 4/21/14, 2097, 2106–08.[10]

160.    In terms of the mitigation case counsel was prepared to present, Brennan claimed

---

[10] According to Fisher, Brennan subsequently "assured" him that the team had "not acquiesced, but rather, in going to the court, had pressed to be allowed to continue to make decisions they saw fit as counsel, including but not limited to putting on mitigation; that the judge had ordered otherwise; and that they had objected to those rulings." [4/24/14 BF-DB]

that counsel had "pursued everything [they] could for mitigation." *Id.* at 2099. He then outlined

the witnesses the defense planned to present, namely:

- Mark Cunningham, a prison adjustment expert who would tell the jury generally about "the ability of the Bureau of Prisons to deal with violent inmates and to protect the general public," although he would not provide any opinion as to Torrez's ability to peacefully adapt to prison or otherwise testify "from a psychological mental health point of view,"

- prison specialist James Aiken, who would testify "as to how onerous life in imprison can be,"

- Dr. Burry, who was "prepared to give some general background about Torrez"; and

- the warden of Red Onion State Prison, where Torrez had been incarcerated following his conviction for the Arlington offenses and where he would serve five life sentences for those convictions.

*Id.* at 2099–2100.  Counsel did not elaborate on the type of detail that Dr. Burry would provide

or how it would be mitigating.

161.    Brennan also explained what the defense would *not* present. For instance, he said:

"[S]ome of the traditional things that we have seen with Dr. Burry in other cases where there has

not been a unified family, or there is a high school dropout, significant juvenile delinquency, or

lead paint, or some other issues, frankly, we have explored all those issues, we really don't have

that." Tr. 4/21/14, 2102. Furthermore, after claiming that counsel had "left no stone unturned

with respect to the mental health portion of this case," *id.* at 2099, Brennan explained that they

did not "have [] mental health—the MRI from Georgetown did not give us an opening," *id.* at

2101. According to Brennan, "Torrez was thoroughly examined by other mental health

professionals prior to our arrival in the case," and the MRI was the "only thing that needed to be

done." *Id.* Lastly, Brennan told the Court that counsel had made the strategic decision not to

challenge Torrez's guilt for the Zion offenses, not mentioning that they had failed to investigate

available defenses. *Id.* at 2102.

68

162.    In response to counsel's representation that Torrez was competent to waive, the Court stated: "Dr. Ratner was asked to examine Torrez for competency to represent himself, and found that he was competent and rational, understood the proceedings against him, also the decision to represent himself, the pros and the cons, and found him competent and able to move forward." *Id.* at 2107. The Court then asked if counsel had noticed any changes to Torrez's mental health since that report, but counsel stated they could not identify anything relevant, failing to remind the Court that Dr. Ratner had in fact expressly refrained from deeming Torrez competent to waive mitigation. *Id.*

163.    Counsel also volunteered that they had met with Torrez's family and that his father, Cesareo, supported the waiver decision. *Id.* at 2109. Furthermore, although Torrez had expressly told the Court that he wanted to waive because he did not believe counsel's mitigation would be effective, counsel sua sponte injected into the record that Torrez's motivation was to avoid spending the rest of his life in jail. *Id.* at 2103. The Court then followed up on this theme, saying to Torrez: "[Y]ou said last week that in part it was because you didn't think it would do any good. But what I really want you to focus on is the fact that it may do a great deal of good and would put you back where you are today from the Arlington County case, which is doing life in prison. So it's beyond just thinking that it won't work? It's that you do not want to serve a life sentence?" *Id.* at 2110. Torrez picked up on this additional justification, clearly preferred by counsel and the Court, and tepidly went along: "I guess that's part of it too." *Id.*

164.    Following a brief colloquy with Torrez, the Court declared Torrez competent to waive and stated: "[Y]ou have made decisions which you are legally permitted to make. And we'll abide by them." *Id.* at 2114–15. A similar exchange occurred the following day, when the court told Torrez "we will abide by your directive, as will your counsel. It's your choice to

69

make." *Id.* at 2247. Counsel remained silent.

### 6.   The penalty-phase proceedings

165.    Directly following the Court's pronouncement that Torrez was competent to waive any penalty-phase defense, the Government commenced its entirely one-sided presentation. During the one-day eligibility phase and three-day sentencing-selection phase, defense counsel made no opening statements or closing arguments, did not cross-examine any witnesses, object to any evidence, or present any evidence against death or in support of a life sentence. No explanation was given to the jury for counsel's silence until the Government had rested its case on eligibility, at which point the Court briefly told the jurors that counsel was following Torrez's instructions by remaining silent. *Id.* at 2150–51. A similarly brief instruction was repeated at the start of the selection phase and before the Government's closing argument. Tr. 4/22/14, 2200–01, 2535.

166.    At the eligibility phase, the Government presented evidence about the Arlington offenses that served as the statutory aggravating factors. During the sentencing-selection phase, the Government focused the majority of its witnesses, exhibits, and argument for a death sentence on the Zion offenses. Near the end of the selection phase, the Government sought clarification about whether Torrez wished to have no mitigating factors listed on the verdict form. The Court asked Torrez if that is what he wanted, and he confirmed that it was. Tr. 4/21/14, 2534–35. Counsel made no objections or arguments to the contrary. Not surprisingly, after deliberating for fewer than five hours, the jury returned a verdict of death on April 24, 2014.

167.    On May 27, 2014, the Government submitted its position on sentencing, which included a request that, if Torrez indicated a desire to waive appeal, the Court "appoint an appropriate mental health professional to perform a competency evaluation of the defendant" and

70

then "conduct a hearing" pursuant to 18 U.S.C. §§ 4241(c) and 4247(d), "to determine whether the defendant is competent to waive his appellate rights." ECF No. 392 at 3. The Court entered judgment on May 30, 2014.

### 7.    Penalty-phase evidence not discovered or developed due to trial counsel's failure to investigate and adequately prepare

168.    Had trial counsel discharged their duties as capital counsel and continued to investigate the preliminary mitigating evidence discovered by the FPD, including following up on the multiple red flags for mental health issues, they would have obtained a wealth of mitigating evidence. Additionally, counsel had in their possession evidence that would have served as a powerful rebuttal to the Government's case in aggravation, but failed to develop or use that evidence. The following is an overview of the evidence discovered and developed by undersigned counsel since being appointed to represent Torrez in these § 2255 proceedings.

### a.    Mitigating evidence

169.    As an initial matter, because the FPD was removed from the case before social worker Jan Vogelsang was able to complete a social history for Torrez, and because trial counsel took no steps to do so, undersigned counsel retained clinical and forensic psychologist Claudia Ahumada Degrati, Ph.D., for that purpose.[11] Specifically, counsel requested that Dr. Degrati "describe and explain the key factors that shaped Jorge's development and functioning, including any evidence of trauma and its inter-generational effects," and that she "identify and describe psychologically significant traumatic events in Jorge's life and evaluate and explain the effects,

---

[11] Dr. Degrati has "over 20 years practicing in the field of mental health," during which she has "assessed and treated individuals with a variety of mental disorders, including intellectual disability, autism spectrum disorder (ASD), acquired brain injury, depression, anxiety, and posttraumatic stress disorder (PTSD)." CD ¶ 1. Her "clinical experience includes providing psychotherapy to individuals who have been exposed to domestic violence and sexual, physical, and emotional abuse," as well as "conducting psychological and neuropsychological evaluations and assessments and providing forensic consultation on mental health issues." *Id.*

71

if any, of those events on his cognitive, psychological, and emotional development and social functioning." CD ¶ 3. In preparation, Dr. Degrati met with Torrez on two occasions for a total of approximately eight hours and participated in several telephone calls with him; met with his parents and his sister in their home on two occasions and separately with Sara on one additional occasion; and reviewed "numerous declarations and social history records of family members and other individuals who observed Jorge's experiences, development, and functioning." *Id.* ¶ 2.

170.    Based on this information, Dr. Degrati prepared a detailed overview of Torrez's life. Additionally, given her extensive training and experience as a psychologist, Dr. Degrati was able to provide significant insight into Torrez's upbringing and its impact on his functioning. Her opinions, which are set forth in full in her attached declaration, include the following:

> Jorge's family's tendency to withdraw from the community and the deep mistrust they instilled in their children . . . had a severe detrimental impact on Jorge beginning early in life. Developing trust is one of the most fundamental steppingstones of healthy psychosocial development. Whereas failure to develop trust results in fear and a belief that the world is unsafe and unpredictable, the outcome of successfully developing trust is a sense of safety and hope. . . .

> At home, trapped in an abusive environment, Jorge was faced with formidable tasks of adaptation. Growing up isolated with very strict, extremely rigid and controlling parents, Jorge had to gain a sense of control and power in situations of utter powerlessness. Jorge had to learn to preserve a sense of safety in a home that was not always safe. . . . His parents not only had exceedingly poor parenting skills at home, but they were ill-equipped to prepare Jorge for the outside world. They never learned English or made any efforts to acculturate in their adopted country. . . .

> Communication had to be a problem for Jorge at home and beyond. He had to learn English on his own by watching television. His parents only spoke Spanish but once Jorge learned English this became his best (and preferred) language. . . . Such disruption of interpersonal communication with his parents impacts the parents' ability to support their child's socialization process and creates emotional distance; it has an overall negative impact on the closeness and intimacy between parent and child. . . .

> Growing up in such an environment caused Jorge to have difficult interpersonal relationships with peers. His few friends in childhood and adolescence were younger or otherwise developmentally delayed. In adolescence, when peer relationships are crucial and most influential, Jorge attempted unsuccessfully to

72

develop friendships and romantic relationships. While strong peer attachments can enhance a young person's sense of wellbeing, problems in peer relationships can have significant psychological and socio-emotional consequences. Jorge's upbringing and shy temperament set the stage for a rocky start. Jorge showed signs of depression beginning in elementary school. . . . In adolescence, his depression appears to have been more profound and his personal hygiene suffered. His peers rejected him because he smelled bad. They picked on him, made fun of him, and bullied him. While he was able to gain some female friends by being sweet and supportive, he was unsuccessful in achieving the romantic relationship he craved. He lacked the social skills to deepen his friendships. The people he considered his friends saw him as a mere acquaintance and even an object of ridicule.

Jorge saw enlisting in the military as his chance to escape the oppressive home environment, gain independence, and his only opportunity to succeed in the world. Yet he lacked the . . . protective factors and resiliency necessary to foster empowerment, self-sufficiency, positive coping, and behaviors that would have enabled him to succeed in the community and life choices.

Degrati ¶¶ 93–100.

171.    Additionally, undersigned counsel followed up on the extensive evidence gathered by the FPD suggesting that Torrez suffers from a serious mental illness, which was corroborated by counsel's own investigation, including in interviews with lay witnesses never contacted by any prior counsel as well as follow-up interviews with key witnesses previously contacted by the FPD. *See, e.g.*, [Decs of Arango, Vargas, Akins, Mendez, King, Duffie, Mow] Based upon this evidence, undersigned counsel retained experienced forensic psychiatrist Dr. Susan Rushing, M.D., to determine whether Torrez has any psychiatric diagnoses. Dr. Rushing performed an extensive record review and conducted seven hours of psychiatric examination over the course of four separate days and concluded that Torrez "suffered from Reactive Attachment Disorder (RAD) in childhood with persistent symptoms in adulthood." Rushing at __ (citing Diagnostic and Statistical Manual, 5th edition, Diagnostic Criteria Code 313.89). As Dr. Rushing explains in the report being filed with this petition:

RAD is a condition where a child between the ages of 9 months and 5 years-old is unable to establish a healthy attachment with their parent or primary caregiver. Children with RAD have been so disrupted in early life that their future

73

relationships are also impaired. They may experience difficulty relating to others and are often developmentally delayed. Reactive attachment disorder is common in children who have been abused physically, sexually and/or emotionally and/or lived in an institutional setting. . . .

When untreated or not remedied in childhood, the individual is likely to have symptoms that persist into adulthood and significantly interfere with the individual's ability to fully experience relationships including professional relationships with coworkers, platonic friendships and romantic relationships. Individuals are likely to present as detached and withdrawn. They are unable to maintain significant relationships, romantic or platonic. They are unable to show affection and resistant to receiving love. They are likely to have control issues, anger problems, impulsivity, be distrustful, be unable to fully grasp emotions. They are likely to be unable to feel empty and lack a sense of belonging. All of these character traits were apparent in my interactions with Torrez and in the records reviewed.

*Id.* at __.

172.    Dr. Rushing also explains that "[c]hildren with RAD are more likely to develop behavioral health disorders, social disorders, substance abuse disorders, and other attachment disorders such as disinhibited social engagement disorder and developmental trauma disorder, which has been shown to place individuals at increased risk for criminal behavior and incarceration as adults." *Id.* at __.

173.    Finally, consistent with the recommendations of FPD experts Dr. Watson and Dr. Hyde, undersigned counsel retained Dr. Jeffrey Lewine, Ph.D., to perform a multimodal integration report integrating results from Torrez's MRI and functional MRI, as well as to administer a QEEG. Notably, the results of the MRI integration and the QEEG were convergent and showed that Torrez "demonstrates both structural and functional brain abnormalities with particular involvement of parietal, frontal, and mesial temporal regions." Lewine at 8. As explained in Dr. Lewine's report, these "brain regions normally support attention, executive functions, emotional regulation of behavior, decision making, tactile and motor function, and memory." *Id.* He concludes:

74

> The suggested degree of functional compromise is consistent with Torrez' history of [reading] difficulties and a specific learning disability, plus Dr. Watson's neuropsychological testing which indicated impairment in several cognitive sub-domains. Observations are not etiologically specific and likely reflect a combination of genetic and environmental factors, with no specific disease or injury process identified based on the data and Torrez' clinical history. Regardless of how Torrez' brain got compromised, it is highly likely that the observed neurobiological abnormalities have negative functional consequences for his everyday abilities, especially with respect to executive functions, memory, and attention.

*Id.* at 9.

174.     The techniques employed by Dr. Lewine are based on methodologies that were available and in use in 2014 and could have been obtained by prior counsel; *see also* Rushing Report at __ ("The use of volumetric measurements to understand brain structural compromise is supported by peer-reviewed scientific studies, and the relevant methods were already well established by the time Torrez' MRI data were collected in 2014.").

### b.     Evidence to rebut aggravation

175.     As indicated above, the Government's case for the death penalty rested on its claim that Torrez was responsible for the deaths of two young girls from Zion—Laura Hobbs and Krystal Tobias—who went missing for several hours on Mother's Day 2005 and were found deceased in a wooded park early the next morning. Hobbs's father had initially confessed to having committed the murders, but was later exonerated through DNA testing. Torrez was connected to the case through a CODIS hit after a sample of his DNA was taken following his arrest for the Arlington offense. Tr. 2373. Although Torrez later admitted to having been at the scene at one point, he strenuously denied any involvement in the girls' deaths.

176.     To support its theory during the selection phase, the Government presented the testimony of lab analysts from the Northern Illinois Regional Crime Laboratory, and from the Serological Research Institute ("SERI"), a private lab in California, who conducted DNA testing on items of evidence collected in the case and who testified to the presence of Torrez's DNA on

swabs taken from the body of Laura Hobbs. Tr. 4/22/14, 2372–75; Tr. 4/23/14, 2430–35. Specifically, SERI lab analysts Heather Parsons and Gary Harmon testified to the presence of semen on several of the swabs. Tr. 4/23/14, 2419, 2428–35. Regarding the oral swab of Laura Hobbs, Harmon testified that the "sperm fraction from the oral swab of Laura Hobbs . . . was compared to Jorge Torrez. And it was found to be consistent with him." *Id.* at 2432; *see also id.* at 2431. Harmon likewise testified that several right-hand swabs taken from Laura Hobbs "had a profile, the major profile or stronger profile consistent with Jorge Torrez." *Id.* at 2433–34.

177.    In fact, the SERI lab report described the sperm cell fractions extracted from the oral swabs as a "mixture of *at least two males*," indicating a second, unknown participant in the offense. Second Analytical Report at 5, ¶¶ 3, 6. Additionally, the DNA profiles obtained from the right-hand swabs are described on the SERI lab report as a "mixture of *at least two males*." Second Analytical Report at 6-7, ¶¶ 9-12. Yet Harmon never mentioned the presence of a second contributor to the DNA profiles, and this misrepresentation, like the rest of the Government's penalty-phase presentation, went uncontested by counsel. The jury was thus left with the false impression that Torrez was the sole perpetrator of the offense.

**B.    Counsel Was Ineffective.**

178.    Generally, counsel's investigation into penalty-phase evidence is judged under *Strickland*'s two-prong standard requiring a showing of deficient performance and prejudice. But where, as here, the defendant directed counsel not to present penalty-phase evidence, he "must address two distinct deficient performance inquiries and two distinct prejudice inquiries." *Sanders*, 23 F.4th at 983. As the Ninth Circuit explained in *Sanders*:

> As for the deficient performance inquiries, a defendant must satisfy the traditional deficient performance question outlined in *Strickland*, that counsel's performance in conducting the penalty phase investigation was deficient. Next, the defendant must show that counsel's deficient performance affected the defendant's decision not to present a penalty defense. . . .

76

> Turning to the prejudice inquiry, the defendant must first show that there is a reasonable likelihood that he would have changed his mind and allowed the presentation of a mitigation defense had he been properly advised and informed. Second, he must also satisfy the traditional prejudice question—that there is a reasonable likelihood that the new mitigating evidence, if presented at trial, would have led the jury to return an LWOP sentence rather than death.

*Id.* (internal citations omitted); *see also Cummings*, 588 F.3d at 1360 (reaffirming Eleventh Circuit's use of same framework in cases where mitigation waived at time of trial).

179.    Torrez is able to establish each prong of this test.

**1.    Counsel unreasonably failed to complete the constitutionally-required mitigation investigation and failed to develop evidence in their possession to rebut the case in aggravation.**

**a.    Failure to discover mitigating evidence**

180.    As stated above, capital counsel is constitutionally obligated to conduct a "thorough" investigation into mitigating evidence. *Porter*, 558 U.S. at 39; *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (same). Indeed, well-established best practices mandate that capital counsel conduct an "*ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record* and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death." Am. Bar Ass'n, Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 Hofstra L. Rev. 677, 689 (2008) (emphasis added); *see also Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in the American Bar Association standards and the like are guides to determining what is reasonable[.]"). Counsel's duty to investigate is particularly critical in the context of mental health mitigation. *See Rompilla*, 545 U.S. at 390–92; *Williams*, 529 U.S. at 395–96. Also critical is the development of a social history report, which allows for the identification of "trends, patterns of behavior, causal factors, [and] behavior that lies outside the developmental, social, and cultural norms for [the defendant's] age." Richard G. Dudley, Jr. & Pamela Blume

Leonard, *Getting It Right: Life History Investigation As the Foundation for a Reliable Mental Health Assessment*, 36 Hofstra L. Rev. 963, 973 (2008); *see also Wiggins*, 539 U.S. at 527 (noting that trial counsel's "failure to prepare a social history" violated prevailing professional guidelines).

181.    Here, counsel had been told by the first trial team that the mitigation investigation was not complete, highlighting in particular issues of mental health and the need for a social history report. *See supra* ¶ __. Expert capital defense practitioners familiar with the case agreed, as did counsel's own mitigation specialist, Carolyn Burry. *See supra* ¶ __. Yet counsel failed to follow up on these clear indications that more investigation was necessary. *Wiggins*, 539 U.S. at 525 ("[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses."). In particular, counsel unreasonably:

- failed to prepare a social history, which would have identified the "trends, patterns of behavior, causal factors, [and] behavior" that were "outside the developmental, social, and cultural norms" for Torrez and would have illuminated the types of opinions reached by post-conviction psychologist Dr. Degrati;

- failed to retain a forensic psychiatrist, such as Dr. Rushing, to follow up on the many symptoms of mental illness documented by the FPD and determine that Torrez in fact suffers from a diagnosable psychiatric condition;

- waited until just over one month prior to the start of trial to obtain brain imaging, and then relied on a one-page report from the hospital radiologist to conclude that the results were "normal," without pursuing the opinion of an appropriately qualified expert, such as post-conviction expert Dr. Lewine, who could interpret the images in the context of other neurobiological information; and

- failed to obtain a QEEG, despite knowing that two separate mental health professionals had advised the FPD to do so.

182.    In short, although counsel told this Court that they were prepared to go forward with mitigation, "the record leaves no doubt that counsel's investigation to support that case was an empty exercise." *See Andrus*, 140 S. Ct. at 1882 (finding counsel performed deficiently

78

despite "nominally put[ting] on a case in mitigation," including calling five witnesses); *see also Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004) (holding that counsel's duties at the penalty phase are "not discharged merely by presenting some limited evidence").

183.    Trial counsel had no reasonable or strategic basis for failing to conduct a complete mitigation investigation in accordance with professional norms. While strategic choices are given considerable deference, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see also Gray*, 529 F.3d at 229 (same). Here, "[c]ounsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527–28.

184.    In particular, the fact that Dr. Lee, the Georgetown radiologist who reviewed and interpreted Torrez's MRI, summarily reported the brain scan as "normal" did not excuse counsel from any further investigation into mental health. Dr. Lee never evaluated Torrez and was given no records or clinical history to consider. Nor is there any evidence that Dr. Lee was trained to conduct the type of analysis required for the proper interpretation of brain images in a forensic context. Studies have shown that in "clinically based imaging, radiologists are looking for particular types of abnormalities, and may overlook or not interpret what may be an important finding." Erin Bigler et al., *Structural Neuroimaging in Forensic Settings*, 84 UMKC L. Rev. 301, 309 (2015). Not trained to evaluate scans in a forensic context, hospital-based radiologists often overlook "subtleties" in brain imaging and inaccurately report the scan findings as "within normal limits." *Id.* Furthermore, "clinical radiological interpretation remains a descriptive process of the images as viewed and interpreted by the radiologist, which rarely includes any

type of quantitative imaging analyses." *Id.* As explained above, such quantitative analysis was available at the time of trial. *See* Lewine Report at 9. Indeed, Torrez's trial counsel had been expressly advised to retain Ruben Gur, who would have performed precisely this type of analysis. *Id.* at 2–3.

185.    Nor is counsel's performance justified by Torrez's prior indications that he might waive a penalty-phase defense. As an initial matter, unlike many capital defendants, Torrez never instructed his counsel not to investigate mitigation. *Cf. Owens v. Guida*, 549 F.3d 399, 407–08 (6th Cir. 2008); *Cummings*, 588 F.3d at 1336. To the contrary, when the Court granted Torrez's request for new counsel in February 2013, Torrez acknowledged on the record his understanding that the law required his attorneys to conduct a mitigation investigation "no matter what" Torrez's "feelings" were on the subject. ECF No. 424 at 10; *see also id.* at 10–11 (Torrez expressly stating on the record that he would "allow new counsel to pursue the mitigation investigation," including going to Mexico, investigating his childhood, and speaking again to his family and friends). Counsel's retained mitigation specialist, Dr. Burry, confirmed that Torrez was open to speaking with her, and had no objections to her work. *See supra*.

186.    In any event, a client may be "fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct some sort of mitigation investigation." *Porter*, 558 U.S. at 40 (citing *Rompilla*, 545 U.S. at 381–82); *see also Gray*, 529 F.3d at 232 (noting that in *Landrigan*, the Supreme Court had "reaffirmed" its "earlier holdings that counsel has an affirmative duty to investigate for mitigating evidence when preparing for sentencing," regardless of the client's wishes); *Krawczuk v. Sec'y, Fla. Dep't of Corr.*, 873 F.3d 1273, 1301 n.2 (11th Cir. 2017) (Martin, J., concurring) ("*Landrigan* never addressed the performance prong of *Strickland*, and so it did nothing to alter trial counsel's perennial 'obligation to conduct a

thorough investigation of the defendant's background.'" (quoting *Williams*, 529 U.S. at 396)).

187.    In short, counsel had no objectively reasonable basis to forgo the mitigation investigation remaining in this case. Counsel was deficient.

### b.   Failure to develop evidence to rebut aggravation

188.    Counsel's failure to develop the evidence of a second perpetrator to rebut the prosecution's theory of the Zion offense was also objectively unreasonable. It is well established that counsel's provision of a constitutionally adequate defense in a death penalty case includes seizing every available means to rebut the prosecution's case in aggravation. *See, e.g., Andrus v*, 140 S. Ct. at 1881–82 (holding counsel performed deficiently by, inter alia, "forgoing critical opportunities to rebut the case in aggravation); *Rompilla*, 545 U.S. at 385–89 (counsel performed deficiently by failing to examine available evidence regarding prior rape and assault conviction used at sentencing phase of capital murder trial); *Hooks v. Workman*, 689 F.3d 1148, 1206 (10th Cir. 2016) (finding counsel performed deficiently based in part on counsel's failure to present contextualizing evidence to "soften[ the] edge" of a prior violent felony introduced in aggravation); *White v. Ryan*, 895 F.3d 641, 666 (9th Cir. 2018) (counsel performed deficiently by failing to present evidence rebutting an aggravating factor); *see also* ABA Guidelines, Guideline 10.11, cmt. ("Where possible, counsel should . . . rebut the [aggravating] evidence or offer mitigating evidence that will blunt its impact."); *id.* at Guideline 10.11(I) ("Counsel at all stages of the case should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible.").

189.    Here, the evidence of a second perpetrator of the Zion offense was clear from the face of the lab reports, which counsel had in their possession. Yet prior to the sentencing phase, counsel stated their position that "it would not be to Torrez' best interests to contest Zion factually" so as not to lose "credibility" with the jury. Tr. 4/21/14, 2102. Such a position was

objectively unreasonable where counsel had in their possession evidence that cast substantial doubt on the Government's theory that Torrez acted alone and was the immediate perpetrator of the murders. *See, e.g.*, *Washington v. Murray*, 952 F.2d 1472, 1477 (4th Cir. 1991) ("counsel inexplicably had failed to recognize the significance of, and hence to proffer in Washington's defense," evidence of semen stains found at the crime scene that did not belong to Washington); *see also Rompilla*, 545 U.S. at 385-86 (counsel's deficiency was especially egregious where rebuttal evidence was "readily available").

### 2. Counsel's deficient investigation deprived Torrez of the opportunity to make an informed decision regarding a penalty-phase defense.

190.    Counsel's failure to conduct a constitutionally-adequate penalty-phase investigation and preparation means that, a priori, counsel failed in their duty "to ensure that [their] client's decision not to present a penalty phase defense" was "based on an educated understanding of the penalty phase and [the] evidence" that could have been presented. *Sanders*, 23 F.4th at 987 & n.17 (referring to this duty as the duty to ensure that the decision is "informed and knowing"); *see also Clark v. Thaler*, 673 F.3d 410, 422 (5th Cir. 2012) ("Though the Supreme Court in *Landrigan* specifically stated that it had never imposed an 'informed and knowing' requirement on a defendant's decision not to introduce evidence, it assumed without deciding that such a requirement existed."); *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) ("In addition to hampering [defense counsel's] ability to make strategic decisions, [counsel's] failure to investigate [defendant's background] clearly affected his ability to competently advise [defendant] regarding the meaning of mitigation evidence and the availability of possible mitigation strategies.").

191.    As the Ninth Circuit has explained, "even when we have placed emphasis on the client's desires, we have required that the client make an 'informed and knowing' decision not to

present mitigating evidence." *Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir. 2003). But, the court continued, "[i]t is, of course, difficult for an attorney to advise a client of the prospects of success or the potential consequences of failing to present mitigating evidence when the attorney does not know that such evidence exists." *Id.* The same is true here. Counsel also failed to even discuss with Torrez the evidence that contradicted the Government's version of the Zion murders and indicated a second perpetrator of the crimes. Torrez thus never had the opportunity to make a knowing and intelligent waiver of presentation of this critical evidence.

### 3. Counsel performed unreasonably by acquiescing to Torrez's stated desire to waive a penalty-phase defense.

192.    According to the ABA Guidelines, counsel performs ineffectively when they "simply acquiesce" to a capital client's stated desires to waive mitigation, "which usually reflect the distorting effects of overwhelming feelings of guilt and despair rather than a rational decision in favor of a state-assisted suicide." ABA Guidelines, Guideline 10.5, cmt. Instead:

> Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison. A client who insists on his innocence should be reminded that a waiver of mitigation will not persuade an appellate court of his innocence.

*Id.*; *see also Silva*, 279 F.3d at 847 (holding that counsel has duty to "try to educate or dissuade" the defendant about the consequences of actions).

193.    Here, counsel was aware that Torrez had previously indicated that he might waive mitigation, but there is nothing in the record to suggest that they made any attempts to persuade him otherwise during the course of their representation. By contrast, the FPD team "actively took

steps throughout [their] representation aimed at dissuading [Torrez] from ultimately making this decision." Kamens Dec ¶ 19. For instance, FPD mitigation specialist Ingrid Christiansen discussed "information about life in a federal penitentiary" with Torrez, a subject about which "he was always interested." IC ¶ 25. She explains:

> I knew he had been miserable at Red Onion [State Prison], where he had been incarcerated immediately after being convicted for the Arlington crimes, and I told him it would be different in a federal prison, that it might be easier to live there than in Red Onion. He seemed very interested in the kinds of programs offered to inmates and the kinds of freedoms attainable with good behavior. He wanted to understand that there were things he could do with his life to make it more meaningful. For instance, he liked the idea that he could be in a position be some sort of mentor to fellow inmates who had received less schooling than him or were not as knowledgeable as was Jorge on various topics. Every time I gave him a compliment like that, he sat up straighter and looked more interested and focused.

*Id.*

194.    In the same vein, the FPD also arranged for Torrez to meet with Wilbert Rideau, a former capital convict who spent ten years on Louisiana's death row and another thirty-plus years sentenced to life in prison before his convictions were overturned. Kamens Dec. ¶ 19. Rideau is the coordinator of the Life Support Project, which operates under the auspices of the Federal Death Penalty Resource Counsel Project, and has consulted with numerous capital prisoners regarding, among other issues, the possibilities of leading a fulfilling life while imprisoned. The FPD provided Rideau's contact information to trial counsel and explained his role, *see* [13-05-08_List of Experts], but no further meetings between Rideau and Torrez occurred after the FPD was removed from the case.

195.    Regardless of whether trial counsel undertook any efforts to prepare Torrez for a penalty-phase defense prior to trial, it is clear that counsel did not invest much time into persuading Torrez against waiving after he announced his intention to do so on April 8, 2014. Torrez made his decision immediately upon being convicted of capital murder, despite having

believed he would be acquitted. Counsel informed the Court of Torrez's intent that afternoon, which was a Tuesday. Despite the fact that the eligibility phase was not scheduled to commence until April 21, counsel requested only two days to consult with Torrez on the matter, volunteering to report back that Friday. Tr. 4/08/14, 2090. The Court granted this request, but also made clear that the issue need not be definitively resolved on that date. *Id.* at 2091. Later that same day—April 8—Mitchell shared with co-counsel the article described above reporting that although "most" capital defendants express a preference for execution over life in prison, "[most] of them . . . change their minds." *See supra*. Nevertheless, when asked that evening whether the penalty-phase witnesses should be prepared for the week of April 21, Mitchell simply laughed. And counsel moved to withdraw the very next day, providing no indication that they were working with Torrez in an attempt to change his decision.

196.    Nor is there any evidence suggesting that counsel asked Torrez's family to intervene in an attempt to change his opinion. As discussed below, the evidence does not support that Torrez had a steadfast desire to be executed rather than spend the rest of his life in prison. In fact, he "repeatedly" told Christiansen that his motivation behind considering a penalty-phase waiver was that he would be a "burden" on his family if he were to be sentenced to life imprisonment. IC ¶ 24. Trial counsel Brennan told the Court on April 21, 2014 that Torrez's father, Cesareo, "supported" his son's decision to waive, but he said nothing to suggest counsel had urged him to do otherwise.

### 4. Counsel unreasonably failed to challenge Torrez's penalty-phase position as amounting to a waiver of the right to counsel.

197.    When a client is represented, "the lawyer has—and must have—full authority to manage the conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988). Apart from a small number of fundamental decisions "belonging exclusively" to the client— "whether to plead

85

guilty, waive a jury, testify in his or her own behalf, or take an appeal" *Jones v. Barnes*, 463 U.S. 745, 751 (1983)—decisions relating to trial strategy, including whether and how to cross-examine witnesses and objections to evidence, are decisions reserved for counsel, *United States v. Chapman*, 593 F.3d 365, 368 (4th Cir. 2010) (decision whether to seek mistrial). *See also Sexton v. French*, 163 F.3d 874, 885 (4th Cir.1998)(whether to file a motion to suppress); *Gonzalez v. United States*, 553 U.S. 242, 251 (2008)(whether to allow a magistrate judge to conduct jury selection). Decisions relating to trial strategy belong to the attorney, even if the client opposes them. *See Chapman*, 593 F.3d at 369. These principles apply equally to the penalty phase of a capital trial. *See, e,g.*, *Commonwealth v. Mason*, 130 A.3d 601, 671 (Pa. 2015) (trial court erred by allowing capital defendant to "veto" counsel's decision to raise a claim of ineligibility for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002)). Thus, although a competent client may be permitted to waive the presentation of mitigating evidence if his waiver is knowing, intelligent, and voluntary,[12] strategic and tactical decisions regarding such matters as the cross-examination of prosecution witnesses, challenges to the admissibility of evidence, jury instructions, and argument, remain with counsel.

198.    Notably, this Court had already recognized the foregoing in the context of this case *and* determined that Torrez was incapable of making these types of decisions without the assistance of counsel. *See* ECF No. 418 at 9 (denying Torrez's 2012 request to proceed pro se because, inter alia, Torrez was "incapable of understanding and being able to represent [him]self" regarding complex decisions that would be required at the penalty phase of proceedings). The Court reaffirmed this finding when it denied counsel's April 9 motion to

---

[12] Here, counsel ineffectively failed to challenge Torrez's competency to waive his fundamental rights to a defense and to counsel at the penalty phase, and ineffectively failed to ensure that his waiver of these rights was knowing, voluntary, and intelligent. *See infra* §§ IV.B.5; IV.B.6.

withdraw. [4/11/14 J. O'Grady Letter] (Court explaining that "questions or issues will likely arise during the eligibility and sentencing phase that will require legal analysis" from counsel).

199.     Furthermore, Federal Resource Counsel capital appellate lawyer Barry Fisher specifically advised Brennan that counsel argue for the ability to "go ahead and act as counsel for Torrez, including arguing, putting on mitigation witnesses, crossing the Government's witnesses, etc.," supporting the request with, inter alia, references to the Sixth Amendment right to counsel. [4/24/14 BF-DB].

200.     Nevertheless, after counsel's August 9, 2014 motion to withdraw from representation was denied, counsel raised no challenges to the Court's improper conclusion that Torrez could exercise complete control over every aspect of the eligibility and selection phases, even though he was represented by counsel and did not renew his earlier request to self-represent. The Court appears to have been operating under an assumption, unsupported by law, that if Torrez preferred the death penalty to life imprisonment, then this "defense objective" allowed him to control every aspect of the eligibility and selection phases, even tactical decisions usually reserved for counsel. By failing to argue otherwise, counsel violated Torrez's Sixth Amendment right to counsel.

### 5.  Counsel unreasonably failed to ensure that Torrez's waivers of a penalty-phase presentation and of counsel were competent.

201.     Counsel also performed ineffectively by failing to request that Torrez be examined for competency to waive mitigation and self-represent. The Due Process Clause prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Medina v. California*, 505 U.S. 437, 449 (1992); *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Once a bona fide doubt about the defendant's competence has been raised, the trial court's constitutional obligation may only be discharged by holding a hearing to determine competency. *See Pate*, 383

U.S. at 387. Competence turns on whether the defendant "has sufficient *present* ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (emphasis added). Even if a defendant is found competent at one point in the proceedings, the trial court "must continually be alert for changes which would suggest that he is no longer competent." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000).

202.    The only evaluation of Torrez's competency prior to his waiver was the one conducted by Dr. Ratner in February 2013. As discussed above, Dr. Ratner found that Torrez was competent to represent himself at the guilt phase of trial. Ratner Dec. However, he questioned whether Torrez had sound judgment when making decisions if he were to represent himself. *See* ECF No. 253. While Torrez had complained of his attorneys' efforts to conduct a mitigation investigation, Dr. Ratner thought that Torrez exhibited a significant amount of denial that could lead him to be sentenced to death. *Id.* These concerns were sufficiently significant to Dr. Ratner that he expressly limited his opinion to the guilt-innocence stage of trial and conditioned it on the assumption that the Court would assess Torrez's competency related to penalty phase issues at a later time.  Ratner Dec.

203.    Furthermore, even absent Dr. Ratner's express concerns about Torrez's competency to self-represent in the penalty phase and/or make decisions regarding the presentation of mitigating evidence, counsel had a duty to request a renewed competency evaluation. More than a year had passed since Dr. Ratner's examination, during which time Torrez had been convicted of capital murder. Recognizing that a person's mental state can "vary over time" and can "interfere with an individual's functioning at different times in different

ways," *Indiana v. Edwards*, 554 U.S. 164, 175 (2008), the Court had a responsibility to conduct a renewed competency hearing before Torrez's waivers. Even counsel for *the Government* recognized that the February 2013 competency evaluation was not sufficient to protect Torrez's constitutional rights as to all future waivers. *See* Doc. 392 at 3 (prosecution recommending a second competency evaluation in the event that Torrez waived his right to an appeal). And Dr. Ratner himself confirmed this in an interview with undersigned counsel, explaining: "Because competency is specific to time and purpose, and because the February 14, 2013 evaluation was limited to guilt-phase proceedings, I could not have opined on Torrez's competency related to penalty-phase proceedings as of April 21, 2014 without further evaluation." Ratner Dec ¶ 6.

204.    Yet, rather than reminding the Court of Dr. Ratner's concerns or noting the unreliability of the outdated evaluation, counsel affirmatively represented to the Court on April 21, 2014, that they were "unable to file an affidavit that says Torrez is not competent." Tr. 4/21/14, 2107. Of course, counsel were in no position to comment upon their client's competency, as they had failed to undertake the necessary life history and mental health investigation that would have provided substantial support for a competency evaluation. *See supra*. But even without this information, counsel had more than sufficient grounds to request that the Court inquire into Torrez's ability to waive mitigation and effectively self-represent. As counsel told the Court, they found their client's instructions that they not present mitigation evidence to be "irrational," *see* Tr. 4/21/14, 2103–04, which directly implicated the *Dusky* standard. *See Dusky*, 362 U.S. at 402 (requiring that defendant have "sufficient present ability to consult with his lawyer with a reasonable degree of *rational* understanding—and whether he has a *rational* as well as factual understanding of the proceedings against him"). In addition, counsel had been expressly advised by the FPD that Dr. Watson and Dr. Hyde had identified mental

89

health concerns, and counsel had in their possession Dr. Watson's neuropsychological test results demonstrating as much. *See supra* ¶¶ __. As stated above, the fact that the Georgetown radiologist who performed Torrez's last-minute MRI reported that the images were "normal" did nothing to negate the findings of Dr. Watson and Dr. Hyde, *see supra* ¶ __ , which should have been raised with the Court. Instead, counsel inaccurately informed the Court that they did not "have [] mental health" evidence. Tr. 4/21/14, 2101.

### 6. Counsel unreasonably failed to ensure that Torrez's waivers of mitigation and of counsel were knowing, intelligent, and voluntary.

205. Even assuming Torrez had been found competent to waive mitigation and to effectively self-represent during the penalty phase hearings, professionally reasonable counsel would have challenged Torrez's ability to knowingly and voluntarily waive both the fundamental right to present mitigation and the right to counsel.

206. When a defendant indicates a desire to forego his fundamental constitutional rights, courts have an obligation to determine that the decision is being made knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243–44 (1969) (decision to plead guilty); *Brookhart v. Janis*, 384 U.S. 1, 7–8 (1966) (right to confrontation); *Faretta v. California*, 422 U.S. 806, 835 (1975) (decision to self-represent); *Rees v. Peyton*, 384 U.S. 312, 314 (1966) (per curiam) (decision to waive appeal). Courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Zerbst*, 304 U.S. at 464. The need to ensure that a defendant is fully informed before waiving fundamental aspects of a fair trial is especially acute in capital cases, where the consequences of these choices is the most severe. In the case of self-representation, the defendant must be "made aware of the dangers and disadvantages of self-representation" and the record must "establish that he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (citation omitted).

90

207.    Because the adverse consequences of waiving counsel are so severe, the court must conduct a "searching or formal inquiry" to ensure the waiver is being made knowingly, intelligently, and voluntarily. *Patterson v. Illinois*, 487 U.S. 285, 292 & n.4, 298–300 (1988). This strict waiver standard is designed to insure that defendants:

> will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. Any trial conducted in derogation of that model leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided. . . . The Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 241–42 (1973).

208.    Although the Court made some attempt to advise Torrez of the disadvantages of foreclosing any mitigation presentation, it made no attempt to advise him of the different consequences of foregoing challenges to the Government's evidence throughout the eligibility and sentencing phases, arguments to the jury, and a role in shaping the jury instructions and verdict form. Again, even counsel for *the Government* had previously acknowledged that, should Torrez wish to represent himself, a "lengthy colloquy" would be required, which "must include a discussion of death penalty procedures . . . and sentencing, as well as a discussion of the type of evidence the Government will present in its case in chief (including, e.g., expert testimony)." ECF No. 263 at 4–5; *see also* ECF No. 392 at 4 (arguing that, in the event Torrez elected to waive direct appeal, court must not only order a second competency evaluation, but also "conduct a further inquiry to determine whether the defendant continues in his desire to waive that right and that his decision to do so is knowing, intelligent, and voluntary"). Yet Torrez's own counsel idly stood by and allowed their client to waive fundamental rights absent the type of "searching or formal inquiry" required for the court to determine whether Torrez was relinquishing these rights knowingly, intelligently, and voluntarily. *Patterson*, 487 U.S. at 292 &

91

n.4.

209.     Counsel's total failure to ensure that Torrez was extensively colloquied on the full extent of the rights he was waiving means that any waiver cannot have been knowing and intelligent. *Boykin*, 395 U.S. at 243 (a court "cannot presume a waiver of these . . . important federal rights from a silent record").

**7.  Had counsel performed effectively, there is a reasonable probability that Torrez would not have been permitted to waive a penalty-phase defense in its entirety.**

210.     Had counsel performed a constitutionally adequate mitigation investigation, they could have presented Torrez with a far more compelling penalty-phase package. Torrez was not wrong to suspect that counsel's anemic proposed mitigation presentation was likely to be ineffectual given the Government's aggravating factors, especially in light of counsel's ineffective failure to discover that they had evidence rebutting the Zion charges. But evidence of childhood trauma, mental illness, and organic brain damage is precisely the type of evidence that the Supreme Court has acknowledged to be powerfully mitigating, *see infra* ¶¶ __, and counsel could have rebutted the Zion offenses.

211.     In a prior letter to this Court, Torrez had emphatically stated that he wanted to represent himself "to fight for his life" and that he did not have a "death wish." [Nov. 2012 Pro Se Letter] Furthermore, as Brennan himself told the Court during the waiver hearing, Torrez's "seeming[] desire to be executed" was not rational, as he had strenuously wanted to contest the charges against him, even though an acquittal in the capital case would not have saved him from spending the rest of his life in prison given his convictions in state court. Tr. 4/21/14, 2103–04. This inconsistency lends further support to the fact that it was not that Torrez had a "desire to be executed," but that he believed his counsel's prepared penalty-phase presentation was as likely to ensure that result as no defense whatsoever.

92

212.    Counsel could have also used the information they gathered in a thorough mental health investigation in an attempt to persuade Torrez to allow a penalty phase defense. For instance, had counsel retained a qualified psychiatrist such as Dr. Rushing, they would have known that Torrez suffers from Reactive Attachment Disorder, a psychiatric illness that develops in infants and young children due to "[i]nconsistent care, continual neglect of basic physical and emotional needs, and the inability to form a secure, stable attachment" with their caregivers. Rushing at 7. To be sure, had counsel merely familiarized themselves with the material obtained by Christiansen and Dhyana Fernandez of the FPD team, they would have known that Torrez had grown up desperate for the affection of his parents, but never received it. *See supra*; *see also* Dr. Degrati Dec. It is not difficult to imagine that his father's "support" for his decision to waive a penalty-phase defense played a large role in Torrez's commitment to the decision, and that a plea from Cesareo that his son fight the Government's efforts to kill him would have been welcome.

213.    Moreover, regardless of Torrez's stance, there is a reasonable probability that effective counsel would have precluded his waiver of mitigation and/or his waiver of counsel on the grounds that he was effectively waiving counsel and was not competent to knowingly, intelligently, and voluntarily make such a waiver. *See supra*.

### 8.    There is a reasonable probability that, had counsel performed reasonably, Torrez would not have been sentenced to death.

214.    To prevail on his claim of penalty-phase ineffective assistance of counsel, Torrez must demonstrate there is a reasonable probability that, had competent counsel presented a penalty defense, a least one juror would have voted for a life-without-parole sentence. *Wiggins*, 539 U.S. at 537. As detailed above, building on the work of the FPD team, undersigned counsel discovered evidence that Torrez was raised in an environment of neglect and abuse, suffers from a serious mental illness, and has brain damage. This is precisely the type of information that the

93

Supreme Court has found to be mitigating. *See, e.g.*, *Porter*, 558 U.S. at 36 n.4, 41–42 (defendant's post-traumatic stress disorder, childhood abuse and "brain abnormality . . . would [have] humanize[d] Porter [and] allow[ed] the [jury] to accurately gauge his moral culpability"); *Wiggins*, 539 U.S. at 534–35 (same as to childhood privation and abuse); *Williams*, 529 U.S. at 396 (same as to childhood neglect and abuse); *Rompilla*, 545 U.S. at 390, 392 (evidence "pointing to schizophrenia and other disorders," as well as cognitive impairments, "would have destroyed the benign conception of Rompilla's upbringing and mental capacity"); *Sears*, 561 U.S. at 956 ("proper" prejudice analysis must "take[] into account" the defendant's "significant frontal lobe abnormalities" as revealed on psychological tests); *see also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable").

215.    The Fourth Circuit has done the same. For instance, in *Gray v. Branker*, the court granted habeas relief based solely on counsel's failure to investigate and present evidence showing the defendant's mental illness. Specifically, the court explained that it "need not speculate" whether mitigating evidence "would have been available if Gray's lawyers had fulfilled their duty to investigate," given that the lawyers had a report diagnosing the defendant with "adjustment disorder with mixed disturbance of emotions and conduct," together with "reductions in impulse control." *Gray*, 529 F.3d at 236. The court continued:

> In addition, counsel could have introduced expert testimony such as that of Dr. Bellard, who diagnosed Gray as having "paranoid personality disorder" and "adjustment disorder." The jury would have heard from such an expert that Gray had a severe mental illness, and that his ability to conform his conduct to the requirements of the law was "significantly impaired" at the time of the offense. The jury would have heard testimony that "if [Gray] had not had paranoid personality disorder, he would have been more likely to deal in a rational and calm manner with the problems that were facing his family." It would have learned that Gray's

94

disorder made him irrationally mistrusting and "quick to counterattack," and that individuals with his disorder are prone to "psychotic episodes" when they are under severe stressors such as those faced by Gray at the time of the offense.

*Id.*

216.   Other circuit courts of appeal have likewise recognized the mitigating impact of the type of evidence available here. *See, e.g.*, *Lloyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992) (ineffective assistance as the result of counsel's failure to present evidence on defendant's brain damage, child abuse, substance abuse); *Buenoano v. Singletary*, 963 F.2d 1433 (11th Cir. 1992) (ineffective assistance due to failure to present evidence concerning, inter alia, defendant's poverty, childhood abuse, mental health problems, and brain damage); *Armstrong v. Dugger*, 833 F.2d 1430 (11th Cir. 1987) (ineffective assistance found from failure to present evidence regarding defendant's poverty, poor living conditions in childhood, lack of childhood supervision, poor school attendance, seizures, and brain damage); *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) (ineffective assistance in defense counsel's failure to present evidence on difficult childhood, problems in the Army, brain damage, and depressive tendencies).

217.   Meanwhile, had counsel performed effectively, they could have presented evidence to contest the Government's theory of Torrez's role in the Zion offense. Because the jury had already convicted Torrez of Snell's murder and had already learned about the Arlington offenses in the Government's guilt-phase presentation, the Zion case was central to the Government's case for death. The prosecutor emphasized the Zion offense in closing, describing it as Torrez's "most brutal crime." Tr. 4/24/14, 2541; *see also id.* 2550–51. And the Zion case was central to the first two aggravating factors the jury had to consider in deciding whether to sentence Torrez to death. ECF No. 390 at 4.

218.   Left to believe that Torrez acted alone in committing the Zion offense, the jury was given an inaccurate and unfair impression of his culpability and the appropriateness of a

95

death sentence. This is especially so where Torrez was just sixteen years old at the time of the offense. It is well established that juveniles who commit crimes have diminished culpability relative to adults. *See Miller v. Alabama*, 567 U.S. 460, 471 (2012) ("[C]hildren are constitutionally different from adults for purposes of sentencing."); *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[B]ecause juveniles have lessened culpability they are less deserving of the most severe punishments . . . [a]s compared to adults."); *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (A juvenile's "irresponsible conduct is not as morally reprehensible as that of an adult." (internal quotations omitted)). This diminished culpability arises from the fact that juveniles are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569; *see also Miller*, 567 U.S. at 471 ("[C]hildren . . . lack the ability to extricate themselves from horrific, crime-producing settings."); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("[Y]outh . . . is a time and condition of life when a person may be most susceptible to influence."). It was therefore critical that the jury, in deciding Torrez's sentence, be informed that whatever role he may have played in the Zion offense, he acted along with, and possibly at the behest of, a second unknown perpetrator.

219. "In this case, the jury recommended the death penalty without knowing anything about [Torrez's] troubled background." *Noguera v. Davis*, 5 F.4th 1020, 1043 (9th Cir. 2021). His trial "counsel did nothing to counterbalance the prosecutor's view of [Torrez] or to portray [him] as a human being, albeit one who had committed [a] violent crime[ ]." *Andrews v. Davis*, 866 F.3d 994, 1099 (9th Cir. 2017). Moreover, the jury was left with the erroneous belief that Torrez was the sole perpetrator of the Zion offenses. Had counsel performed effectively, there is a reasonable probability that at least one juror would have voted in favor of life. Torrez is entitled to a new capital sentencing hearing.

**V.    TORREZ IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE UNDER *NAPUE* BECAUSE HIS DUE PROCESS RIGHTS WERE VIOLATED WHEN THE GOVERNMENT PRESENTED FALSE OR MISLEADING TESTIMONY.**

220.    The claims and factual allegations set forth in all other sections of this Motion are incorporated by reference and re-alleged as though fully set forth herein.

221.    As detailed in Claim IV, *supra*, the Government relied on misleading testimony relating to DNA evidence from the Zion offense in order to secure a death sentence against Torrez. The Government's knowing presentation of false testimony violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Giglio v. United States*, 405 U.S. 150, 153 (1972) ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." (quotations omitted)). False testimony "includes both perjury and evidence that, 'though not itself factually inaccurate,…creates a false impression of facts which are known not to be true.'" *Burr v. Jackson*, 19 F.4th 395, 410 (4th Cir. 2021) (quoting *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967)). To show materiality under *Napue*, a movant need only establish "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added). Here, the Government knew that the DNA testimony it presented related to the Zion offense was misleading. Because there is at least a reasonable likelihood that the false testimony could have impacted the jury's decision making, Torrez's sentence must be reversed.

**A.    The Government Presented Misleading Testimony.**

222.    As discussed in Claim IV, the Government presented materially misleading testimony at the penalty phase of trial regarding Torrez's alleged role in the murder of two girls in his hometown of Zion, Illinois, in 2005, when he was sixteen years old. SERI lab analysts Heather Parsons and Gary Harmon testified to the presence of semen on several of the swabs taken from the body of one of the girls, Laura Hobbs. Tr. 4/23/14, 2419, 2428–35. Regarding the

97

oral swab of Laura Hobbs, Harmon testified that the "sperm fraction from the oral swab of Laura Hobbs…was compared to Jorge Torrez. And it was found to be consistent with him." *Id.* at 2432; *see also id.* at 2431. Harmon likewise testified that a right-hand swab taken from Laura Hobbs "had a profile, the major profile or stronger profile consistent with Jorge Torrez." *Id.* at 2433. Harmon testified that he obtained "the same results" for three other right-hand swabs taken from Laura Hobbs. *Id.* at 2433–34.

223.    In fact, the SERI lab report described the sperm cell fractions extracted from the oral swabs as a "mixture of at least two males," indicating a second, unknown participant in the offense. Second Analytical Report at 5, ¶¶ 3, 6. Likewise, the DNA profiles obtained from the right-hand swabs are described on the SERI lab report as a "mixture of at least two males." Second Analytical Report at 6-7, ¶¶ 9-12. Yet Harmon never mentioned the presence of a second contributor to the DNA profiles, leaving the jury with the false impression that Torrez was the sole perpetrator of the offense, and the Government never corrected the falsehood.

**B.      The Government Knew the Testimony Was Misleading.**

224.    The Government knew that the DNA testimony it sponsored was misleading. The testifying lab analysts concluded themselves, and stated in their own reports, that the DNA evidence collected from the body of Laura Hobbs came from "a mixture of at least two males." *See* Second Analytical Report at 5-7, ¶¶ 3, 6, 9-12. Knowing that its evidence would not be subjected to cross-examination, the Government took advantage of this fact to intentionally mislead the jury regarding Torrez's culpability for the Zion offense.

**C.      There Is a Reasonable Likelihood that the False Testimony Could Have Contributed to Torrez's Death Sentence.**

225.    Where the Government knowingly sponsors false testimony, materiality is established where there is "any reasonable likelihood that the false testimony *could* have affected

the judgment of the jury." *Agurs*, 427 U.S. at 103 (emphasis added). Here, there is at least a reasonable likelihood that the Government's presentation of misleading DNA testimony could have affected the jury's verdict at sentencing. Because the jury had already convicted Torrez of Snell's murder and had already learned about the Arlington offenses in the Government's guilt-phase presentation, the Zion case was central to the Government's case for death. The prosecutor emphasized the Zion offense in closing, describing it as Torrez's "most brutal crime." Tr. 4/24/14, 2541; *see also id.* at 2550–51. And the Zion case was central to the first two aggravating factors the jury had to consider in deciding whether to sentence Torrez to death. ECF No. 390 at 4.

226.     Presented with misleading testimony suggesting that Torrez acted alone in committing the Zion offense, the jury was given an inaccurate and unfair impression of his culpability and the appropriateness of a death sentence. This was especially so where Torrez was just sixteen years old at the time of the offense. It is well established that juveniles who commit crimes have diminished culpability relative to adults. *See Miller v. Alabama*, 567 U.S. 460, 471 (2012) ("[C]hildren are constitutionally different from adults for purposes of sentencing."); *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[B]ecause juveniles have lessened culpability they are less deserving of the most severe punishments…[a]s compared to adults."); *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (A juvenile's "irresponsible conduct is not as morally reprehensible as that of an adult." (internal quotations omitted)). This diminished culpability arises from the fact that juveniles are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569; *see also Miller*, 567 U.S. at 471 ("[C]hildren…lack the ability to extricate themselves from horrific, crime-producing settings."); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("[Y]outh . . . is a time and condition

of life when a person may be most susceptible to influence."). It was therefore critical that the jury, in deciding Torrez's sentence, be informed that whatever role he may have played in the Zion offenses, he acted along with, and possibly at the behest of, a second unknown perpetrator. There is therefore at least a reasonable likelihood that the false testimony could have affected the jury's verdict. Accordingly, Torrez's death sentence must be reversed.

## VI.     TORREZ IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE IMPACT OF THE ERRORS IDENTIFIED ABOVE.

227.    The claims and factual allegations set forth in all other sections of this Motion are incorporated by reference and re-alleged as though fully set forth herein.

228.    Claims of constitutional error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual deficiencies warrants relief. The circumstances of this case demonstrate the cumulative effect of counsel's serious and inexplicable failures, and the Government's violation of the constitution, collectively undermined the fairness of the trial and sentencing proceedings. In light of the record as a whole, the cumulative effect of the errors more likely than not caused a suspect verdict and sentence. *See Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (citing *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985)). There is a reasonable probability that, together, they affected the outcome of Torrez's guilt-innocence and penalty trials, and they had a substantial and injurious effect on the result. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *Brecht v. Abrahamson*, 507 U.S. 619 (1993). This Court should therefore grant Torrez relief from his convictions and/or his sentence.

## REQUEST FOR RELIEF

Based upon all of the above allegations and the entire record of this prosecution, Torrez respectfully requests that the Court provide the following relief:

A.  Permit the Government to file an answer and allow Torrez reasonable time to file a reply, to amend the motion, if warranted, and to file such legal memoranda and briefs as may be necessary to respond or reply to any defenses raised and/or motions filed by the Government;

B.  Order such discovery as Torrez may specifically request by separate motion;

C.  Conduct an evidentiary hearing after the completion of discovery, as Torrez will request by separate motion;

D.  Permit further amendment to and briefing of the motion if the fact-development procedures so warrant, and allow reasonable time for briefing the merits of grounds asserted in the motion and any amendments thereto, after discovery is complete and an evidentiary hearing is conducted;

E.  Vacate Torrez's conviction and death sentence and order a new trial of the guilt-innocence and penalty phases; and

F.  Grant such additional relief as may be necessary and to which Torrez may be entitled.

Respectfully submitted,

 /s/ Katherine Thompson
KATHERINE THOMPSON
JOANNE HEISEY
SAMUEL J.B. ANGELL
Federal Community Defender Office
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone (215) 928-0520
katherine_thompson@fd.org
joanne_heisey@fd.org
samuel_angell@fd.org

/s/ Joan C. Robin
JOAN C. ROBIN
VA Bar # 44502
114 North Alfred Street
Alexandria, VA 22314
Telephone (703) 349-1111
Facsimile (703) 349-1118
joni@jonirobinlaw.com

Counsel for Movant, Jorge Avila Torrez

XXXX, 2023

101