UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,    )   Case 1:11-cr-115
                             )
            Plaintiff,       )
                             )
      v.                     )   Alexandria, Virginia
                             )   September 13, 2023
JORGE AVILA TORREZ,          )   1:34 p.m.
                             )
            Defendant.       )
_____)   Pages 1 - 17


TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.

UNITED STATES DISTRICT COURT JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

APPEARANCES:

FOR THE PLAINTIFF:

    JAMES L. TRUMP, ESQUIRE
    OFFICE OF THE UNITED STATES ATTORNEY
    2100 Jamieson Avenue
    Alexandria, Virginia  22314
    (703) 299-3700

FOR THE DEFENDANT:

    JOAN C. ROBIN, ESQUIRE
    LAW OFFICE OF JONI C. ROBIN, PLLC
    114 North Alfred Street
    Alexandria, Virginia  22314
    (703) 349-1111

    JOANNE M. HEISEY, ESQUIRE
    SAMUEL J.B. ANGELL, ESQUIRE
    OFFICE OF THE FEDERAL PUBLIC DEFENDER (PA)
    601 Walnut Street, Suite 545 West
    Philadelphia, Pennsylvania  19106
    (215) 928-0520

THE DEFENDANT, JORGE AVILA TORREZ, IN PERSON

P R O C E E D I N G S

(The defendant is not present.)

THE COURTROOM DEPUTY:  The court calls Criminal Case *United States of America v. Jorge Avila Torrez*, Case No. 2011-cr-115.

May I have appearances, please, first for the government.

MR. TRUMP:  Good afternoon, Your Honor.  Jim Trump on been behalf of the United States.

THE COURT:  Good afternoon, sir.

MS. HEISEY:  Good afternoon, Your Honor.  I'm Joanne Heisey with the Capital Habeas Unit for the Federal Defender's Office in Philadelphia, and I'm with my cocounsel, Sam Angell and Joni Robin.

THE COURT:  Very good.  Welcome.

MR. ANGELL:  Good afternoon, Your Honor.

THE COURT:  Welcome.

Counsel, I'm sure you're aware we've had some issues.  What I'm going to do is I'll take your items that you don't need to have with you other than the papers.

I think the marshal service is going to have him seated away from you-all.

MS. ROBIN:  Should I stay here or move?

THE COURT:  I think you should sit in the

gallery. I'm not ordering you to.

MS. ROBIN: Thank you.

THE COURT SECURITY OFFICER: Sir, the marshals are heading back now.

THE COURT: Off the record.

(Off-the-record discussion held.)

THE COURT: You can present your oral arguments initially. That would be helpful to the Court.

MR. ANGELL: Could Your Honor -- if Your Honor is giving us instructions, would you give them again.

THE COURT: I said based on the circumstances that I anticipate we're going to face, I would ask -- let you know that I'm aware of everything that's been filed in the matter and that you present any oral arguments efficiently.

MR. ANGELL: Thank you.

THE COURT: Ms. Robin can interpret for you. She knows how I operate, so she can tell you what's going on.

(The defendant enters.)

THE COURT: Counsel in the matter of *United States v. Mr. Torrez* is now all present.

This comes on a 2255. I'll let you-all take

the lead, Defense Counsel.

MS. HEISEY: Thank you, Your Honor.

As you're aware, this is a capital habeas proceeding. Our office was representing Mr. Torrez in 2018. Last year Mr. Torrez filed a request to represent himself in these proceedings before we had had an opportunity to file our habeas petition. So at that point, the court continued the hearing, and the parties met to discuss Mr. Torrez's request.

And at that point, the court Ordered a competency evaluation for Mr. Torrez, and he appointed Dr. Richard Ratner to conduct the evaluation.

Dr. Ratner had an initial meeting with Mr. Torrez, I believe, in January of this year. And both myself and counsel for the government have been in touch with Dr. Ratner, and his evaluation of Mr. Torrez is still ongoing. Although he had an initial meeting, he's reported to us that he still requires a second meeting with Mr. Torrez in order to complete his competency report. Although, he stated that he is near to being finished with it.

There was some -- they recently -- Mr. Torrez was transported to the Northern Neck facility, but now that he's back here in the Alexandria facility, my understanding is that it's Dr. Ratner's hope to be able

to see him for that second evaluation this week while he's here in Alexandria. And we'd ask that he be able to remain here until Dr. Ratner is able to complete that second evaluation and complete his report for the Court.

The only other thing that I would just note for the record -- I'm sure that Your Honor is aware, but it's been our position all along that this competency evaluation is sort of beside the point. Because Mr. Torrez doesn't have a right to represent himself in these proceedings, and our position is the Court should simply --

THE COURT: So the analysis is somewhat attenuated. I agree absolutely that he does not have a right to represent himself in a 2255 case. But there does seem to be some authority out there to address the ability of a person from a competency standpoint to even ask the Court for that ability. So I think we still have to go through that battle of competency even though it's not the traditional competency assessment. But we still have to go through that before we can actually get to that.

MS. HEISEY: I agree, Your Honor, when it comes to competency. The standard here, as we've hashed this out with the Court in our briefing and

prior argument that's all part of the record. But the standard governing this determination would be different from --

THE COURT: A trial.

MS. HEISEY: Exactly.

But I just wanted to note that's our position. Again, that's all been briefed and is in the record.

I don't think I have anything to add at this point other than just to say that, you know, the status of the case is that we're simply awaiting Dr. Ratner's competency report. And once we receive that, then we can sort of regroup and discuss what the next step will be from there.

THE COURT: Very good. Thank you, Counsel.

Mr. Trump, anything, sir?

MR. TRUMP: Judge, as to status, I agree with counsel that we are awaiting Dr. Ratner's report. I spoke with him a little over a week ago, and he indicated that he has one more session to go with Mr. Torrez. He wasn't sure how long after that his report would be finished.

As to the pending issues, I would ask the Court to perhaps prejudge whether there is a right and to what degree it can be exercised. Because I think

there were some unanswered questions in the prior round of briefing, and we put that off pending the whole idea of competency.

But I would note that it's the government's position that there is a right. And if there is a right, it can be waived. But to what degree the Court must allow Mr. Torrez to proceed *pro se*, if he exercises that right, or to what extent the Court has discretion is the issue that was pending before Judge O'Grady.

In any event, I think once the report is issued or digested, and we can confer with each other and present to the Court a schedule for briefing and subsequent hearings.

There is one open issue here. Judge O'Grady had appointed Mr. Hundley as an independent counsel for Mr. Torrez. It's my understanding that Mr. Torrez does not wish to meet with Mr. Hundley believing that he is sort of part and parcel of this team when he's really not. He is independent.

But one of the issues that we are unclear of is to what exactly it is that Mr. Torrez wants to do. Does he want to waive his 2255? Does he want to proceed *pro se*? Does he want to have some control over the issues with the 2255 but yet have counsel?

And the reason I raise this is that this same issue came up prior to trial.  The initial motion that Mr. Torrez made *pro se* was that he wanted to represent himself.  But then after receiving the advice of an independent attorney and having a series of *ex parte* hearings with the court, he decided he doesn't want to proceed *pro se* but he wants to proceed with new counsel.  That's how it was resolved.

So even though the posture now is that Mr. Torrez says he wants to proceed *pro se*, this may change if he understands the ramification of that decision.  And that's why Mr. Hundley was appointed.

I say all of this to ask the Court to advise Mr. Torrez that Mr. Hundley is an independent attorney and that it would be in his best interest to at least meet with Mr. Hundley and tell Mr. Hundley what it is that he wants.  So then Mr. Hundley can inform the Court and the parties because that will shape subsequent briefing and hearings.  But as of right now, we really don't have a clear idea of what that is.

THE COURT:  Okay.  Thank you, Mr. Trump.

For the record, the Court will say the following things:

Mr. Torrez, I am saying these things for your benefit.  You may remain seated.

There are a lot of things that we need to do to prepare this matter, which is on for trial for an ultimate disposition.

As Mr. Trump has noted, attorneys have different roles and responsibilities in the disposition of this matter. A lot of it depends on you, but the bottom line is not much of it is going to be accomplished unless we are able to get a proper evaluation from a healthcare provider. That's where you will be somewhat in control of the agenda, by working with this individual. Because the Court needs to make all kinds of determinations as to how we go forward from here.

So you are in control of many things, but nothing can be done of any significance unless you are able to meet with the healthcare providers and people who are interested in your position and your interest in the case.

So while I can't advise you to do anything, I suggest to you that things are going to likely work better in your favor if you cooperate with people who are trying to get this matter in the best posture available. So do what you think you need to do. Take the advice of counsel. Listen to what they have to say and make your own best determinations.

Do you have any questions, sir?

THE DEFENDANT: Due to my health condition at the jail right now, I don't know when he can come see me.

But I protested the conditions there for the trays and stuff and the way they are just treating us over there. I'm not eating. I'm not drinking.

So I don't know if it would be a good idea for me to meet with him while I'm at Alexandria Jail. It would have been better if at Northern Neck. I had no problems over there. I had no issues over there. The jail here has me lying down basically with no access to nothing. The only thing sitting in my cell right now is a mattress and role of toilet paper. That's it.

THE COURT: Sir, I would suggest to you that working your way through the circumstances that you are facing in Alexandria will probably result in your return to Northern Neck. The quicker you cooperate, the quicker you can probably get back to Northern Neck.

So these are decisions that you are going to have to make for yourself. I'll suggest to you that the more cooperation you give with the facilities in Alexandria, the more likely you will be able to return to where you are comfortable at Northern Neck.

THE DEFENDANT: I don't see why I had to come to Alexandria in the first place. Because Northern Neck has inmates' counsel come here for court all the time. There's no reason why I have to be housed in Alexandria.

THE COURT: I understand your point, sir. I hope you understand mine. The best way to get back to Northern Neck is to try to go through Alexandria as efficiently as possible.

THE DEFENDANT: Before, when Judge O'Grady was here -- I haven't told you. It's the first time I've seen you, Your Honor.

I've cut off all communications with my attorneys, no legal calls, no legal visits. I had asked Judge O'Grady, if there's going to be something filed or something is going to happen, to have the court notify me directly. He said he did that, but I near never received anything from the court.

THE COURT: Let me make a note in the record that anything the lawyers receive in the case, that you also get a copy of.

THE DEFENDANT: I don't wish to meet with them, even Mr. Hundley. He's already violated the client confidentiality agreement. I told him stuff in confidence that I didn't want them to know. He told

them. That's why I cut off communications with him.

Just recently, Rachel Primo, she used to be an investigator. She came back after I tried to get rid of them, and she violated that by telling my family I am on a hunger strike. That's none of their business.

Everything I signed previously, I want voided and nullified. I don't want them --

THE COURT: As I said, there are certain things that I have to do to even bring out the possibility of removing them from the case. There's certain things that I have to do, but I can't do those things unless and until I get information I need to make the best call that I need to make.

So, again, I appreciate what you're saying, and I understand your position in the matter. We need to work through this together, and to a large degree, you are in control as to how we work through this thing.

If you don't want to cooperate, then I suggest you -- if you don't want to cooperate, then I'm not going to be able to do my job.

THE DEFENDANT: What would be a faster outcome? Trying to get rid of attorneys or just --

THE COURT: Well, as I'm sure you understand,

I haven't read some of the documents that have been filed in the matter. It's a different determination the Court has to make as to whether or not you can represent yourself in the contest of this type of hearing as opposed to the original trial. There's a different analysis that needs to take place.

THE DEFENDANT: What about the 2255, just dropping it, waiving my rights?

THE COURT: My concern is if you want to drop that without the ability of the Court to review medical records to make sure you are making a competent and voluntary and prudent decision to make, then I would not be doing my job. I am going to make sure I do everything I need to do to protect your rights.

All right, sir?

THE DEFENDANT: I mean, the worst outcome already happened. I've been sentenced to death. I got a state case -- at least two different state cases. Even if I beat the federal case, I'm not getting out. What harm can come from me representing myself? There is no more harm that can happen to me. The worst has already happened.

THE COURT: Again, the constitution requires that we take certain steps to protect your rights from the beginning of trial until the end of disposition of

the matter. This particular judge is going to do everything that he can to make sure that the right things happen as we go through the process.

THE DEFENDANT: Seeing counsel right now -- I mean, I've talked to them in person, over the phone, in letters. They just don't seem to understand what I tell them. So I mean, I got no trust in them. They can't properly represent me if they don't understand. They completely don't understand me, the stuff that I told them before when I was working with them.

THE COURT: Let me hear from the government one last time.

You can have a seat, sir.

MR. TRUMP: Just so Mr. Torrez knows, Dr. Ratner plans to visit him Friday at ADC and the marshals may transport him back to Northern Neck on Saturday. That's the way it stands now. The reason he was brought here was for this hearing, as well as for Dr. Ratner, so he can complete the report and for no other reason.

THE COURT: Well, sir, what was essentially said in court is you can be back at Northern Neck as early as Saturday or Sunday. Again, it depends on what you do.

THE DEFENDANT: Being transported back and

forth I keep losing all my property. My family doesn't even know where I'm at right now. They think I'm still at Northern Neck. I can't even notify people right now I'm in Alexandria. I haven't had a shower, toothpaste, toothbrush. I can't even brush my teeth.

THE COURT: I will direct that the individuals at the Adult Detention Center in Alexandria make note to inform your family where you are and when you return back to Northern Neck.

All right, sir. Thank you. You're remanded to the United States Marshal.

MR. TRUMP: Your Honor, there is one other thing we need to put on the record.

THE COURT: Yes, sir.

MR. TRUMP: The procedural context we're in, the 2255 context, has a statute of limitation. The government has indicated that it will not assert a statute of limitation defense upon the filing of a Section 2255 motion for reasons that we've put on the record previously. So we have stated that until all of this is resolved, we will continue in that posture. The government would not raise the statute of limitation as a defense upon the filing of the 2255 motion. I just want to make sure that's on the record.

THE COURT: That will be made part of the

record.

MS. HEISEY: Can I ask one last thing too, Your Honor?

THE COURT: Yes.

MS. HEISEY: When we convened the last time, Judge O'Grady had asked that we submit the current draft of our habeas petition both to Dr. Ratner and to Mr. Torrez so that they could both see that as part of Dr. Ratner's assessment of Mr. Torrez's competency to be able to handle these proceedings.

We did submit to Dr. Ratner, as well as to the Court and mailed a copy to Mr. Torrez as well. As he mentioned, he's not receiving legal mail from us. So I have a copy in case he hasn't -- I don't know if he's already received that.

THE COURT: What we can do is, if you want to, you can provide a copy of it to the Court and the Court will make sure that it goes through the proper chain to get to Mr. Torrez.

MS. HEISEY: Thank you, Your Honor.

THE COURT: Thank you, sir.

-----------------------------------
Time:  2:03 p.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

_____
                                      /s/
Rhonda F. Montgomery, CCR, RPR