UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA        :
                                :
            Plaintiff,          :   Criminal Action
                                :   No. 1:11-cr-00115-RDA-1
       v.                       :
                                :
JORGE AVILA TORREZ,             :   February 27, 2023
                                :   10:15 a.m.
                                :
                                :
            Defendant.          :
                                :
............................. :


TRANSCRIPT OF HEARING PROCEEDINGS
BEFORE THE HONORABLE LIAM O'GRADY,
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the United States:      **James L. Trump, Assistant U.S. Attorney**
                            UNITED STATES ATTORNEY'S OFFICE
                            2100 Jamieson Avenue
                            Alexandria, VA 22314
                            703-299-3700
                            Email: Jim.trump@usdoj.gov

                            **Richard Cooke, Assistant U.S. Attorney**
                            UNITED STATES ATTORNEY'S OFFICE
                            2100 Jamieson Avenue
                            Alexandria, VA 22314
                            703-299-3700
                            Email:  Richard.cook@usdoj.gov

APPEARANCES (Cont.)

For the Defendant:     **Joanne Marie Heisey, Assistant**
                       **Federal Public Defender**
                       FEDERAL COMMUNITY DEFENDER FOR THE
                       EASTERN DISTRICT OF PENNSYLVANIA
                       601 Walnut Street
                       Suite 545 West
                       Philadelphia, PA 19106
                       215-928-0520
                       Email: Joanne_heisey@fd.org

                       **Samuel John Browne Angell,**
                       **Assistant Federal Public Defender**
                       FEDERAL COMMUNITY DEFENDER FOR THE
                       EASTERN DISTRICT OF PENNSYLVANIA
                       601 Walnut Street
                       Suite 545 West
                       Philadelphia, PA 19106
                       215-928-0520
                       Email: Samuel.angell@fd.org

                       **Joan Caroline Robin, Esq.**
                       LAW OFFICE OF JONI C. ROBIN, PLLC
                       114 N. Alfred Street
                       Alexandria, VA 22314
                       703-349-1111
                       Fax: 703-349-1118
                       Email: Joni@jonirobinlaw.com

                       **James W. Hundley, Esq.**
                       Briglia Hundley PC (Tysons)
                       1921 Gallows Rd
                       Suite 750
                       Tysons Corner, VA 22182
                       (703) 883-0880
                       Email: Jhundley@brigliahundley.com


Court Reporter:        **Scott L. Wallace, RDR, RMR, CRR**
                       Official Court Reporter
                       United States District Court
                       401 Courthouse Square
                       Alexandria, VA 22314-5798
                       Cell: 443-584-6558
                       Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**<u>MORNING SESSION, FEBRUARY 27, 2023</u>**

(10:15 a.m.)

THE DEPUTY CLERK:  The Court calls *United States of America versus Jorge Avila Torrez*, Case Number 1:11-cr-115.

May I have appearances, please, first for the government.

MR. TRUMP:  Good morning, Judge.  Jim Trump and Richard Cook for the United States.

THE COURT:  All right.  Good morning to you both.

MS. HEISEY:  Good morning, Judge.  I'm Joanne Heisey from the Federal Defender's Office for the Eastern District of Pennsylvania representing Mr. Torrez.  With me is my co-counsel, Sam Angell, as well as Joan Robin, and we have Mr. James Hundley with us as well.

THE COURT:  Good morning to each of you.

MR. TRUMP:  Good morning, Your Honor.

THE COURT:  All right.  Good morning, Mr. Torrez.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Let me start by kind of explaining why we're here today.  I know you've been waiting for a while for a hearing, and the -- as you know, I appointed Dr. Ratner to examine you for competency, and he came to see you, I think, in January; is that right?

THE DEFENDANT:  Not exactly sure on the date, but I saw him.

THE COURT:  And how many times did you see Dr. Ratner?

THE DEFENDANT:  Once for probably two hours.

THE COURT:  Two hours?  All right.  And did that go well?

THE DEFENDANT:  I mean, he asked me some questions that I couldn't answer because I don't have my discovery, but, other than that, it went fine for me.

THE COURT:  All right.  And you cooperated with him in the questioning --

THE DEFENDANT:  Yes.

THE COURT:  -- that he did, and you were truthful with him?

THE DEFENDANT:  Yes.

THE COURT:  How are things at the Alexandria Detention Center?  Are you being treated fairly there, in your estimation?

THE DEFENDANT:  Uh, a little bit better than when I first got here.

THE COURT:  Okay.

THE DEFENDANT:  It's discrimination, basically, because of my charges.  I'm in the admin sec unit with only five people.  I don't come out with nobody.  We used to have a unit worker who cleaned the unit, and he left, and I signed up to try to be the unit worker, and they told me no because of my charges, but what's the reason?  I don't come out as a unit worker.  I have no contact except with the deputies.

THE COURT:  All right.  Physically, are you doing well health-wise?

THE DEFENDANT:  I guess, Your Honor.

THE COURT:  Do you get any exercise at all?

THE DEFENDANT:  There's no exercise equipment in the unit. It's a small unit.

THE COURT:  Yeah.

THE DEFENDANT:  Nothing to do in there, really.

THE COURT:  The only exercise is just what you do on your own?

THE DEFENDANT:  Yeah.

THE COURT:  Okay.  Let's spend a few minutes going back and talking about the history of why we're here.  You wrote me back in April of 2022 and indicated that you no longer wished to be represented by the Pennsylvania lawyers and said -- I'll just quote it.

"I have already told my attorneys about my decision to represent myself.  I would like to file a second motion if the need arises for it to void and nullify all forms I have signed for my attorneys that allows them to act in my name or to gather information and documents about me.  I would like this to be on the Court's records.  As of today, I've stopped and cut off all forms of communication with my attorneys, and this includes legal mail, legal calls, and legal visits."  And you signed that letter dated -- it was dated April 1st of 2022, and it got to me on April 5th.

You followed that up shortly, within about a month,

because you had not heard from me, in a letter you signed on May 9th of 2022. You indicated that you have not received a response to my letter to the Court. "I'm making this request because I no longer wish to be represented by the attorneys from the Federal Community Defender's Office for the Eastern District of Pennsylvania," and you repeated that, "Just so the Court knows, I have broken off all forms of communication with my attorneys." And you indicated that, "If I contacted them, that you would not be getting that information."

So, you followed that up with a letter right before our hearing on July 17th, which is dated July 8th of 2022, and in that letter you spoke about Mr. Hundley, who I had appointed at that stage to represent you, and you said that you had met with him and that Mr. Hundley had been asked for legal advice on how to get rid of your attorneys from Pennsylvania. And Mr. Hundley advised you not to do so, and you indicated that the best advice he could or would give me was to keep on doing what I'm doing now. "I can tell by Mr. Hundley's advice to me that he did not want the same things that I want, so how is he to represent or advise me properly?

Let me make one thing clear, though. I asked to represent myself in court. I did not ask for new attorneys, and I do not want new attorneys. I can and will speak for myself."

And it goes on to indicate that the second time that he spoke with Mr. Hundley he felt that he had, by speaking to the

Pennsylvania attorneys, violated your trust, and that you, thereafter, would not speak to him anymore.

You also indicated that, "I do not want or need the brief from the attorneys in Pennsylvania.  I hereby make a motion for the Court to disregard and to expunge anything that my former attorneys have filed or will file on or after April 1st of 2022, and this is to include the brief that my federal attorneys have been working on."

And then we had our hearing on July 17th, and I appointed Dr. Ratner after that.  It became apparent to me that the decisions that Dr. Ratner has to make are multiple, and that he determined your competency, but not just to understand the proceedings against you in a general sense the way it was at trial, but also in regard to your 2255 petition, which is a little different and, as I indicated, can be a challenge for a layperson.

So, I asked the parties to brief the following issues that I would then inform Dr. Ratner about, and they are SIS and to submit briefing addressing the appropriate legal standards to be applied to the following issues:  One, Mr. Torrez's competency to waive and/or right to waive the motion -- the filing of a motion under Title 28 of the United States Code 2255; second, Mr. Torrez's competency and/or the right to file a 2255 motion *pro se*; third, Mr. Torrez's competency and/or right to decide the issues to be raised by counsel in a 2255 motion.

And the parties briefed those four issues for me, and I had a copy sent to the Alexandria Detention Center. Did you receive the briefs that the parties filed?

THE DEFENDANT: I did not, Your Honor.

THE COURT: Okay. And I think that Mr. Hundley wrote a pleading to the Court recently indicating that he had tried to see you, and that you wouldn't speak to him on the telephone or meet with him in person over the course of the last several weeks; is that correct, sir?

THE DEFENDANT: He's only tried to come once, which was this past Friday, and I refused the visit.

THE COURT: Okay. And so you -- you didn't review any documents that he had with him or that he may have had?

THE DEFENDANT: No, Your Honor.

THE COURT: Okay. Well, that's the purpose of the hearing today, is to, in part, have legal argument about what Dr. Ratner's task is when he writes an evaluation report to the Court about your competency. I wanted to make sure you understood why we are here today. Do you have any questions about that?

THE DEFENDANT: Do you have a copy of the documents that you're talking about right now, Your Honor?

THE COURT: I have the pleadings. I've got -- does your counsel have a copy of the pleadings that he could follow along with if he wants to?

MS. ROBIN:  I do have a copy.  I'll see if we have an extra that we could give to Mr. Torrez.

THE COURT:  Okay.

MS. ROBIN:  Yes, I think we do have an extra set.

THE COURT:  Thank you.  Okay.  We can take a recess for you to read those if you would like to.

THE DEFENDANT:  We can continue on, Your Honor.  That's fine.

THE COURT:  Okay.  The first question I really have for you is -- I'm a little confused as to what you want in terms of legal assistance moving forward.  There seems to be some question as to whether you just want new attorneys who are more aligned to your positions that you think should be taken in this petition or whether you do not wish to have any attorney helping you under any circumstances, and have you made a decision about that?

THE DEFENDANT:  I don't want no attorneys, Your Honor.

THE COURT:  And why is that?

THE DEFENDANT:  Because, as I see it, it's a conflict of interest from what they told me in person, their words.  They have an agreement with the prison not to go after my rights or anything like that.  So, if they want to defend my due process rights, which is through the courts, my envelopes, my stamps, and all that stuff, and my legal discovery that I had at the time, I don't see how they represent my best interest.

THE COURT:  Well, that seems to me to be a conflict with

present counsel and that you have received information which, I don't know whether it's correct or incorrect.

THE DEFENDANT:  I've had bad luck with attorneys since I got arrested, Your Honor.  There was one attorney that was exceptional, and then she turned around and basically stabbed me in the back, so I don't want no more attorneys, Your Honor.

THE COURT:  Under any circumstances, even if they didn't have a conflict?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Well, let me ask you this:  Have you reviewed a draft of the 2255 petition that the attorneys in the Eastern District of Pennsylvania have been working on on your behalf?

THE DEFENDANT:  Not since long before April of last year, Your Honor.

THE COURT:  And in what form was it in at that stage?  Did it include the --

THE DEFENDANT:  It was just a draft.

THE COURT:  Okay.  So, it included what issues they felt were important during your appeal?

THE DEFENDANT:  I believe it was like, what, the Fourth, Fifth, Sixth, and Eighth Amendment violations they were arguing.

THE COURT:  Fourth, Sixth, and Eighth Amendment?

THE DEFENDANT:  I believe so.

THE COURT:  And --

MS. ROBIN:  Can I just ask, Your Honor, if we're going to

get much more into communications between attorney-client that we be able to do that *ex parte*?

THE COURT: Yes. I wasn't going to go any further right now, but thank you.

MS. ROBIN: Thank you.

THE COURT: Did you -- so you read that draft of the brief?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And did you disagree with their position?

THE DEFENDANT: The arguments are weak, from the way I see it, Your Honor. Only two of them were the strongest, and I don't see it going anywhere.

THE COURT: Well, do you feel that you can do a better job if you're given time to research those issues and file a pleading with the Court?

THE DEFENDANT: I don't see that I could do any worse than they have.

THE COURT: Is it your intent to file your own 2255, if I give you that permission?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So, you do want to file a 2255 petition to --

THE DEFENDANT: If I can proceed without attorneys, then yes, Your Honor.

THE COURT: And do you have any support, legal support in

the Terre Haut prison?  What is your access to the law library or --

THE DEFENDANT:  It's just me.

THE COURT:  Or do you have -- you know, these days there are a lot of inmates, fellow inmates who have some legal training or at least say they have some legal training that assist inmates in drafting pleadings.  Do you have -- what access do you have to any kind of assistance?

THE DEFENDANT:  It's just me and one hour a day at the law library, Your Honor.  That's it.  I don't have no outside support.  I don't have no jailhouse lawyers.

THE COURT:  When we were at the trial stage, you know, you had a perceived conflict with your initial attorneys and then fired them and then represented yourself for a while and then decided that you needed counsel, and so we had counsel for the majority of the trial, and then you requested that your attorneys not perform -- not be allowed to move forward with certain defenses, and then the conflict arose there.  Is there a possibility that if you represented yourself and found that you needed counsel that you would seek to have counsel -- further counsel appointed?

THE DEFENDANT:  No, Your Honor.

THE COURT:  And why is that?

THE DEFENDANT:  I'm prepared to draft the appeal right now, and I feel a need to get rid of the attorneys.

THE COURT:  You just lost all faith in counsel in any form?

THE DEFENDANT:  Yes.

THE COURT:  Remind me of your education.  You graduated from --

THE DEFENDANT:  -- high school.

THE COURT:  High school.  You went into the Marines?

THE DEFENDANT:  Yes.

THE COURT:  Did you have -- have you had any further education, formal education?

THE DEFENDANT:  No.

THE COURT:  All right.  And the legal knowledge that you've picked up over the years is based on your own --

THE DEFENDANT:  Self-taught, basically.

THE COURT:  I'm sorry?

THE DEFENDANT:  Self-taught.

THE COURT:  And as a result of all the different hearings that you've had for the last eight years or nine years?

THE DEFENDANT:  Yes, and whatever I could find out at the law library.

THE COURT:  Okay.  Have you read the briefs that were filed in the direct appeal after your conviction here?

THE DEFENDANT:  Uh, I believe I've read parts of it.  I don't believe I actually sat there and read the whole thing through, because I was also depending on counsel back in those

days.

THE COURT: Did you read the Fourth Circuit's opinion on the appeal?

THE DEFENDANT: I haven't -- it's been a while since I've done that, Your Honor.

THE COURT: Okay. It was probably sent to you back then, and you read it after it was filed.

THE DEFENDANT: At one point, I thought I wouldn't need my discovery no more, and I gave it all to the attorneys, so -- They're the ones with all the discovery and all the reports and everything, all the briefs.

THE COURT: Have you looked at what a petition under 18 U.S.C. 2255 allows you to appeal and what issues can be contested in a 2255? I know you mentioned the Fourth, Sixth, and Eighth Amendments.

THE DEFENDANT: I know the appeal has to do with the Court errors and stuff like that. The habeas corpus is basically the violations to the amendments of the Constitution. I understand that, Your Honor.

THE COURT: Okay. And effective assistance of counsel, do you understand that?

THE DEFENDANT: Yes, yes.

THE COURT: And the Eighth Amendment is cruel and unusual punishment. Is that what your understanding is?

THE DEFENDANT: I don't know all the amendments off the

top of my head, but I do have them printed out at the jail. I know the Fifth one is pleading the Fifth.

THE COURT: All right. So you've done that research?

THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: As it applies to a 2255 versus a direct appeal?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. That's all the questions that I have for you right now. Do you have any questions for me based on what we've just discussed?

THE DEFENDANT: Just the communications with the Court. You said you sent me something to the jail. I never received it, so I don't know what's going on there with that.

THE COURT: I'm not sure either, but I'll investigate that because I wanted to make sure you had these briefs before we had our hearing. I mean, just for your own benefit. But, you see -- are these extra copies that he can take with him at the end of the hearing today?

MS. ROBIN: Yes, he can.

THE COURT: Okay. All right, then. I'm going to turn to counsel now for any legal arguments. I mean, this is what I consider to be preliminary questioning of Mr. Torrez to get an idea of where he stands today, and there will be necessary subsequent questioning once Mr. Ratner's report has been issued. But I wanted to give the parties an opportunity to listen to

Mr. Torrez so he could tell us where he stands today.  So I'll hear any argument from you to begin.  Thank you.

MS. ROBIN:  Thank you, Your Honor.  We understand Mr. Torrez's position, his desire to represent himself, but he doesn't have a right to self-representation in 2255 proceedings. The Supreme Court has made clear that *Faretta*'s Constitutional right to self-representation is limited to the trial context, and so there's no Constitutional right in this context that we're in now for him to represent himself.

THE COURT:  Well, has the Supreme Court been clear that he doesn't have a fright to represent himself in a 2255 or 2254?

MS. ROBIN:  So, the Supreme Court has addressed that question in the context of an appeal.  That was the holding in *Martinez,* and it held that there was no Constitutional right to self-representation there, but the Court in holding that made clear that *Faretta*'s right is limited to the trial context, and so other courts that have addressed this question in the 2255 context have held that *Martinez* applies there as well and that there's no Constitutional right outside of the trial context, and that extends to 2255 and 2254 proceedings as well.

THE COURT:  You know, there's obviously a lot of district court decisions that suggest that the judge ultimately makes a decision on whether an inmate under 2255 should have the right to represent himself and draft an opinion, and it appears that Mr. Torrez intends to file an appeal, which was an issue that I

was uncertain of until this morning, and that he's had the benefit of reading a draft of your pleading and also having done research on 2255.

MS. ROBIN: And just to clarify, Judge, I'm not sure what Mr. Torrez was referring to as far as having reviewed a draft, because we did not have any draft of the habeas petition put together at the point at which he wrote the Court asking to represent himself. So I'm not sure what he's recalling having reviewed. I'm not sure what that was, but it was not a draft of the petition.

THE COURT: Where are you today on the petition?

MS. ROBIN: Well, we've -- so, at the point when we were here last August, as we discussed, we were sort of wrapping up our investigation that had been delayed for periods of time due to the pandemic, and that we were able to wrap up shortly after that hearing last year, and so we've -- I would say we've completed our investigation and would be ready to file at any point.

THE COURT: So, knowing that Mr. Torrez isn't going to be available for any further communications, you would be prepared to file a legal brief in the near future and have a draft of that now?

MS. ROBIN: That's right.

THE COURT: Okay. All right. Thank you. Go ahead.

MS. ROBIN: So -- and as Your Honor mentioned, these other

district courts that have addressed this question have found that, because there's no right to self-representation in this context, that it is up to the Court's discretion, and what the Court should consider is the interest of justice in deciding whether Mr. Torrez should be allowed to represent himself in these proceedings, which, by their nature, are extremely complex, are ripe with risks for forfeiture of claims, and which the Supreme Court has explained that provision of counsel in these proceedings is necessary to ensure a full and fair proceeding and to ensure a fair imposition of the death penalty.

Obviously, these sorts of proceedings are very heavy on legal research and writing. They require investigation of facts outside of the record, they require work with experts, and I would be very doubtful that Mr. Torrez would be capable of doing any of those things in a way that would afford him a full and fair proceeding here.

THE COURT: All right. I don't have any other questions for you at this time.

MS. ROBIN: Thank you.

THE COURT: All right. Mr. Trump, Mr. Cooke.

MR. TRUMP: As to the Court's initial question as to what further work Dr. Ratner has to do, I don't know where he is in his process, but obviously step one is to determine whether Mr. Torrez suffers from any sort of mental disease or defect that would render him unable to make voluntary, knowing decisions

about his future.

That was done before. Dr. Ratner determined he was not suffering from such mental disease or defect. I'm fairly confident that that will be the result again.

But the next step is to determine, to what extent he can, what is his intellectual capability. Is he able to understand the consequences of his decision to waive counsel? Is he able to understand the basic legal issues that confront him? Not being a psychiatrist or psychologist, I'm not sure exactly how that process works, but that would be Dr. Ratner's second task.

In our briefs, we discussed the issue of waiver of a 2255 filing. I guess that's not an issue at this point, but if it were, Dr. Ratner would have to discuss with Mr. Torrez the consequences of that decision.

As far as the arguments concerning the Constitutional right, even if we agree that there's no Constitutional right to self-representation, we do believe there is a statutory right.

This whole argument is full of irony, Your Honor. For example, a defendant sentenced to life without parole has no statutory right to counsel and is, perhaps, compelled to proceed *pro se* under a Section 2255 proceeding, yet we're standing here arguing whether Mr. Torrez is capable of doing that himself when he's faced with, obviously, the most severe penalty.

But given the fact that the analysis in *Faretta* and the analysis of the subsequent cases, if you have a right, you have a

right to waive it. That was, in fact, the Supreme Court's analysis. I'm not sure how that changes in the statutory context. If there's a statutory right, isn't the same analysis applicable; that if you have a right, you have a right to waive it?

I think we all agree that, as attorneys, we would rather deal with counsel, having tried a case, a capital case with a *pro se* defendant and having encountered in our most recent trial, Judge, where there are difficulties, both legal and practical, of dealing with a *pro se* defendant, so I'm standing here at the podium not suggesting that it would not be to the advantage of both parties to deal with a represented defendant, but the question is whether Mr. Torrez has the right to waive counsel, and I think he has a statutory right to counsel; he has a statutory right to waive counsel.

If we go a step further and say, well, it's up to the Court's discretion, I think then the Court's discretion can't be exercised at this point. The Court's discretion would have to wait for a proceeding in which Dr. Ratner has filed a report and, perhaps, a more fulsome *ex parte* colloquy with Mr. Torrez as to what he wants.

When we were faced with this decision before, Mr. Torrez's initial request to the Court was to fire his attorneys and proceed *pro se*. It then became clear that what he wanted to do was direct his attorneys' strategic decisions. And, again, if

that's where we end up here -- again, I find it somewhat ironic that counsel's insistence that they have complete control over the issues to be presented to the Court in a 2255 context would force Mr. Torrez to make a decision to jettison counsel versus trying to work with him and decide which issues should be presented would not be the better course for Mr. Torrez.

I just -- it's difficult to comprehend how that would not be a more favorable outcome here if that is possible. Bottom line, I suggest to the Court that we direct Dr. Ratner to proceed with his evaluation, provide the Court and the parties with the report.

Step two would be to have a subsequent hearing at which -- after Mr. Torrez has read all the pleadings, has had the benefit of seeing Dr. Ratner's report, and perhaps at some point then either *ex parte* or at a hearing discuss with him what his preferences are.

Again, as before, perhaps he will change his mind and decide that, if counsel is willing to sit down and work out a pleading that's to his satisfaction, that he would proceed with counsel, or, perhaps, he will insist that he proceed *pro se*, but, either way, I guess I still can't wrap my head around the argument that he has absolutely no right to make decisions about his legal future. That just does not seem to be both a legal and a practical consequence.

As we point out in our briefs, Your Honor, and as, again,

someone who has gone through this, to say that a habeas proceeding is so complex that no defendant should be allowed -- no capital defendant should be allowed to proceed *pro se* really turns the whole *Faretta* thing on its head.  A trial is just as complicated as a habeas proceeding, Judge.  In fact, the legal issues confronting a defendant at trial, the evidentiary issues, the hearsay rule, impeachment, all of those issues, the judgment that's required to represent yourself at trial is certainly as complicated, if not more complicated, than a habeas petition.

So, again, I do take issue with counsel's position that somehow we put the habeas process up on a pedestal and say that is so complicated that Mr. Torrez can't do it himself.

As a legal matter, I don't think he can do it himself. That's just the way it is.  And as a legal matter, I don't think many defendants can represent themselves very adequately at trial, but they have the right to do so, and that's where we end up, Judge.

THE COURT:  What additional information do you think Dr. Ratner should have before he drafts his report and/or visits with Mr. Torrez again?  And prior to my request for additional briefing, Dr. Ratner had been prepared to speak with Mr. Torrez, I think, and I don't know if he arranged a date to speak, but he fully intended to explore what goes into a 2255 petition so that he had a better understanding of it as a matter of law so then he would be able to further evaluate Mr. Torrez's ability to draft

such a pleading himself?

MR. TRUMP:  I would have no problem with Dr. Ratner sitting down with counsel and going through the types of questions that counsel would suggest that Dr. Ratner ask Mr. Torrez.

Again, I don't know how specific a psychologist or psychiatrist would want to believe -- or would want to be with Mr. Torrez, but to the extent that he needs some background in what Mr. Torrez faces in terms of drafting and filing and litigating a habeas petition in this context, whatever advice and questions they can provide is fine with us, Judge.

THE COURT:  All right.  I think that would be advisable, yes.  All right.  Thank you, Mr. Trump.

MS. ROBIN:  May I just respond?

THE COURT:  Certainly.

MS. ROBIN:  Well, I just would like to respond to the discussion of whether there's a statutory right to self-representation here, because, again, most courts that have addressed this question have not found there to be a statutory right either.  We're aware of one unpublished Fifth Circuit case finding that there was a statutory right under Section 1654, but that's not what most courts that have addressed this question have held, and I don't think that it's true that if you have a right -- for instance, if you have a right to counsel here, that you automatically have a right to raise it, because that's the

opposite of what the Supreme Court held in *Martinez* where, of course, the petitioner there had a right to counsel in an appeal, and the Court held that he didn't have a right to waive counsel; he didn't have a right to represent himself. So, I don't think it's true that just because there's a right, there's a right to waive.

Again, most of the courts that have addressed this issue have found there's no right to self-representation in this context for the reason that provision of counsel is, by default in 2255 proceedings, for the reason that they are so complex and they require --

THE COURT: So, it's an interesting conflict there, which Mr. Trump brought up in the pleadings, which is that, you know, the defendant has a right to ultimately decide his or her defense, and that lawyers are agents who do not have the final decision on whether to argue for or, you know, argue against the death penalty. In Mr. Torrez's case or in the *Reese* case where -- a recent Fourth Circuit case -- where a defendant says, I don't want to bring up prior convictions or I don't want my mental health history to get in front of the jury, and, you know, the courts have said that's a right that a defendant has. He's competent and understands. And so there's a huge conflict there in this setting because Mr. Torrez is saying, I didn't like what I saw, even if it was some preliminary document, and I don't trust counsel to finalize a pleading, and you're saying he has no

right in this context, which is, you know, outside of the -- the government has cited a hundred-year-old case from Justice Friendly, and that ultimately it is a defendant's choice. So, there clearly is -- courts over the years have grappled with this decision, and, you know, the best solution was addressed by Mr. Trump, who said counsel and defendant should work together and decide ultimately what to file in the court. That's not likely to work here. What about a situation where a pleading is filed by you, and then Mr. Torrez has the opportunity to file a supplemental pleading if he wishes to do so? If you had a situation where that arose, what would be your reaction to that?

MS. ROBIN: We have, Your Honor. We've had other cases where hybrid representation has been permitted, and I think that could be an option here, for the Court to consider claims or issues raised by counsel, as well as those raised by Mr. Torrez. We haven't -- I don't think that there's been any sort of dispute with Mr. Torrez as to what should or shouldn't be raised in a habeas petition because we have never reached the point of even having those discussions with him at the point at which he moved to proceed *pro se*. So I can't say that that's what's happening here, that there's some sort of dispute about claims, because we've never reached the point of actually having those discussions with Mr. Torrez.

But as far as the delineation of the rights and duties of a client vis-à-vis counsel, the client does have the right to set

the objectives of the representation, but it's up to counsel to determine the strategy, and there are only certain limited decisions that counsel has -- or I'm sorry -- that the client has an absolute right to make, such as whether or not to plead guilty, whether or not to waive a jury, whether or not to testify, et cetera.

In *Ruth* {ph}, of course, Mr. Ruth had waived any presentation of mitigating evidence at his penalty phase, but he was representing himself there, so it wasn't a context where he was represented by counsel.

The Fourth Circuit on appeal held that if he had been represented by counsel, that the decision of whether or not to present mental health evidence at the penalty phase would have been a strategy decision rather than an objective decision to be made by the client.

So, I think that's where, you know, the delineation of the rights and responsibilities are there.

I also just want to make clear what standard Dr. Ratner should be applying when he's determining Mr. Torrez's right to -- or I'm sorry, competency to represent himself, because the government framed it as, whether he has a mental disease or defect such that he would be able to make rational decisions, but the standard here for him to represent himself is much higher than that. It's not the *Dusty* standard to proceed to trial, it's the standard announced under *Indiana versus Edwards* to represent

himself, which means his ability to handle the proceedings, and, of course, we're talking about a 2255 capital habeas proceeding here which, by its very nature, is complicated, entails -- it's heavy in legal research and writing, requires investigation outside of the record, all of which Mr. Torrez would be very much hampered in his ability to do.

That's all I have, if Your Honor doesn't have any further questions.

THE COURT: Thank you, Ms. Robin. Mr. Trump, do you want to respond to the last --

MR. TRUMP: Your Honor, I think I was pretty clear. I did not say that Dr. Ratner's examination ends with a finding that he has the ability to make knowing and voluntary -- I followed that up by saying that the second step is to determine the extent of his, you know, intellectual capacity, and for that he would have to be examined with respect to the legal proceedings that he now faces, which is exactly why I said to the Court that I would have no objection to Dr. Ratner sitting down with counsel and coming up with a colloquy to address that issue.

Again, I don't think we'll agree on the proper legal standard. I think on page 6 of our pleading we lay out our argument very clearly that we basically disagree that it is as stark a choice as defense counsel makes out, that Mr. Torrez simply has no right to waive counsel. I don't think that's the law. We don't think that's what the courts have decided, both in

terms of a noncapital 2255 situation or a capital situation.

THE COURT: Thank you. Well, I would like Mr. Torrez to receive a copy of the draft and have a chance to review the draft petition. And, of course, Mr. Torrez, you're free to consult with counsel if you wish about it, but I want you to have it in your -- you to have reviewed it so you understand the arguments that they wish to make on your behalf in that pleading.

And I will ask Dr. Ratner to speak with counsel about the work that they're doing on your behalf and what goes into a 2255 petition filing before he comes back, and then I'll ask him to visit with you again.

Is there anything else that you would like to make sure I get to you before -- besides that draft and before Dr. Ratner visits you next time?

THE DEFENDANT: I mean, I would like all my discovery, Your Honor. If you're going to allow me to proceed *pro se,* I'm going to need all of my discovery that the attorneys have.

THE COURT: I haven't made that decision yet.

THE DEFENDANT: I mean, that would help me out a lot to answer the questions that Dr. Ratner has for me.

THE COURT: Right. Where is his discovery?

THE DEFENDANT: Counsel has all the discovery.

THE COURT: Pennsylvania counsel has your discovery?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And what do you mean by the word "discovery"?

THE DEFENDANT: All the expert reports, police reports, autopsies, everything that -- basically all the three or four cases that I had that they put together. It was all put on a laptop. So, there was so much paperwork that the jail didn't want me to have it, so the workaround was to put it on a laptop and give me a laptop. They have the laptop. I asked them where it was, and they told me they had it. I tried asking the jail if they will allow me to get it again, but they're telling me that counsel has to do it, but I'm trying to go *pro se*, I don't have counsel, so that's where my issue comes in at.

THE COURT: Ms. Heisey, what is your response to that?

MS. HEISEY: I'm sorry, I didn't understand -- I'm sorry, Judge. I didn't understand when you were saying that we could have brought it in on a laptop.

THE DEFENDANT: That's the problem, Your Honor. There's no communication between the attorneys because the federal public defenders that I had originally were sending me documents like this (indicating), but the jury questionnaires, the transcripts and everything, I had stacks of paperwork in my cell, so it was all put on a laptop by the federal public defenders. When I got new counsel for the appeals and all that stuff, they passed on the laptop. I specifically asked the Pennsylvania attorneys, where's that laptop? And they told me they had it -- one of them told me they had it. So, where is this laptop at?

THE COURT: Well, this is the record from the trial court

and the original direct appeal?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Not the work product of Ms. Heisey and her group, right?

THE DEFENDANT: It was before them.

THE COURT: Okay.

MS. ROBIN: Yeah. I know that that had happened when Mr. Torrez was represented by the attorneys from the Eastern District of Virginia, that there was a laptop that had discovery on it that he was able to view at the jail, but, as far as I know, we are not in possession of that, unless co-counsel has a representation.

THE DEFENDANT: That's my issue, Your Honor. There's no -- that's what they told me, and now they're saying this. That was the problem before. Like I told you, they said they didn't show me nothing to do with the brief or whatever. All the visits that I've had with them at the prison three to four hours long, what are we talking about then if it wasn't legal discovery and all this stuff? Like I told you before, they'll spend five or ten minutes talking about the case, and then we'll talk about something else for the rest of the time. What do I need counsel for? There's no communication between us. There's no --

THE COURT: Okay. Who's the lead counsel in the direct appeal that you think may have had possession of a computer? Do you recall who?

MR. TRUMP:  Well, it wasn't trial counsel.

THE COURT REPORTER:  I'm sorry, say that again.

MR. TRUMP:  I know it wasn't trial counsel, but I don't know off the top of my head the name of the attorney.

THE DEFENDANT:  Robert Jenkins maybe.

MR. TRUMP:  No, no.  I can see his face from the oral argument in front of the Fourth Circuit, but I don't --

THE COURT:  Would you --

MR. TRUMP:  I thought it was Julie Stelzig, who was the counsel on direct appeal for Mr. Torrez.

THE COURT:  How do you --

MR. TRUMP:  She's out of the Federal Public Defender's Office out of Maryland.

THE COURT:  In Maryland.

MR. TRUMP:  But she didn't argue the case before the Fourth Circuit.

MR. COOKE:  According to the Fourth Circuit's decision, Ms. Stelzig argued.

MR. TRUMP:  I may be confusing my --

THE DEFENDANT:  -- too many attorneys, Your Honor.

MR. TRUMP:  But I know that trial counsel had kept most of the material on their tablets, which they used in court.

THE COURT:  Right.

MR. TRUMP:  I don't know if that's what they gave to appellate counsel.  There's certainly a digital copy of an

appendix --

THE COURT: Right.

MR. TRUMP: -- at the Clerk's Office in the Fourth Circuit, but -- you know, obviously I don't know what habeas counsel has put together. I just don't. I don't know if they had access to trial counsel's files or whatever.

THE COURT: Yeah. I'll look to find that computer and see whether I can make it available to you at the Alexandria Detention Center. Are you allowed to go to the library at the A.D.C.?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay.

THE DEFENDANT: They just recently got tablets at the jail, and the law library has the tablets. It's actually a little more complicated than actually going to the law library, but I'm managing to navigate a little bit.

THE COURT: Okay. All right. Well, I'll see if I can get that to you, but what I want you to focus on is carefully reviewing the draft of the petition that counsel has generated and think about that carefully. I'll try to get you the fact discovery from your original case on the laptop or a substitute. The record that went down to the Fourth Circuit, I'm sure, is really lengthy, maybe difficult to navigate, but it's broken down pretty extensively, so it may be something that -- and that, frankly, I'm not sure how I'm going to get that to you, but I

will attempt to get you the original records. But I really want you to get a -- take a close look at the that's been worked up for you, all right?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I don't know Dr. Ratner's schedule. I'm sure it will be four to six weeks before he has an opportunity to speak with counsel. If he gets a draft of the brief as well or it's explained to him and he gets a break and can go see you, he then needs to generate a report, and I think he had been working on the report. I have no --

THE DEFENDANT: I'm welcome to see somebody else if it helps the Court, Your Honor. It doesn't have to be Dr. Ratner.

THE COURT: No, I want Dr. Ratner. He's already started it and has been working on it. We can't get a psychiatrist any sooner than that these days. They're all so busy, and he's a seasoned veteran in forensic psychiatry. So don't, unfortunately, expect that we'll be back here in three weeks. I wish we could, but that's being too optimistic.

If you want something, just write another letter to me. But I want you to wait until you get a draft of the brief, and I'll write you and tell you what progress I have made on getting you the discovery.

For now, I'll ask all counsel to remain in their present positions until further notice. Is there any objection to that, including Mr. Hundley? And as I've said, when I asked

Mr. Hundley to get involved in the case, I know that you were upset when he spoke to Pennsylvania counsel, but how's he going to understand how to advise you if he doesn't know what prior counsel has done?  He was just doing his job.  He's a wonderful veteran of serious cases that have gone on here in the Federal Court in Alexandria, and he's not a friend of the government. He's not a friend of the Court.  He's a lawyer who represents his clients very zealously, and he certainly wasn't trying to work on behalf of the Pennsylvania lawyers.  He was trying to understand what was going on.  So keep that in mind.  I don't know whether you want to have any further contact with Mr. Hundley.  I think that you should use him as a future resource, especially if you have legal questions and you still are not willing to speak with your Pennsylvania counsel.  It's an option for you, and I want you to keep an open mind about that, all right?

THE DEFENDANT:  I understand, Your Honor, but I want no more communication with the attorneys.

THE COURT:  Okay.

THE DEFENDANT:  I understand that he had to talk to the counsel, I understand that, but it's not that he talked to them, it's that he told them everything that I told him.  It's basically me versus the counselor right now.  I'm trying to get rid of them.  We're at opposite ends.  And so I have my game plan.  When I told him my game plan, and he goes and tells the counsel that, then it's a violation of my trust.  He talked to

counsel.  He told the counsel what I said.  That's not right.

THE COURT:  Okay.  I understand your problem with that, and if you make it clear to Mr. Hundley in the future that nothing that you tell him should be told to anybody else, he'll honor that, okay?  No doubt about that.  I think that must have been unclear to him.  All right.  Anything further this morning that we should raise?

MR. TRUMP:  Other than when we should meet again.

THE COURT:  I will contact Dr. Ratner and give him -- and ask him to contact Ms. Heisey.  Do you want him to contact you directly?

MS. HEISEY:  Yeah.  That would be great.  Thank you.

THE COURT:  And also any objection to him receiving a draft of the 2255 petition?

MR. TRUMP:  That's between you, Mr. Torrez, and counsel.  Whatever you want to give him is fine with us.

THE COURT:  Okay.  All right.  Ms. Heisey, do you have any objection to giving it to him?  Is it too much information?  I would like him to have both.

MS. HEISEY:  I think that will be fine.

THE COURT:  All right.  Then I'll tell them -- and can you send that to him, you know, in a confidential form?

MS. HEISEY:  Yes, yes.  Will do.

THE COURT:  All right.

MR. TRUMP:  Procedurally, we've been in a sort of

suspended stage, and we will continue that.  We've informed counsel that the government's agreement not to object to an out-of-time filing will continue through the end of these proceedings in determining what -- which way we will go, either with counsel or without counsel.  That remains the case.

THE COURT:  Thank you for that.  So, your right to file an appeal is preserved, even though the time for it has run.  But because of COVID and because of our present hearings, you're not -- you'll have the ability to file the petition in the future.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Well, thank you, all, for getting together in a little bit of short notice there, and I appreciate it very much, and I'll get whatever I can get from Dr. Ratner, and we'll communicate with you as soon as I know more and set up a future hearing date in conjunction with Dr. Ratner's schedule and your own, of course.  All right.  Thank you, all. We're in recess.

(Proceedings adjourned at 11:08 a.m.)

# C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace
-----------------------------
**Scott L. Wallace, RDR, CRR**
   **Official Court Reporter**

10/23/23
-----------------
    **Date**